UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| INTELLIVISION, a Joint Venture, | ) | |
| | ) | ECF CASE |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 07-CV-4079(JGK) |
| v. | ) | |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


# MEMORANDUM OF LAW OF PLAINTIFF INTELLIVISION
# IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS


LAW OFFICES OF BRUCE D. KATZ & ASSOCIATES

Bruce D. Katz, Esq.
225 Broadway – 37th Floor
New York, NY 10007
(212)233-3434

*Attorneys for Plaintiff*
Intellivision

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT   1

II. ARGUMENT   2

   A. The Applicable Legal Standard for Deciding
Motions Under Fed. R. Civ. P. 12(b)(6)   2

   B. Microsoft's Arguments Are Based Upon An Erroneous
Statement of The Facts Alleged in the Complaint   3

      1. MIcrosoft's Statute of Limitations Argument
Relies Upon a Misstatement of Facts Concerning
The Parties' Execution of Their Agreement   3

      2. Microsoft Has Misstated Facts Relating to Intellivision's Residence   6

      3. Microsoft Has Misstated Facts Relating to Intellivision's
Reasonable Reliance On Microsoft's Misrepresentations   7

   C. Intellivision Reasonably Relied on Microsoft's Misrepresentations   9

   D. Intellivision's Claims of Fraudulent Inducement and Mistake are not
Precluded by any of the Provisions of the Parties' Agreement   14

      1. A General Merger Clause Does Not Shield a Party From
The Consequences of its own Fraud   14

      2. Neither the "Release" Nor the "Disclaimer of Liability"
Clauses Bar Intellivision's Claim of Fraudulent Inducement   19

   E. Intellivision Did Not Ratify the Parties' Agreement   22

III. CONCLUSION   25

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page**

*422 W. 15th St., Inc. v. Estate of Johnson*,
    258 A.D. 227, 16 N.Y.S.2d 283 (1st Dep't 1939)                              24

*Allen v. Westpoint-Pepperell, Inc.*,
    11 F. Supp.2d 277 (S.D.N.Y. 1997)                                          25

*Allen v. Westpoint-Pepperell, Inc.*,
    945 F.2d 40 (2d Cir. 1991)                                                  2

*Antone v. General Motors Corp.*,
    64 N.Y.2d 20, 473 N.E.2d 742, 484 N.Y.S.2d 514 (1984)                      7

*Bank of Am. Corp. v. Lemgruber*,
    385 F. Supp.2d 200 (S.D.N.Y. 2005)                                         10, 11

*Bloss v. Va'ad Harabonim of Riverdale*,
    203 A.D.2d 36, 610 N.Y.S.2d 197 (1st Dep't 1994)                           21

*Bremen* v. *Zapata Offshore Co.*,
    407 U.S. 1, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972)                        20

*Bridge Capital Investors II v. Small*,
    144 Fed. Appx. 762, 2005 WL 1621046 (11th Cir. 2005)                       5

*Brooklyn Nat'l Bank of New York v. Werblow*,
    263 A.D. 884, 32 N.Y.S.2d 169 (2d Dep't 1942)                              21

*Buckeye Check Cashing Inc.* v. *Cardegna*,
    546 U.S. 440, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006)                   20

*Cantor Fitzgerald Inc. v. Lutnick*,
    313 F.3d 704 (2d Cir. 2002)                                                7

*Casey v. Masullo Brothers Builders, Inc.*,
    218 A.D.2d 907, 630 N.Y.S.2d 599 (3d Dep't 1995)                           11

*Cetnar v. Kinowski*,
    263 A.D.2d 842, 693 N.Y.S.2d 730 (3d Dep't 1999)                           17

*Chase v. Columbia National Corp.*,
    832 F. Supp. 654 (S.D.N.Y. 1984)                                           16

*Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*,
    88 A.D.2d 461, 453 N.Y.S.2d 750 (2d Dep't 1982)                            24

*Commercial Coin Laundry Sys. v. McGraw*,
    No. 256026, 2005 WL 3481459
    (Mich. December 20, 2005)     5

*Conley v. Gibson*,
    355 U.S. 41, 78 S. Ct. 99, 2 L. ED. 2d 80 (1957)     2

*Consolidated Edison, Inc. v. Northeast Utilities*,
    249 F. Supp.2d 387 (S.D.N.Y. 2003)     19

*Corva v. United Services Automobile Ass'n*,
    108 A.D.2d 631, 485 N.Y.S.2d 264 (1st Dep't 1985)     12

*Cucchiaro v. Cucchiaro*,
    165 Misc.2d 134, 627 N.Y.S.2d 224
    (Sup. Ct. Orange County 1995)     21

*Danann Realty Corp. v. Harris*,
    5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959)     16-18

*Dimon Inc. v. Folium, Inc.*,
    48 F. Supp.2d 359 (S.D.N.Y. 1999)     12, 17

*DuPont v. Perot*,
    59 F.R.D. 404 (S.D.N.Y. 1973)     25

*Dutton v. Glass*,
    No. 04 CV 3496, 2005 U.S. Dist. LEXIS 868
    (S.D.N.Y. January 20, 2005)     7

*Dynamics Corp. of Am. v. International Harvester Co.*,
    429 F. Supp. 341 (S.D.N.Y. 1977)     6

*Elfenbein v. Gulf & Western Indus.*,
    590 F.2d 445 (2d Cir. 1978)     1

*Faulkner v. Beer*,
    463 F.3d 130 (2d Cir. 2006)     2

*FDIC v. Frank L. Marino Corp.*,
    74 A.D.2d 620, 425 N.Y.S.2d 34 (2d Dep't 1980)     21

*Ferry v. Poughkeepsie Galleria Co.*,
    197 A.D.2d 913, 602 N.Y.S.2d 267 (4th Dep't 1993)     21

*Griffel v. Belfer*,
    10 N.Y.2d 902, 179 N.E.2d 518 (1961)     20

*Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,*
    748 F.2d 729 (2d Cir. 1984)    10, 18

*Goldsmith v. Nat'l Container Corp.,*
    287 N.Y. 438, 40 N.E.2d 242 (1942)    25

*Hanley v. Aperitivo,* No. 97 CV 5768,
    1998 WL 307376 (S.D.N.Y. June 11, 1998)    6

*Hanley v. Café Des Artistes, Inc.*, No. 97 CV 9360,
    1999 WL 688426 (S.D.N.Y. September 3, 1999)    6

*Harris v. Hallberg*,
    2007 NY Slip Op. 604, 36 A.D.3d 857,
    828 N.Y.S.2d 579 (2d Dep't 2007)    14

*Harsco Corp. v. Segui,*
    91 F.3d 337 (2d Cir. 1996)    18

*Jackson v. State,*
    210 A.D. 115, 205 N.Y.S. 658 (4th Dep't 1924)    13

*Janian v. Barnes*,
    294 A.D.2d 787, 742 N.Y.S.2d 445 (3d Dep't 2002)    17

*Kirsch v. Liberty Media Corp.,*
    449 F.3d 388, 392 (2d Cir. 2006)    2

*Koulajian v. Trek Bicycle Corp.*, No. 90 CV 3156,
    1992 WL 28884 (S.D.N.Y. 1992)    7

*Lazard Freres & Co. v Protective Life Ins. Co.,*
    108 F.3d 1531 (2d Cir. 1997)    11, 12

*Leon v. Murphy,*
    988 F.2d 303 (2d Cir.1993)    6

*Long Island Lighting Co. v. Transamerica Delval, Inc.*,
    646 F. Supp. 1442 (S.D.N.Y. 1986)    6

*Mallis v. Bankers Trust Co.,*
    615 F.2d 68 (2d Cir. 1980), *cert. denied*,
    522 U.S. 864, 118 S. Ct. 169, 139 L. Ed. 2d 1126 (1997)    11

*In re Marketxt Holdings Corp.*, Ch. 11 Case No. 04-12078,
    2006 Bankr. LEXIS 2746 (Bankr. S.D.N.Y. 2006)    17

*McLaughlin & Stern, L.L.P. v. Lipkin,*
    288 A.D.2d 65, 733 N.Y.S.2d 17 (1st Dep't 2001)      21

*Mercogliano Lumber Corp. v. Sea Cliff Homes, Inc.,*
    31 Misc.2d 1078, 221 N.Y.S.2d 920 (Sup. Ct., Queens County 1961)      25

*Nat'l Westminster Bank v. Ross,*
    676 F. Supp. 48 (S.D.N.Y. 1987)      22

*Nechis v. Oxford Health Plans, Inc.,*
    421 F.3d 96 (2d Cir. 2005)      2

*Oko v. Walsh*,
    2006 N.Y. Slip. Op. 2732, 28 A.D.3d 529,
    814 N.Y.S.2d 655 (2d Dep't 2006)      14

*OnBank & Trust Co. v. F.D.I.C.,*
    967 F. Supp. 81 (W.D.N.Y. 1997)      14

*Patell Indus. Mach. Co., Inc. v. Toyoda Machinery U.S.A., Inc.,*
    880 F. Supp. 96 (N.D.N.Y. 1995)      14

*Phoenix Racing Ltd. v. Lebanon Valley Auto Racing Corp.,*
    53 F. Supp. 2d 199 (N.D.N.Y. 1999)      25

*In re Ply\*Gem of Laurel, Inc.,*
    91 A.D.2D 513,
    456 N.Y.S.2d 382 (1st Dep't 1982)      5

*Royal Hair Pin Corp. v. Rieser Co., Inc.,*
    218 N.Y.S.2d 773 (Sup. Ct. Kings County 1961)      24

*Sabo v. Delman*,
    3 N.Y.2d 155, 164 N.Y.S.2d 714 (1957)      15-17, 20

*Schenck v. State Line Tel. Co.*,
    238 N.Y. 308 144 N.E. 592 (1924)      24

*In re Schick,*
    232 B.R. 589 (S.D.N.Y. 1999)      24

*Shah v. Consolidated Edison Corp.,*
    No. 05-Civ.-2868, 2006 WL 3155786
    (S.D.N.Y October 26, 2006)      1

*Sterling Nat'l Bank & Trust Co. of New York v. Giannetti,*
    53 A.D.2d 533, 384 N.Y.S.2d 176, 176 (1st Dep't 1976)      20

*Stryker v. Rusch*,
    8 A.D.2d 244, 187 N.Y.S.2d 663 (3d Dep't 1959)                                    17

*Stuart Silver Assoc., Inc. v. Baco Dev. Corp.*,
    245 A.D.2d 96, 665 N.Y.S.2d 415 (1st Dep't 1997)                             14

*Tahini Investments, Ltd. v. Bobrowsky,*
    99 A.D.2d 489, 470 N.Y.S.2d 431 (2d Dep't 1984)                        11-13

*Todd v. Pearl Woods, Inc.,*
    20 A.D.2d 911, 248 N.Y.S.2d 975 (2d Dep't 1964), *aff'd,*
    15 N.Y.2d 817, 205 N.E.2d 861, 257 N.Y.S.2d 937 (1965)           11, 12, 14

*Towers Realty Corp. v. Fox*,
    278 A.D. 74, 103 N.Y.S.2d 437 (1st Dep't 1951)                        24- 25

*Triangle Underwriters, Inc. v. Honeywell, Inc.*,
    604 F.2d 737 (2d Cir. 1979)                                                         6

*Weaver Organization, Inc. v. Manette*,
    41 A.D.2D 138, 341 N.Y.S.2d 631 (1st Dep't 1973)                          12

*Wells Fargo Bank Northwest v.  Taca Int'l Airlines,*
    247 F. Supp.2d 352 (S.D.N.Y. 2002)                                           19

*Yedlin v. Rubin*,
    219 A.D. 694, 220 N.Y.S. 545, (2d Dep't 1927),
    *aff'd,* 247 N.Y. 529, 161 N.E. 170 (1928)                                     24

*Yurish v. Sportini,* 123 A.D.2d 760, 507 N.Y.S.2d 234 (2d Dep't 1986)           13

**Statutes**

N.Y. C.P.L.R. §202                                                              6-7

**Other**

19A N.Y. Jur.2d Compromise, Accord and Release §103                     21

60A N.Y. Jur.2d Fraud and Deceit §226                                    21

60A N.Y. Jur.2d Fraud and Deceit §217                                    24

35A C.J.S. Federal Civil Procedure §399                                   1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| INTELLIVISION, a Joint Venture, | ) | |
| | ) | ECF CASE |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 07-CV-4079(JGK) |
| v. | ) | |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

_____

### MEMORANDUM OF LAW OF PLAINTIFF INTELLIVISION IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Intellivision submits this memorandum of law in opposition to the motion of defendant Microsoft Corporation ("Microsoft") to dismiss the Complaint filed by Intellivision in the above-captioned action on January 12, 2007.

### I.  PRELIMINARY STATEMENT

In an effort to be excused for defrauding Intellivision, Microsoft seeks to shift the blame to Intellivision for: (1) allowing itself to be defrauded by Microsoft; (2) ratifying the parties' fraudulently-induced Agreement and thereby waiving its right to recovery; and (3) filing its complaint *one day too late*.

Microsoft's otherwise compelling arguments are based upon its erroneous recitation of the facts alleged in the Complaint. When considered in light of the facts, as actually alleged, all of Microsoft's arguments collapse.[1]

_____

[1] Intellivision's Amended Complaint eliminates factual ambiguities in its Original Complaint that Microsoft seized on in its motion.  A motion to dismiss is not a responsive pleading.  Thus, leave to amend was not required.  *See Shah v. Consolidated Edison Corp.,* No. 05-Civ.-2868, 2006 WL 3155786 (S.D.N.Y. October 26, 2006) (citing *Elfenbein v. Gulf & Western Indus.,* 590 F.2d 445, 448 n. 1 (2d Cir.1978)).  *See also* 35A C.J.S. Federal Civil Procedure §399.

## II.  ARGUMENT

**A.      The Applicable Legal Standard For Deciding
Motions Under Fed. R. Civ. P. 12(b)(6)**

Microsoft's motion should be granted only if "'it appears beyond doubt that the plaintiff

can prove no set of facts in support of [its] claim which would entitle [it] to relief.'"  *Nechis v.*

*Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v. Gibson,* 355 U.S.

41, 45-46, 78 S. Ct. 99, 2 L. ED. 2d 80 (1957)).  When deciding a motion to dismiss, Courts must

accept all factual allegations in the complaint as true, and draw all reasonable inferences in

plaintiff's favor, *Kirsch v. Liberty Media Corp.,* 449 F.3d 388, 392 (2d Cir. 2006), and must limit

their analysis to "facts stated on the face of the complaint, in documents appended to the

complaint or incorporated in the complaint by reference, and to matters of which judicial notice

may be taken."  *Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 42 (2d Cir. 1991).  It is

permissible for the court to consider materials outside the record that were relied upon in drafting

the complaint or that are integral to a complaint only if the court has determined that there are no

disputes as to the authenticity, accuracy and relevance of such materials.  *Faulkner v. Beer*, 463

F.3d 130, 134 (2d Cir. 2006).

Intellivision's Original Complaint states valid causes of action for fraud and mistake.

Intellivision's Amended Complaint clarifies and expands on the allegations of its Original

Complaint, attaches a copy of the parties' Agreement, further states grounds for tolling, states

additional valid causes of action for negligent misrepresentation and breach of fiduciary duty, and

eliminates Intellivision's claim for "waste." [2]

---

[2] Intellivision did not attach a copy of the parties' Agreement to its Original Complaint because it
did not wish to be sued for ignoring the Agreement's Confidentiality Clause (¶8) in the unlikely
event the parties' fraudulently-induced Agreement is upheld by the Court.  By introducing a copy
of the Agreement itself, Microsoft it has waived any claim of confidentiality under ¶8.

**B.    Microsoft's Arguments Are Based Upon An Erroneous
Statement of The Facts Alleged In The Complaint**

Microsoft raises three principal arguments in support of its motion: (1) Intellivision could

not have reasonably relied on Microsoft's representations concerning its intended use of

Intellivision's technologies or its plans regarding interactive television because (a) the Agreement

contains no restrictions on Microsoft's use thereof, and (b) the alleged misrepresentations were

made *after* Intellivision executed the Agreement; (2) The Agreement contains three provisions that

bar any recovery to Intellivision -- a merger clause, a release, and a disclaimer of liability; and (3)

Intellivision's claims are time-barred by virtue of (a) unreasonable delay in filing suit, resulting in

ratification of the Agreement, and (b) New York's and/or Connecticut's statutes of limitations for

fraud claims.

As demonstrated below, Microsoft's arguments mischaracterize critical allegations of the

Complaint, ignore other critical factual allegations, and misapply the governing caselaw.

**1.    Microsoft's Statute of Limitations Argument
Relies Upon a Misstatement of Facts Concerning
The Parties' Execution of their Agreement**

Paragraphs 26- 27 of Intellivision's Original Complaint explicitly allege that Intellivision

executed the parties' Agreement on January 16, 2001.  Relying on the parties' Agreement,

Microsoft disputes this allegation and argues that Intellivision's principals executed the

Agreement five days earlier, on January 11, 2001.

Intellivision does not dispute the authenticity of the parties' Agreement.  However, it does

dispute Microsoft's allegation that the Agreement was finalized (or "executed") on January 11,

2006.  As discussed at ¶¶27-37 of Intellivision's Amended Complaint, only an *incomplete* copy of

the Agreement was signed by Intellivision and its members on January 11, 2006.  At that time, the

parties understood and agreed that complete or "integrated" agreement did not exist and was,

therefore, not executed by Intellivision.  A signed copy of the parties' complete Agreement was neither executed by Intellivision nor delivered to Microsoft until January 16, 2001.

Paragraph 1 of the parties' Agreement defines "Agreement" to mean "this document and attachments thereto."  The Agreement includes the body (pages 1-8) and Attachments A-C. Different portions of the parties' Agreement were prepared and signed on different dates.  (1) The "body" was signed by Intellivision on January 11, 2001 and retained in the possession of Intellivision until formal execution of the Agreement on January 16, 2001; (2) Attachments B and were signed on different dates.  The assignments of Attachment B were signed by John Daniels on December 13, 2000, Paul Hoffman on December 26, 2000, and Bruce Adams on December 28, 2000, and retained by Intellivision until formal execution on January 16, 2001; (3) Attachment C was neither agreed upon, completed, nor executed by Intellivision until January 16, 2001.

Upon execution of Attachment C, the complete Agreement, as executed by Intellivision's principals, was delivered to Microsoft for execution by an officer.  Execution by Microsoft occurred on January 19, 2001.  The first paragraph of the Agreement specifies that it not effective until the "date of the last signature below" – which was January 19, 2001.  Thus, Agreement was not complete until January 16, 2001 and was not enforceable until January 19, 2001.

Importantly, Attachment C specifies the requirements that must be met before Microsoft's obligation to pay $850,000 (45% of the full contract price under ¶¶3(a) and 3(B))  would be triggered.  An essential provision of the Agreement, Attachment C was neither finalized nor executed until January 16, 2001 – one day *after* Microsoft confirmed the misrepresentations that it had first made to Intellivision at its Web TV campus in 2000 and repeated throughout the remainder of 2000 and January 2001 (*See* Amended Complaint, ¶¶18-26).

Microsoft relies on the state court decision *In re Ply*Gem of Laurel, Inc.,* 91 A.D.2d 513, 456 N.Y.S.2d 382, 383 (1st Dep't 1982) to support its contention that the statute of limitations for

Intellivision's fraud claim began to run on January 11, 2001 and, thus, expired one day before Intellivision filed its Complaint on January 12, 2007. Since the parties' Agreement was not executed by Intellivision until January 16, 2001 and was not enforceable until January 19, 2001, this argument is incorrect.

Even if January 11, 2001 had been the effective date of the Agreement, Intellivision's claims would not be time-barred. Intellivision's cause of action for fraudulent inducement did not accrue until it gave consideration and thus suffered damage. Under ¶ 2.1 of the Agreement, Intellivision's assignment of its patent applications to Microsoft did not take effect until *after* Microsoft paid Intellivision the amount required under the Agreement. This did not occur until February 2001. *See* Amended Complaint, ¶44. Accordingly, Intellivision's Original Complaint was timely filed.

New York state courts have held that a cause of action for fraudulent inducement accrues upon "execution" of the contract.[3]  However, in actions pending in federal court, "[a]lthough state law furnishes the statute of limitations itself, the question of when the limitations period begins to run is determined by federal law." *Hanley v. Café Des Artistes, Inc.*, No. 97 CV 9360, 1999 WL 688426, *7 (S.D.N.Y September 3, 1999) (citing *Hanley v. Aperitivo,* No. 97 CV 5768, 998 WL 307376, *7 (S.D.N.Y June 11, 1998). Under federal law, the statute of limitations begins to run "when the plaintiff 'knows or has reason to know' of the injury that is the basis of the action." *Leon v. Murphy,* 988 F.2d 303, 309 (2d Cir.1993).

Courts in the Second Circuit have long held that a cause of action for fraudulent inducement of contract accrues when the contract has been fully executed and when the party

---

[3] Although no New York state court has addressed this issue, "execution" means execution sufficient to make the contract enforceable (e.g., the contract's effective date). *See, e.g., Commercial Coin Laundry Sys. v. McGraw*, 2005 WL 3481459, *1 (Mich. 2005) (limitations period commenced on "effective date" of contract); *Bridge Capital Investors II v. Small*, 144 Fed. Appx. 762, 763 2005 WL 1621046, *1 (11th Cir. 2005) (statute of limitations of fraudulent inducement claim began to run on date both parties executed agreement).

alleging fraud has given consideration and thus suffered damage. *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 748 (2d Cir. 1979) ("… for fraudulent inducement of contract; 'the cause of action accrues when the document is executed and when the party alleging fraud has given consideration and thus suffered damage.'"). *See also, Dynamics Corp. of Am. v. International Harvester Co.*, 429 F. Supp. 341, 355 (S.D.N.Y. 1977) (same); *Long Island Lighting Co. v. Transamerica Delval, Inc.*, 646 F. Supp. 1442, 1449 (S.D.N.Y. 1986) (same).

Intellivision's cause of action did not accrue until the assignment of its inventions occurred which, under ¶2.1 of the parties Agreement, did not occur until Microsoft made the payment required by ¶3(A) in February 2001.

### 2. Microsoft Has Misstated Facts Relating to Intellivision's Residence

In support of its argument that N.Y. C.P.L.R. §202, New York's borrowing statute, mandates application of Connecticut's three-year statute of limitations rather than New York's six-year limitations period, Microsoft argues that Intellivision was a resident of Connecticut at the time of contract execution and only *now* has an office in New York.

However, as explicitly alleged at ¶1 of Intellivision's Original Complaint (and expanded on in ¶1 of its Amended Complaint), Intellivision had offices in New York City *and* Connecticut (and was thus a resident of both states) before, during, and after it negotiated and entered into its Agreement with Microsoft - -and until today.

Pursuant to N.Y. C.P.L.R. §202, an action filed by a *nonresident* plaintiff, seeking to recover for causes of action arising outside of New York, "requires application of the shorter statute of limitations period as well as all applicable tolling provisions, provided by either New York or the state where the cause[s] of action accrued." *Dutton v. Glass*, No. 04 CV 3496, 2005 U.S. Dist. LEXIS 868, * (S.D.N.Y. January 20, 2005) (citing *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002)).  Thus, C.P.L.R. §202 is invoked only when a non-resident

plaintiff sues in New York over a cause of action that accrued out of state.  Section 202 has no

application here because Intellivision was a resident of New York before, during and after the

parties entered into their Agreement, and its members suffered injury in New York.  That

Intellivision also had a residence in Connecticut is of no moment.  Although a party can have but

one domicile, it can have more than one residence.  *See, e.g., Koulajian v. Trek Bicycle Corp.*, No.

90 CV 3156, 1992 WL 28884, *3 (S.D.N.Y. February 11, 1992) (New York draws a distinction

between residency and domicile for purposes of the borrowing statute … Trek also concedes that a

person can be a resident of more than one state") (citing *Antone v. General Motors Corp.*, 64

N.Y.2d 20, 473 N.E.2d 742, 484 N.Y.S.2d 514, 571-18 (1984)).

### 3.    Microsoft Has Misstated Facts Relating to Intellivision's Reasonable Reliance On Microsoft's Misrepresentations

Microsoft argues that Intellivision could not have reasonably (or possibly) relied on

Microsoft's alleged misrepresentations because Intellivision's members executed the parties'

Agreement on January 11, 2001 – four days *before* Microsoft is alleged to have made its

fraudulent representations.  Microsoft's argument is unavailing, in part, because Intellivision did

not execute a copy of a complete or enforceable Agreement until January 16, 2001 – one day *after*

Microsoft restated the misrepresentations it had earlier made in 2000.  As alleged at ¶¶18-19 of the

Original Complaint and expanded on in ¶¶18-26 of the Amended Complaint, Intellivision relied

on representations made throughout 2000 and January 2001, which were confirmed by Microsoft

on January 15, 2001, the day before Intellivision signed Attachment C and delivered the parties'

signed Agreement to Microsoft.  Thus, the facts alleged in Intellivision's Original and Amended

Complaints, which must be taken as true, belie Microsoft's arguments.

At pages 8-9 of its Memorandum, Microsoft further argues that, as a matter of law,

Intellivision could not have reasonably relied on any misrepresentations made by Microsoft

concerning its intended use of Intellivision's technologies or its plans regarding interactive television – because no such representations are contained in the parties' Agreement.

Microsoft contends that if Intellivision intended to restrict Microsoft's otherwise unfettered ability to use the assigned technologies, it was incumbent on Intellivision to insist on restrictive language in the parties' Agreement.  In the absence of any restrictive language, Microsoft was permitted to use the assigned technologies any way it pleased.  Thus, according to Microsoft, Intellivision cannot demonstrate reasonable reliance.

Microsoft's seemingly convincing arguments are based entirely on a "straw man." Intellivision does not allege that it relied on Microsoft's representations that it would not use the assigned technologies.  Intellivision simply relied on Microsoft's repeated representations that it had not *already* produced products embodying Intellivision's core technologies.  Intellivision specifically advised Microsoft that if it had already developed a product, or was in the process of developing such a product, a per-unit royalty would be essential.  Since Microsoft repeatedly assured Intellivision that it had not already developed and was not in the process of developing such a product, a per-unit royalty was entirely unworkable.[4]  According to Microsoft, no tangible product was then in existence, or envisioned, from which a royalty rate could be determined. Intellivision assigned technologies that could be embodied in hundreds of products.  In the absence of any existing or planned product, there was simply no way for the parties to fashion a royalty.

In summary, Microsoft's misrepresentations were *not* related to its future use of the assigned technologies, but to its previous or ongoing development of one or more products embodying the assigned technologies.  Because of Microsoft's material misrepresentations,

---

[4] Since Microsoft was a software producer and had not historically introduced hardware devices like the "Ultimate TV®" set-top box, Intellivision's reliance on Microsoft's representation that it had not developed such a hardware device was reasonable.

Intellivision agreed to forego a per-unit royalty on the products that Microsoft had already developed and was in the process of developing.[5]

Accordingly, Microsoft's argument that reasonable reliance cannot be demonstrated because of the absence of language in the parties' Agreement restricting Microsoft's use of the assigned technologies is entirely without basis. The material misrepresentations relied on by Intellivision concerned Microsoft's manner of *payment* for its acquisition of Intellivision's technologies and not a promise to refrain from use of the assigned technologies. Had the parties reached a verbal agreement that Microsoft would not use Intellivision's inventions, Intellivision would have required that understanding to be included in the parties' Agreement.

### C.    Intellivision Reasonably Relied on Microsoft's Misrepresentations

Under New York law, in evaluating whether a plaintiff has justifiably relied on an alleged misrepresentation, a Court may consider, for example, the sophistication and expertise of the plaintiff in financial matters, the existence of a fiduciary relationship, access to the relevant information, concealment of the fraud, and the opportunity to detect the fraud. *Bank of Am. Corp. v. Lemgruber,* 385 F. Supp.2d 200, 230 (S.D.N.Y. 2005).[6] New York law imposes an affirmative duty on *sophisticated investors* to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the businesses they are acquiring. *Id.* (citing *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to

---

[5] Microsoft's misrepresentations were egregious. Microsoft had, in fact, already developed such a product by January 2001. Since then, Microsoft has sold many millions of computers embodying Intellivision's core technologies – despite falsely representing that it had developed no such products. Significantly, Intellivision's core technologies have been incorporated into Microsoft's Windows Vista™ operating system which will reside on some 95% of all PCs sold on a worldwide basis. *See* Original and Amended Complaints, ¶14.

[6] These are disputed issues of fact that cannot be resolved in the context of the instant motion. Furthermore, the Amended Complaint contains allegations as to each of these factors which, when taken as true, mandate denial of Microsoft's motion.

critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.").

Microsoft attempts to liken this case to *Grumman* and its progeny by contending that Intellivision is too sophisticated to have relied on Microsoft's misrepresentations. However, this argument ignores the facts alleged in Intellivision's Original and Amended Complaints. As stated therein, Intellivision developed the inventions it assigned to Microsoft in a home office/laboratory located, at various times, in a barn, attic and basement. On the other hand, Microsoft (like the plaintiff in *Grumman*) is one of the world's largest and most profitable corporations. The facts alleged in Intellivision's Original and Amended Complaints do not support Microsoft's contention that the parties' Agreement was the result of an arm's-length negotiation between sophisticated parties. In any event, the relative sophistication of the parties is a factual issue that cannot be resolved in the context of a motion to dismiss.

Furthermore, Microsoft does not allege that Intellivision had access to its proprietary information. In the absence of such access, no amount of investigation by even the most sophisticated party would have revealed the false nature of Microsoft's representations. Microsoft alleges at Pg. 5, fn. 2 of its Memorandum that it announced the impending introduction of its "Ultimate TV" set-top box product to the press in October 2000. However, Intellivision's own Internet searches in 2000 and 2001 for any such products did not reveal the press release cited in Microsoft's Memorandum or any other publication relating to Microsoft's Ultimate TV or any similar product. *See* Amended Complaint, ¶25. Nor does Microsoft contend that the press release cited at fn. 2 of its Memorandum was posted to the Internet in October 2000.[7]

---

[7] Even if the press release cited in Microsoft's brief was available for viewing on the Internet in October 2000, a July 18, 2007 search of Microsoft's press release website revealed that there were more than 427 press releases issued by Microsoft from June 2000 through January 2001 (among millions of other articles concerning Microsoft). Intellivision was certainly not obligated to study the overwhelming amount of publicly available information relating to Microsoft, one of the

"[W]hen matters are held to be peculiarly within defendant's knowledge, it is said plaintiff may rely without prosecuting an investigation, as he has no independent means for ascertaining the truth." *Lemgruber, supra,* 385 F. Supp.2d at 230-31 (citing *Lazard Freres & Co. v Protective Life Ins. Co.,* 108 F.3d 1531, 1542 (2d Cir. 1997); *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir. 1980), *cert. denied*, 522 U.S. 864, 118 S. Ct. 169, 139 L. Ed. 2d 1126 (1997); *Tahini Investments, Ltd. v. Bobrowsky,* 99 A.D.2d 489, 490, 470 N.Y.S.2d 431, 433 (2d Dep't 1984); *Todd v. Pearl Woods, Inc.,* 20 A.D.2d 911, 248 N.Y.S.2d 975 (2d Dep't 1964) (plaintiff justifiably relied on misrepresentations of facts "peculiarly within the knowledge of defendants" even though plaintiffs could have ascertained the truth through inspection of public records), *aff'd*, 15 N.Y.2d 817, 205 N.E.2d 861, 257 N.Y.S.2d 937 (1965)). *See also Casey v. Masullo Brothers Builders, Inc.*, 218 A.D.2d 907, 630 N.Y.S.2d 599 (3d Dep't 1995) ("If, however, as plaintiffs contend, 'the facts were peculiarly within the knowledge of the defendant[] and were willfully misrepresented, [then] failure of [a purchaser] to ascertain the truth by inspecting the public records [will] not [be] fatal'").

Under New York law, a person has the right to rely on representations, where, as is the case here, the party making the representations has superior knowledge of the subject matter of the transaction. *See Corva v. United Services Automobile Ass'n,* 485 N.Y.S.2d 264, 266 (1st Dep't 1985). Thus, New York courts have consistently and correctly refused to tolerate a doctrine that would allow tortfeasors to make material misrepresentations and then escape liability on the ground that their victims, had they only been more diligent, could have uncovered and avoided the fraud. *See, e.g., Weaver Organization. Inc. v. Manette,* 41 A.D.2d 138, 341 N.Y.S.2d 631 (1st Dep't 1973). *See also, Dimon Inc. v. Folium, Inc.*, 48 F. Supp.2d 359, 368-69 (S.D.N.Y. 1999) ("The New York cases recognize that the peculiar knowledge exception applies not only where the

---

world's largest companies, as part of its due diligence efforts. Not even the most sophisticated entities have ever been held to such a high standard.

facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty") (citing *Tahini, supra,* 470 N.Y.S.2d at 432-33) (reliance arguably justified where plaintiff had no practical way of knowing that purchased land had been used as industrial waste dump) and *Todd, supra,* 248 N.Y.S.2d at 977 (facts discoverable by review of public records held peculiarly within defendant's knowledge)). *See also Lazard, supra,* 108 F.3d at 1542 & n.9.

The truth about Microsoft's development efforts at the time the parties negotiated and entered into their January 2001 agreement was "peculiarly within the knowledge of" Microsoft. Intellivision could not have discovered the truth by simply conducting a due diligence review of documents Microsoft made available to Intellivision – in fact, Microsoft made no such documents available to Intellivision. Nor could Intellivision have reviewed the infinite amount of information on the Internet relating to Microsoft to uncover the truth. Without knowing that Microsoft intended to introduce a product named "Ultimate TV®", Intellivision would have had no ability to focus its search. Since Microsoft falsely represented that no such products had been developed, Intellivision had no choice but to assume that there were no documents for it to review concerning any such products. Intellivision most assuredly could not review all of Microsoft's internal development records. In view of the enormity of Microsoft's development efforts, had Intellivision undertaken to so that in 2002, such endeavor would likely be still be underway. In view of the enormous amount of publicly available information relating to Microsoft (online and elsewhere), and Microsoft's enormous amount of internal records, the task of uncovering Microsoft's misrepresentations would have been extraordinarily difficult. Although Intellivision certainly did review information concerning Microsoft's existing and upcoming products, it did not happen along the press release cited in Microsoft's brief or any similar information.

In any event, whether or not Intellivision had access to any information that revealed Microsoft's misrepresentations is, of course, a disputed factual issue that cannot now be resolved as a matter of law. *See, e.g., Jackson v. State,* 210 A.D. 115, 205 N.Y.S. 658 (4th Dep't 1924) (although a sophisticated buyer, access was limited); *Tahini, supra* (triable issue of fact whether buyer could have ascertained that industrial waste drums were buried on the property bought); *Yurish v. Sportini,* 123 A.D.2d 760, 507 N.Y.S.2d 234 (2d Dep't 1986) (gross receipts of delicatessen business in the peculiar knowledge of sellers where buyer alleged it had "virtually no way of confirming" seller's representations); *OnBank & Trust Co. v. F.D.I.C.,* 967 F. Supp. 81, 86 (W.D.N.Y. 1997) (although a sophisticated buyer, a question of fact whether information was made available during due diligence and whether the loan irregularities would have been detected anyway); *Patell Indus. Mach. Co., Inc. v. Toyoda Machinery U.S.A., Inc.,* 880 F. Supp. 96, 98 (N.D.N.Y. 1995) (a question of fact whether in peculiar knowledge where substantial cost to fly out to inspect machinery and inspection might not have disclosed problem).

None of the cases relied on by Microsoft are relevant. In *Harris v. Hallberg*, 2007 NY Slip Op. 604, 36 A.D.3d 857, 828 N.Y.S.2d 579 (2d Dep't 2007) and *Oko v. Walsh*, 2006 N.Y. Slip. Op. 2732, 28 A.D.3d 529, 814 N.Y.S.2d 655 (2d Dep't 2006), the plaintiffs alleged reliance on oral representations that were contracted by the express terms of their written agreements. For instance, in *Oko,* the complaint alleged reliance on an oral representation of loan approval based on a mortgage pre-approval certificate issued by the defendant-appellant. The Court held that such reliance was unreasonable in light of the clear, written and contradictory provision in the mortgage pre-approval certificate stating that the pre-approval did not constitute a loan approval or commitment. In *Harris,* the Court held that an attorney's reliance on an oral representation made by the defendant was unreasonable in light of a flatly contradictory provision in the parties' written agreement.

*Stuart Silver Assoc., Inc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 665 N.Y.S.2d 415 (1st Dep't 1997), is equally inapposite.  There, the Court held that a sophisticated real estate investor's reliance on oral representations was unreasonable in light of, *inter alia,* the investor's failure to review any of the offering materials, consult with an attorney and/or accountant, or even visit the property.

Intellivision has not alleged reliance on oral representations that conflict with any terms of the parties' written Agreement.  Nor did Intellivision fail to conduct any form of due diligence. Intellivision's principals conducted online searches of Microsoft's products to determine Microsoft's veracity; and, on multiple occasions, Intellivision's principals specifically questioned Microsoft as to whether it had already developed, was in the process of developing, or planned to develop or introduce any products utilizing Intellivision's "core technologies."  Each time, Microsoft falsely advised Intellivision that it had not.

> **D.    Intellivision's Claims of Fraudulent Inducement and Mistake are not Precluded by any of the Provisions of the Parties' Agreement**

Microsoft seeks to evade liability for its fraud (and mistake) by invoking three provisions of the parties' Agreement: (1) the Merger Clause (¶9.7); (2) the Release (¶5); and (3) the "Disclaimer of Liability" (¶6.6).

> **1.  A General Merger Clause Does Not Shield a Party From The Consequences of its own Fraud**

Microsoft argues that it should not be held accountable for defrauding Intellivision because it included a *General* Merger Clause at Paragraph 9.7 of the parties' Agreement.

The New York Court of Appeals rejected precisely the same argument in a factually analogous case involving the assignment of patent rights.  The Court held that a general merger clause does not shield a party from acts of fraud.  *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714 (1957).  Were the law otherwise, "a defendant would have it in his power to perpetrate a fraud

with immunity, depriving the victim of all redress, if he simply has the foresight to include a merger clause in the agreement. Such, of course, is not the law." *Sabo,* 3 N.Y.2d at 161.[8] Accordingly, "the parol evidence rule has no application in a suit brought to rescind a contract on the ground of fraud. In such a case, it is clear, evidence of the assertedly fraudulent oral misrepresentation may be introduced to avoid the agreement." *Id.* 3 N.Y.2d at 161.

Likewise, a general merger clause – stating that no verbal undertakings or conditions not contained in the writing are to be binding on either party – does not prohibit the introduction of parol evidence to show fraudulent inducement. *Id. See also, Chase v. Columbia National Corp.*, 832 F.Supp. 654, 662 (S.D.N.Y. 1984) ("A statement in a contract that the written instrument embodies the whole agreement and that all prior understandings between the parties merge into the written agreement merely prevents one party from alleging oral misrepresentations which directly contradict the language of the agreement signed by the party. The "merger" clause … is only contractual boilerplate which … cannot be stretched into an acknowledgement that Columbia was not relying on any representations made by the Plaintiffs concerning the financial condition of Witte Chase"). The merger clause on which Microsoft seeks to rely is virtually identical to that in *Chase* (and *Sabo*) and also "cannot be stretched into an acknowledgement" that Intellivision was not relying on any representations made by Microsoft concerning its actual development of products embodying Intellivision's core technologies in reaching a decision to forego a per-unit royalty. *See also,* all cases cited by Intellivision at pages 11-14 herein. In each cited case, courts discussed the foregoing general rule.

Microsoft's reliance on *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) is entirely misplaced. In *Danann Realty,* the Court of Appeals conditioned

---

[8] The plaintiff in *Sabo,* like here, alleged that he was fraudulently induced to assign his patent rights to the defendant based on the defendant's false representations as to his intention to develop and promote of the patented technology.

the general rule of *Sabo* upon the further principle that where a party "specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon."  5 N.Y.2d at 320-31.

In *Danann Realty*, the parties' contract for the purchase of a lease on a building explicitly stated that the seller had not "made … any representations as to the … expenses [or] operation … [of the building] and the Purchaser hereby expressly acknowledges that no such representations have been made."  5 N.Y.2d at 320.  When the purchaser sought a remedy claiming that it had been fraudulently induced to enter into the agreement based on misrepresentations concerning issues of building operation and expenses, the New York Court of Appeals held that the disclaimer "destroys the allegations in plaintiffs complaint that the agreement was executed in reliance upon … contrary oral representations." *Id.* at 320-21.  *Danann Realty* involved a situation in which the plaintiff had in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded.  *See also In re Marketxt Holdings Corp.*, 2006 Bankr. LEXIS 2746 (Bankr. S.D.N.Y. 2006) (The basic rule under New York law with respect to the effect of a merger clause is that 'a general merger clause is ineffective to exclude parol evidence to show fraud in inducing the contract,' or stated differently, 'where the complaint states a cause of action for fraud, the parol evidence rule is not a bar to showing the fraud - either in the inducement or in the execution - despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made.') (citing *Danann Realty,* 5 N.Y.2d at 320; *Sabo,* 3 N.Y.2d at 160-61).  *See also, Dimon, Inc. v. Folium, Inc.,* 48 F. Supp. 2d 359, 367 (S.D.N.Y. 1999); *Cetnar v. Kinowski*, 263 A.D.2d 842, 693 N.Y.S.2d 730 (3d Dep't 1999); *Janian v. Barnes*, 294 A.D.2d 787, 742 N.Y.S.2d 445 (3d Dep't 2002); *Stryker v. Rusch*, 8 A.D.2d 244, 187 N.Y.S.2d 663 (3d Dep't 1959).

16

The *Danann* rule is inapplicable to this case because the parties' Agreement contains only a boilerplate general merger clause and lacks a *specific disclaimer* of any type. Thus, the merger clause of the parties' Agreement does not serve as a bar to Intellivision's claims of fraudulent inducement and mistake.

All of the cases relied on by Microsoft are inapposite for the same reasons stated in Section C above:: all involved situations where the party alleging fraud had been informed, or easily could have informed itself, of the facts allegedly misrepresented. In *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729 (2d Cir.1984), the Court found that "records accurately disclosing the defects that surfaced during testing were turned over to Grumman," and that "in light of undisputed evidence demonstrating that Grumman enjoyed unfettered access to Flexible's plants, personnel and documents [and] that it possessed the legal, technical and business expertise necessary to make effective use of that access," the purchaser could not have justifiably relied upon the alleged misrepresentations, *Grumman,* 748 F.2d at 733, 737. As to Grumman's arguments concerning the agreement's general merger clause, the Court pointed out that the documentation provided to Grumman, along with the seller's extensive disclaimers, including a disclaimer of "of the implied warranties of title, merchantability and fitness for intended use" on new design for bus were effective against Grumman's suit alleging misrepresentations about defects in the bus design.

Nor is *Harsco Corp. v. Segui,* 91 F.3d 337, 345 (2d Cir. 1996) on point. In *Harsco,* the Court found that the opportunity given to the plaintiff to have verified all of the defendant's verbal representations and the inclusion of sections 2.05 and 7.02 in the parties' agreement (including fourteen pages of exhaustive representations), precluded the plaintiff from establishing reasonable reliance on alleged verbal misrepresentations not contained in the agreement. The Court in *Harsco* dismissed the fraud claim because the parties were sophisticated and "the exhaustive

17

nature of the Section 2.04 representations add[ed] to the specificity of Section 2.05's disclaimer of other representations." *Id. at 345*.  However, the Court explicitly pointed out that, "under different circumstances (e.g., if there were but one vague seller's representation), a "no other representations" clause might be toothless .. But not here"  *Id.* at 344.

Similarly, in *Wells Fargo Bank Northwest v.  Taca Int'l Airlines,* 247 F. Supp.2d 352, 369 (S.D.N.Y. 2002), the Court found that a sophisticated contracting party could not have reasonably relied on representations relating to maintenance costs of purchased airplanes since the purchase agreement expressly stated that the purchaser was not relying on any promises or representations concerning "airworthiness, value, durability, compliance with specifications, condition, operation, fitness for use for a particular purpose, and absence from defects."  The Court pointed out that an airplane's maintenance costs are, in large part, dependent upon its "condition."

Likewise, the facts of this case are entirely different from those of *Consolidated Edison, Inc. v. Northeast Utilities*, 249 F.Supp.2d 387 (S.D.N.Y. 2003), which involved a failed multi-billion dollar merger utility companies rather than a corporate giant's (Microsoft) purchase of patent applications from three individuals engaged in an unincorporated joint venture (Intellivision).  Unlike Intellivision, Consolidated Edison is "one of the nation's largest investor-owned electric and gas utilities … has extensive knowledge and experience in the field of electric generation, transmission, and distribution … [and is a] sophisticated commercial entity with experience in merger and acquisition transactions, including the associated due diligence." 249 F. Supp.2d at 391.

When Consolidated Edison approached the defendant to express interest in purchasing it, the parties executed a written confidentiality agreement governing the due diligence period during which Consolidated Edison could learn more about the defendant and further evaluate the potential merger.  249 F. Supp.2d at 392.  The confidentiality agreement provided that only

representations made in a definitive agreement would have any legal effect, and that "*neither Party nor any Representative of either Party makes any representation or warranty, either express or implied, as to the accuracy or completeness of any Evaluation Material ... Each Party agrees that it is not entitled to rely on the accuracy or completeness of the Evaluation Material".*

The foregoing was followed by a nearly three-month due diligence period during which time Consolidated Edison was provided with virtually unrestricted access to the defendant's facilities and proprietary and financial records.  When the acquisition failed to become as profitable as anticipated, Consolidated Edison alleged that it fell victim to misrepresentations made by the defendant.  This Court rejected Consolidated Edison's arguments because the parties' agreement incorporated the confidentiality agreement whereby Consolidated Edison had expressly disclaimed reliance upon any "Evaluation Material" -- which was defined by the agreement to include all representations made during the due diligence period.[9]

### 2.   Neither the "Release" Nor the "Disclaimer of Liability" Clauses Bar Intellivision's Claim of Fraudulent Inducement

Microsoft further argues that the release provision (¶5) and the "disclaimer of liability" (¶6.6) of the parties' Agreement constitute a waiver of Intellivision's right to claim that it was fraudulently induced to sign the Agreement.

Under New York law, this is not the case.  Neither a waiver nor a release of rights precludes a party from claiming fraud in the inducement of the very instrument by which the party waived his rights.  *Sabo, supra,* 143 N.E.2d at 909 ("…a written waiver *in any form* cannot operate to shield a party from his own fraud.  For the courts to give effect to such a clause would be violative of both public policy and morality, since an ultimate finding of fraud must of

---

[9] Microsoft's reliance on *Buckeye Check Cashing Inc.* v. *Cardegna,* 546 U.S. 440,445-46 (2006) and *Bremen* v. *Zapata Offshore Co.,* 407 U.S. 1, 9-15 (1972) is entirely misplaced.  In both cases, courts enforced arbitration clauses in contracts claimed to have been fraudulently induced.  In New York, a general claim of fraudulent inducement does not invalidate an arbitration or forum selection clause.  However, it does defeat a general merger clause and a release.

necessity vitiate the contract relied upon").  *See also Sterling Nat'l Bank & Trust Co. of New York v. Giannetti,* 53 A.D.2d 533, 384 N.Y.S.2d 176, 176 (1st Dep't 1976).

*Griffel v. Belfer,* 10 N.Y.2d 902, 179 N.E.2d 518 (1961) is closely analogous to the facts herein.  The plaintiff sold a tract of land to a purchaser in exchange for an up-front payment and a 1/32 percentage of profits earned in mineral rights.  Some time later, the defendant falsely advised the plaintiff that he had found only "dry holes" and persuaded the plaintiff to forego any profits mineral rights in exchange for $50 and a general release.  However, the defendant actually found a source of gas underlying the land and was engaged in contract negotiations worth as much as $100,000,000.  The release was summarily discarded and held to be no bar to the plaintiff's claim of fraudulent inducement.

Numerous other cases have reaffirmed the basic principle that a general contractual waiver of rights does not waive the right to claim fraudulent inducement. *See, e.g., McLaughlin & Stern, L.L.P. v. Lipkin,* 288 A.D.2d 65, 733 N.Y.S.2d 17 (1st Dep't 2001) (former law firm partner who executed a release could attack the release on the basis of fraud, where he alleged that his former partner had secretly diverted a fee); *Bloss v. Va'ad Harabonim of Riverdale,* 203 A.D.2d 36, 610 N.Y.S.2d 197, 198 (1st Dep't 1994) ("A release, even though properly executed, may, nonetheless, be void.  Where fraud or duress in the procurement of a release is alleged, a motion to dismiss should be denied"); *Ferry v. Poughkeepsie Galleria Co.,* 197 A.D.2d 913, 602 N.Y.S.2d 267, 268 (4th Dep't 1993) ("Although plaintiffs' commercial lease contained a provision waiving the right to trial by jury of any action arising out of that lease, that waiver does not apply to plaintiffs' causes of action alleging that plaintiff Ferry was induced to enter into the lease agreement by defendant's fraudulent misrepresentations."); *FDIC v. Frank L. Marino Corp.,* 74 A.D.2d 620, 425 N.Y.S.2d 34, 35 (2d Dep't 1980) ("A waiver of the right to assert a setoff or counterclaim is not against public policy and has been enforced by this court. However, such a waiver will not be

20

enforced so as to bar a viable setoff or counterclaim sounding in fraud." (citation omitted));

*Brooklyn Nat'l Bank of New York v. Werblow,* 263 A.D. 884, 884-85, 32 N.Y.S.2d 169 (2d Dep't

1942) ("Obviously the setting up of the compromise agreement as a bar to the first cause of action

does not avoid plaintiff's right to recover, since plaintiff's claim is for damages sustained by reason

of defendant's fraud in inducing plaintiff to execute the compromise agreement and necessarily is

predicated upon the fact that the compromise agreement and all its provisions are valid and

binding …This release does not purport to release the cause of action averred in the complaint. On

the contrary, it constitutes a part of the very foundation of the cause of action alleged." (citation

and internal quotation marks omitted)); *Cucchiaro v. Cucchiaro,* 165 Misc.2d 134, 627 N.Y.S.2d

224, 227-28 (Sup. Ct. Orange County 1995) (holding that "plaintiff's waiver of equitable

distribution is binding only to the extent that the Court finds that the separation agreement was not

fraudulently induced"); *Nat'l Westminster Bank v. Ross,* 676 F.Supp. 48, 54 (S.D.N.Y. 1987)

(holding that defendant's allegation of fraud "supersedes his waiver of the right to assert

counterclaims"). *See also,* 19A N.Y. Jur.2d Compromise, Accord and Release §103 ("A releasor

is entitled to be relieved from the consequences of the release obtained by fraud,

misrepresentation, or deceit. A release obtained through fraud may on that basis be rendered

invalid." (footnotes omitted)); 60A N.Y. Jur.2d Fraud and Deceit §226 ("While a party who, after

having been defrauded, compromises the matter in relation to which fraud was committed with

full knowledge the fraud will be concluded by a valid compromise or settlement, he or she does

have the right to relief from the fraud, notwithstanding a settlement, where it appears that he or she

entered into the settlement without knowledge of the fraud." (footnotes omitted)).

Because it is so well established under New York law that a release is void if induced by

fraud, Intellivision's waiver of "any claims" against Microsoft does not preclude it from contesting

that provision as having been fraudulently obtained.

21

E.    **Intellivision Did Not Ratify the Parties' Agreement**

Microsoft argues that Intellivision ratified the parties' Agreement because it became aware of Microsoft's misrepresentations "within a few weeks" after executing the parties' Agreement yet did not seek to rescind the agreement for six years. This is entirely untrue.

Although ¶¶28-29 of Intellivision's Original Complaint alleges on information and belief that Microsoft introduced a product one week after executing the parties' Agreement, the Complaint does not allege that Intellivision became aware of that product one week after entering into the Agreement. Nor did Intellivision merely sit on its rights for six years before filing this lawsuit. Microsoft and its counsel misled Intellivision by lulling it into a false sense of security as to its rights and caused Intellivision to delay the filing of this lawsuit.

As alleged in greater detail at ¶¶42-52 of Intellivision's Amended Complaint, after Intellivision became aware of Microsoft's misrepresentations and complained to Microsoft about its fraud in 2002, Microsoft further fraudulently induced Intellivision to defer filing a lawsuit by persuading Intellivision that it would be better off financially if it did not sue.

Specifically, although Microsoft made the first payment required by ¶3(A) of the Agreement in February 2001, ¶3(B) sets forth a second payment requirement of $850,000 (approximately 45% of the full contract price) that is triggered upon allowance by the Patent Office of a claim having the language set forth in Attachment C to the parties' Agreement. To dissuade Intellivision to refrain from earlier seeking rescission and/or damages, Microsoft lulled Intellivision into a false sense of security by pointing out that its Ultimate TV® set-top box had been permanently discontinued and had been a huge financial loss to Microsoft. To further persuade Intellivision, Microsoft and its attorneys falsely informed Intellivision repeatedly throughout 2003-2005 that the Patent Office Examiner in charge of handling the Intellivision patent applications indicated that he would allow a claim having the language set forth in

22

Attachment C.  Microsoft repeatedly assured Intellivision that the Examiner would allow the claim and simply required additional information from Microsoft in order to do so.  For instance, on one occasion, Microsoft advised Intellivision that the Examiner merely required a supplemental affidavit stating that the acts constituting Intellivision's reduction to practice of the claimed invention occurred in the United States.

Thus, Intellivision was informed, and believed, that an additional payment of $850,000 was a certainty.  Furthermore, Intellivision believed that Microsoft's pre-existing use of the assigned technologies extended only to the discontinued Ultimate TV® product.  In an effort to mitigate its damages, Intellivision relied on the representations of Microsoft and its attorneys and decided to delay the filing of a lawsuit.  Intellivision's decision to refrain from earlier filing this lawsuit was based entirely on assurances from Microsoft about its product development and assurances from Microsoft attorneys that the Patent Office would be allowing a patent claim having language set forth in Attachment C.

However, while Microsoft was making the foregoing representations to Intellivision, it was concealing from Intellivision the fact that it had already developed a software version of its Ultimate TV® product which was incorporated into the Windows Operating System.  Microsoft knew that such a development was a material consideration to Intellivision and, despite this, concealed it from Intellivision.

Microsoft's assurances were all false and were made for the purpose of convincing Intellivision not to file suit.  On information and belief, the Patent Examiner never advised or lead Microsoft attorneys to believe that he would allow a claim having the language set forth in Attachment C.  In fact, the Examiner's repeated rejection of that claim was upheld by the Patent Office Board of Appeals in July 2006.  However, Intellivision was unaware of this because

Microsoft did not provide Intellivision with copies of documents filed with and received from the Patent Office, as the parties' Agreement required it to do.

Intellivision was persuaded to delay filing this lawsuit based on misrepresentations made to Intellivision by Microsoft and its attorneys concerning allowance of the claim of Attachment C and Microsoft's development efforts.

It was not until October 2006 that Intellivision learned that Microsoft had lost a Patent Office appeal of the Examiner's rejection of a claim having the language set forth in Attachment C and of Microsoft's impending release of its Windows Vista™ Operating System which incorporates some of Intellivision's core inventions. Intellivision quickly obtained the undersigned counsel, who diligently filed suit three months later, on January 12, 2007.

Microsoft argues that Intellivision waited too long to seek rescission. However, when the defendant is responsible for a plaintiff's delay in seeking rescission, the defendant is estopped from relying on such delay. *See, e.g., Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 47 (2d Cir. 1991) ("An action for rescission must be initiated without unreasonable delay, *Schenck v. State Line Tel. Co.*, 238 N.Y. 308, 313, 144 N.E. 592, 594 (1924), unless the delay is caused by the party against whom rescission is sought, *Yedlin v. Rubin*, 219 A.D. 694, 699, 220 N.Y.S. 545, 549-50 (2d Dep't 1927), *aff'd*, 247 N.Y. 529, 161 N.E. 170 (1928). At this point in the litigation, however, there is little evidence probative of the reasonableness of any delay in bringing this action").

Even if Intellivision is found to have ratified the Agreement, its claims for damages cannot be dismissed. Under New York law, "a plaintiff is not precluded from bringing an action for damages for fraud or deceit although he or she has affirmed the contract subsequent to discovering the fraud. 60A N.Y. Jur.2d Fraud and Deceit §217. *See, e.g., DuPont v. Perot,* 59 F.R.D. 404, 410 (S.D.N.Y.1973) (quoting *Goldsmith v. Nat'l Container Corp.,* 287 N.Y. 438, 40 N.E.2d 242,

244 (1942)). *See also In re Schick,* 232 B.R. 589 (S.D.N.Y. 1999); *Allen v. Westpoint-Pepperell, Inc.,* 11 F. Supp. 2d 277 (S.D.N.Y. 1997); *Phoenix Racing Ltd. v. Lebanon Valley Auto Racing Corp.,* 53 F. Supp. 2d 199 (N.D.N.Y. 1999); *Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.,* 88 A.D.2d 461, 453 N.Y.S.2d 750 (2d Dept. 1982); *Towers Realty Corp. v. Fox*, 278 A.D. 74, 103 N.Y.S.2d 437 (1st Dep't 1951); *Royal Hair Pin Corp. v. Rieser Co., Inc.,* 218 N.Y.S.2d 773 (Sup. Ct. Kings County 1961).

Further, New York courts have held that affirmance of a contract is not necessarily affirmance and ratification of the fraud inducing it. Waiver of the cause of action for inducing the contract by fraud is a matter of intention, and an issue of fact to be established on trial. *See, e.g., Royal Hair Pin Corp.; 422 W. 15th St., Inc. v. Estate of Johnson*, 258 A.D. 227, 228, 16 N.Y.S.2d 283, 284 (1st Dep't 1939); *Towers Realty Corp., supra*; and *Mercogliano Lumber Corp. v. Sea Cliff Homes, Inc.,* 31 Misc.2d 1078, 221 N.Y.S.2d 920 (Supreme Court, Queens County, 1961).

Accordingly, Intellivision's delay in filing suit is a factual issue that cannot now be resolved.  Thus, Intellivision's claim for rescission based on fraud and mistake should not be dismissed.  However, in the unlikely event this Court grants Microsoft's motion, Intellivision has a valid claim for damages for the same reason.

### III.  CONCLUSION

For all of the foregoing reasons, Intellivision respectfully submits that Microsoft's motion to dismiss should be denied in its entirety.

Dated: July 19, 2007                    Respectfully submitted,

                                        LAW OFFICES OF BRUCE D. KATZ &
                                        ASSOCIATES


                                        By: ___/s/ Bruce D. Katz_____
                                            Bruce D. Katz, Esq.
                                            225 Broadway – 37th Floor
                                            New York, NY 10007
                                            (212)233-3434

                                            *Attorneys for Plaintiff*
                                            Intellivision