UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x
                             :

INTELLIVISION, a Joint Venture,     :     Civil Action No. 07 CV 4079 (JGK)
                             :     ECF Case

            Plaintiff,    :

                             :

     - against -          :

                             :

                             :

MICROSOFT CORPORATION,     :

                             :

           Defendant.   :

- - - - - - - - - - - - - - - - - - - -x

 

## MEMORANDUM OF MICROSOFT CORPORATION
## IN SUPPORT OF ITS MOTION TO DISMISS INTELLIVISION'S
## FIRST AMENDED COMPLAINT

 

SULLIVAN & CROMWELL LLP
Steven L. Holley (SH2485)
Robert S. Landy (RL9873)
125 Broad Street
New York, New York  10004
(212) 558-4000

Attorneys for Microsoft Corporation

August 17, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT .................................................................1

BACKGROUND ........................................................................................3

ARGUMENT .............................................................................................8

I.     Intellivision's Fraudulent Inducement Claim Should Be Dismissed..........8

     A.    The Alleged Misstatements Could Not Reasonably Have Been Relied on as a Matter of Law................................................8

          1.    Intellivision Cannot Reasonably Have Relied on Reassurances Made *After* It Executed the Agreement It Claims Was Fraudulently Induced. .........................................9

          2.    As a Matter of Law, Intellivision Cannot Reasonably Have Relied on Representations that Are Absent from the Agreement...................................9

          3.    As a Matter of Law, Intellivision Cannot Reasonably Have Relied on Representations that It Could Have Discovered Were False through the Exercise of Ordinary Diligence. .....................10

     B.    The Broad Release in the Agreement Is Fatal to Intellivision's Fraudulent Inducement Claim. ..............................12

     C.    The Express Disclaimer of Liability in the Agreement Is Also Fatal to Intellivision's Fraudulent Inducement Claim...........13

     D.    Having Ratified the Agreement, Intellivision May Not Now Assert a Fraudulent Inducement Claim..........................................14

     E.    Intellivision's Fraudulent Inducement Claim Is Barred by the Statute of Limitations...............................................15

          1.    Intellivision's Fraudulent Inducement Claim Is Time-Barred under Connecticut Law. ...........................16

Page

        2.     Intellivision's Fraudulent Inducement Claim
             Is Also Time-Barred under New York Law. .....................17

             a.     Intellivision Was Not a Resident of New
                  York at the Relevant Time.....................................17

             b.     The Fraudulent Inducement Claim Is
                  Untimely in Any Event. .........................................18

II.     Intellivision's Negligent Misrepresentation Claim Should be
       Dismissed. ................................................................................19

III.    Intellivision's Unilateral Mistake Claim Should Be Dismissed. ..............20

IV.    Intellivision's Mutual Mistake Claim Should Be Dismissed....................20

V.     Both of Intellivision's "Mistake" Claims Are Barred by the Statute
       of Limitations. ...........................................................................22

VI.    Intellivision's Breach of Fiduciary Duty Claim Should Be
       Dismissed. ................................................................................22

CONCLUSION.................................................................................................24

# TABLE OF AUTHORITIES

Page

## CASES

*2 Broadway LLC* v. *Credit Suisse First Boston Mortgage Capital LLC*,
No. 00 Civ. 5773, 2001 U.S. Dist. LEXIS 4875 (S.D.N.Y. Apr. 20,
2001) ................................................................................................................12

*Allen* v. *WestPoint-Pepperell, Inc.*,
945 F.2d 40 (2d Cir. 1991)................................................................................21

*Antone* v. *General Motors Corp.*,
64 N.Y.2d 20, 473 N.E.2d 742 (1984)..............................................................17

*BCH Interim Funding, L.P.* v. *Finantra Capital, Inc.*,
283 F. Supp. 2d 968 (S.D.N.Y. 2003)................................................................19

*Bell Atlantic Corp.* v. *Twombly*,
No. 05-1126, 127 S.Ct. 1955 (May 21, 2007) ....................................................8

*Cafferty* v. *Scotti Brothers Records, Inc.*,
969 F. Supp. 193 (S.D.N.Y. 1997).....................................................................22

*Conley* v. *Gibson*,
355 U.S. 41 (1957)...............................................................................................8

*Creative Waste Management* v. *Capitol Environmental Services*,
429 F. Supp. 2d 582 (S.D.N.Y. 2006)................................................................20

*Dutton* v. *Glass*,
No. 04 CV 3496, 2005 U.S. Dist. LEXIS 868 (S.D.N.Y. 2005 Jan. 20,
2005) ................................................................................................................16

*EED Holdings* v. *Palmer Johnson Acquisition Corp.*,
387 F. Supp. 2d 265 (S.D.N.Y. 2004)................................................................19

*FDIC* v. *Five Star Management, Inc.*,
692 N.Y.S.2d 69 (1st Dep't 1999) .....................................................................22

*First National Bank* v. *Volpe*,
629 N.Y.S.2d 906 (4th Dep't 1995)...................................................................22

*Ganino* v. *Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)...............................................................................11

**TABLE OF AUTHORITIES**
**(Continued)**

Page

*Gross* v. *Diversified Mortg. Investors*,
    438 F. Supp. 190 (S.D.N.Y. 1977)..........................................................................16

*Grymes* v. *Sanders*,
    93 U.S. 55 (1867)..........................................................................................14

*Harris* v. *Halberg*,
    *slip op. 00604*, 828 N.Y.S.2d 579 (2d Dep't 2007)..................................................9

*Jaghory* v. *New York State Department of Education*,
    131 F.3d 326 (2d Cir. 1997).................................................................................8

*Mills* v. *Everest Reinsurance Co.*,
    410 F. Supp. 2d 243 (S.D.N.Y. 2006)..................................................................22

*O'Hearn* v. *Bodyonics, Ltd.*,
    22 F. Supp. 2d 7 (E.D.N.Y. 1998) ...............................................................22, 23

*Oko* v. *Walsh*,
    814 N.Y.S.2d 655 (2d Dep't 2006).........................................................................8

*Orlando* v. *Kukielka*,
    836 N.Y.S.2d 252 (2d Dep't 2007).......................................................................10

*Peach Parking Corp.* v. *346 West 40th Street, LLC*,
    835 N.Y.S.2d 172 (1st Dep't 2007) ....................................................................10

*In re Ply*Gem of Laurel, Inc.*,
    456 N.Y.S.2d 382 (1st Dep't 1982) ....................................................................18

*RBS Holdings, Inc.* v. *Wells Fargo Century, Inc.*,
    No. 06 Civ. 6036, 2007 U.S. Dist. LEXIS 31687 (S.D.N.Y. Apr. 27,
    2007) .........................................................................................................12

*Sack* v. *Low*,
    478 F.2d 360 (2d Cir. 1973)................................................................................16

*Schenck* v. *State Line Tel. Co.*,
    238 N.Y. 308, 144 N.E. 592 (1924).....................................................................14

*Shults* v. *Geary*,
    660 N.Y.S.2d 497 (3d Dep't 1997).......................................................................20

*Stauss* v. *Title Guarantee & Trust Co.*,
    284 N.Y. 41, 29 N.E.2d 462 (1940)................................................................14, 15

## TABLE OF AUTHORITIES
### (Continued)

Page

*Stuart Silver Assocs., Inc.* v. *Baco Development Corp.*,
665 N.Y.S.2d 415 (1st Dep't 1997) .......................................................8

*Stewart* v. *Jackson & Nash*,
976 F.2d 86 (2d Cir. 1992)...............................................................19

*Wholesale Service Supply Corp.* v. *State*,
103 N.Y.S.2d 820 (N.Y. Ct. Cl. 1951)................................................14

### STATUTES AND RULES

C.P.L.R. § 202...............................................................................15, 17

C.P.L.R. § 213...............................................................................18, 22

CONN. GEN. STAT. ANN. § 52-577 (WEST 2007) .......................................17, 18

FED. R. CIV. P. 9(b) ...............................................................................20

FED. R. CIV. P. 12(b)(6)...........................................................................8

### OTHER SOURCES

RESTATEMENT (SECOND) OF CONTRACTS § 380 (1981) ...................................................14

RESTATEMENT (SECOND) OF CONTRACTS § 381 (1981)...................................................15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - -x
                                 :

INTELLIVISION, a Joint Venture,      :      Civil Action No. 07 CV 4079 (JGK)
                                 :      ECF Case
               Plaintiff,    :
                                 :
       - against -            :
                                 :
                                 :
MICROSOFT CORPORATION,       :
                                 :
              Defendant.   :
- - - - - - - - - - - - - - - - - - - - -x

## MEMORANDUM OF MICROSOFT CORPORATION
## IN SUPPORT OF ITS MOTION TO DISMISS

      Defendant Microsoft Corporation ("Microsoft") submits this memorandum of law in support of its motion to dismiss the Amended Complaint ("Am. Comp.") served on Microsoft by plaintiff Intellivision in the above-captioned action on July 20, 2007.

## PRELIMINARY STATEMENT

      Although it is not asserting a breach of contract claim, Intellivision's five causes of action are all predicated on a contract it entered into with Microsoft in January 2001 (the "Agreement"). Pursuant to that Agreement, Intellivision assigned to Microsoft "all of its rights, title and interest in" all of Intellivision's intellectual property relating to interactive television. More than six years after the fact, Intellivision now claims: (i) that it was fraudulently induced to enter into the Agreement or (ii) in the alternative, that it entered into the Agreement as a result of Microsoft's negligent misrepresentations,

(iii) that the Agreement was the product of mutual and/or (iv) unilateral mistake and (v) that Microsoft breached a fiduciary duty to prosecute the patent applications that Intellivision assigned to Microsoft in the Agreement.

The Agreement itself is fatal to each and every one of Intellivision's claims. What Intellivision itself refers to as "the body of the Agreement" was executed by Intellivision: (i) before the "reassurances" by Microsoft that purportedly induced Intellivision to enter into the Agreement and (ii) more than six years before the Amended Complaint was filed. In addition, the Agreement contains (i) a broad release in favor of Microsoft, and (ii) an express disclaimer of liability providing that "neither party shall be liable to the other party" for "damages of any kind or nature arising from this agreement." Finally, the Agreement imposes no duty on Microsoft to prosecute the assigned patent applications. Taking proper account of the terms of the Agreement, it is apparent that none of Intellivision's claims is sustainable.

Quite apart from the terms of the Agreement, Intellivision's claims are untenable. In support of its claims for fraudulent inducement, negligent misrepresentation and unilateral mistake, Intellivision advances an inherently implausible theory of reliance. Intellivision claims that the "main factor" that persuaded Intellivision to enter into the Agreement were reassurances: (i) made by Microsoft *after* Intellivision executed the body of the Agreement and (ii) contradicted by numerous public statements made by Microsoft and widely reported in the news media. In support of its claim for rescission based on a mutual mistake, Intellivision contends that Microsoft actually intended to do

-2-

something it expressly said it would not do, *i.e.*, pay a per-unit royalty on unissued patent claims.

The negligent misrepresentation and breach of fiduciary claims added to the Amended Complaint are legally baseless, just like the waste claim that Intellivision dropped from the original complaint. By entering into an arm's-length contract with Intellivision, Microsoft did not take on any duty to protect Intellivision's interests. Absent such a relationship of trust and confidence, Intellivision's new claims cannot stand.

Accordingly, all five causes of action alleged in the Amended Complaint should be dismissed.

## BACKGROUND

The following are the relevant facts for purposes of this motion to dismiss:

Intellivision is a joint venture formed by Bruce L. Adams, Paul R. Hoffman and John J. Daniels—residents of New Jersey, New York and Connecticut, respectively. (Am. Comp. ¶¶ 1, 2.) Intellivision developed "interactive television and related technologies" and, prior to execution of the Agreement, had filed multiple U.S. patent applications covering those technologies. (Am. Comp. ¶¶ 6, 11-12.) The Amended Complaint alleges that in addition to developing technology, Intellivision was engaged in the "commercial exploitation" of twelve specific "core inventions". (Am. Comp. ¶ 7.) The Amended Complaint also alleges that the technologies assigned to Microsoft in the Agreement were created by Intellivision's founder over the course of seven years, with much of the work performed in "a makeshift laboratory located, at

various times, in a barn, a garage and an attic located in the personal residence of Intellivision's founder."  (Am. Comp. ¶ 9.)  Under the Agreement, all required notices are to be sent to Intellivision at its Connecticut address.  (Am. Comp. Ex. 1 at 5.)

The Amended Complaint alleges that in 1999, representatives of Intellivision met with John Colombo, a Microsoft employee, at a trade show in New York.  (Am. Comp. ¶ 16.)  As a result of this meeting and ensuing conversations initiated by Intellivision, Microsoft invited representatives of Intellivision to the Mountain View, California offices of Microsoft's WebTV division to discuss the possibility of acquiring Intellivision's "intellectual property portfolio," including its patent applications and its "core inventions".  (Am. Comp. ¶ ¶ 18-19.)  Intellivision further alleges that "Microsoft executives, including Anthony Faustini," told Intellivision that:  (i) "Microsoft had not developed and was not engaged in the development of a television set-top box product or associated software that incorporates any of the core inventions developed by Intellivision and covered by Intellivision's patent applications," and (ii) Microsoft's interest in acquiring Intellivision's intellectual property was exclusively for "defensive" purposes, meaning that Microsoft had no intention of using the technology it was about to purchase in any product or service.  (Am. Comp. ¶ 19.)

At some point thereafter, Microsoft in-house counsel Ronald Zink contacted Intellivision with an offer to purchase its intellectual property.  (Am. Comp. ¶ 20.)  Intellivision rejected that initial offer and responded with a counteroffer that would have required Microsoft to pay per-unit royalties for any Microsoft products "within the scope of Intellivision's patent applications."  (Am. Comp. ¶ 21.)  Microsoft

-4-

rejected Intellivision's counteroffer because: (i) none of Intellivision's patent applications had yet resulted in issued patents, and (ii) it would have been very difficult to determine, *ab initio*, which future Microsoft products or services might give rise to royalty obligations and what the required royalty payments would be because no such products had been developed or were currently under development. (Am. Comp. ¶ 22.)

In December of 2000, Microsoft provided Intellivision with a draft of the Agreement and a form of assignment for transferring Intellivision's patent applications to Microsoft. After discussions between the parties, "all necessary revisions were made" to the draft of the Agreement, and Intellivision's principals executed the assignments of the patent applications in late December 2000. (Am. Comp. ¶ 28.)

On January 11, 2001, Intellivision "executed the body of the Agreement". (Am. Comp. ¶ 28, Ex. 1 at 8.) Under the express terms of the Agreement, Intellivision assigned to Microsoft "all of its rights, title and interest in and to the inventions described and disclosed in" the patent applications listed in Attachment A to the Agreement, as well as any patents that might issue as a result of those patent applications. (Am. Comp. Ex. 1 at 2.) The Agreement imposed no obligation on Microsoft to use or refrain from using the assigned technologies or to prosecute the patent applications following their assignment. (Am. Comp. ¶ 59.) The Agreement provided for Microsoft to pay Intellivision the sum of $1,000,000 within 30 days its effective date and an additional $850,000 within 30 days of the issuance of any patents to Microsoft resulting from the assigned patent applications. (Am. Comp. Ex. 1 at 3.)

-5-

The Agreement contained two key provisions, a release and a disclaimer of liability.

> "5.     Release:  Upon payment of the [$1,000,000] sum set forth in Section 3(A), [Intellivision] . . . absolutely and forever releases and discharges MICROSOFT . . . from any and all claims, rights, demands, covenants, agreements, contracts, obligations, responsibilities, representations, warranties, promises, liens, accounts, debts, liabilities, damages, expenses, attorney's fees, costs, and causes of action which they may have as of the Effective Date of the Agreement, relating to the general subject matter described in the Patent Applications or to any other pause technology or system, whether known or unknown . . . except for and provided that there is no release or discharge in connection with the parties' respective rights and obligations as provided in this Agreement."  (Am. Comp. Ex. 1 at 3.)

> "6.6     NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR SPECIAL DAMAGES OF ANY KIND OR NATURE ARISING FROM THIS AGREEMENT, EVEN IF EITHER PARTY HAS WARNED OR BEEN WARNED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE."  (Am. Comp. Ex. 1 at 4 (emphasis in original).)

Intellivision alleges that on January 15, 2001, Mr. Zink reassured Intellivision that Microsoft had not developed, and had no present intention of developing, any product "incorporating Intellivision's core inventions."  (Am. Comp. ¶ 26.)  Intellivision acknowledges that it had executed "the body of the Agreement" four days earlier, but alleges that Mr. Zink's purported confirmation of his previous representations is what persuaded Intellivision to formally execute Attachment C to the Agreement.  (Am. Comp. ¶ 28.)  Although Attachment C did not alter any terms in "the body of the Agreement," Intellivision nonetheless alleges that the Agreement "was not in final form" until Intellivision signed Attachment C on January 16, 2001.  (Am. Comp. ¶¶ 29, 31.)

Intellivision alleges that "approximately one week after Intellivision assigned to Microsoft all of its intellectual property rights covering, *inter alia*, the

-6-

concept of a television set-top box that allows viewers to manipulate the viewing of live television…, Microsoft introduced a product which allowed viewers to manipulate the viewing of live television."  (Am. Comp. ¶ 40.)  Intellivision claims that it did not learn of the existence of this new product, called UltimateTV, until some point in 2002, more than a year after the Agreement was executed.  UltimateTV "incorporate[d] the core technologies embodied in Intellivision's patent applications."  (Am. Comp. ¶ 39.)

Intellivision alleges that it "conducted independent online searches in 2000 and January 2001 for the purpose of verifying Microsoft's representations" and that "[t]hese searches did not uncover any information that conflicted with Microsoft's representations."  (Am. Comp. ¶ 25.)  What Intellivision ignores are more than two hundred publicly available sources of information concerning Microsoft's development of products incorporating one or more of Intellivision's "core inventions," dating back to Microsoft's acquisition of WebTV Networks Inc. in August 1997.  (Declaration of Robert S. Landy Dated August 17, 2007 ("Landy August Decl.") p. 1, Exs. 1-9.)

On January 12, 2007—six years and one day after Intellivision executed "the body of the Agreement"—Intellivision filed the present action in the Supreme Court of the State of New York for the County of New York.  The central allegation of the Amended Complaint is that Microsoft fraudulently induced Intellivision to assign its intellectual property to Microsoft "under terms that were significantly less advantageous to Intellivision than they would have been" had Intellivision known that Microsoft already had developed a product "incorporating the core inventions" assigned by Intellivision to Microsoft in the Agreement.  (Am. Comp. ¶ 57.)  On May 25, 2007,

-7-

Microsoft removed the action to this Court and, on June 15, 2007, moved to dismiss the original complaint. On July 20, 2007, Intellivision served the Amended Complaint on Microsoft. On July 27, 2007, the Court denied Microsoft's motion to dismiss directed at the original complaint, without prejudice, as moot.

## ARGUMENT

In deciding a motion under Rule 12(b)(6) of the Federal Rules of Civil procedure, a court must take the facts alleged in the complaint as true. *Jaghory* v. *New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997). The permissive standard of *Conley* v. *Gibson*, 355 U.S. 41 (1957), is no longer valid. To survive a motion to dismiss, a complaint must contain allegations that present not only a possibility that defendant is liable, but which demonstrate the "plausibility of entitlement to relief." *Bell Atlantic Corp.* v. *Twombly*, No. 05-1126, 127 S.Ct. 1955, 1966 (May 21, 2007).

**I.    Intellivision's Fraudulent Inducement Claim Should Be Dismissed.**

   **A.    The Alleged Misstatements Could Not Reasonably Have Been Relied on as a Matter of Law.**

Under New York law, a complaint alleging fraud "must contain allegations of a representation of material fact, falsity, scienter, reliance and injury. Moreover, the plaintiff must show not only that he actually relied on the misrepresentation, but also that such reliance was reasonable." *Oko* v. *Walsh*, 814 N.Y.S.2d 655, 656 (2d Dep't 2006) (internal citations omitted) *citing Stuart Silver Assocs., Inc.* v. *Baco Dev. Corp.*, 665 N.Y.S.2d 415 (1st Dep't 1997).

-8-

1.  **Intellivision Cannot Reasonably Have Relied on Reassurances Made *After* It Executed the Agreement It Claims Was Fraudulently Induced.**

Intellivision readily admits that its "principals *executed* the body of the Agreement on January 11, 2001."  (Am. Comp. ¶ 28) (emphasis added).  What Intellivision refers to as the "body of the Agreement" contains all elements of the basic bargain between the parties, including their agreement that Microsoft would pay Intellivision a lump sum for its intellectual property and not a per-unit royalty on any products which might incorporate that intellectual property.  Attachment C does not alter this basic bargain.  Instead, it contains the language of a patent claim that, if granted by the U.S. Patent and Trademark Office, would trigger Microsoft's obligation to pay an additional lump sum royalty to Intellivision.  Attachment C is irrelevant to the one aspect of the Agreement that Intellivision claims was fraudulently induced, namely, that the Agreement "did not require royalty payments based on the sale of products incorporating Intellivision's technology."  (Am. Comp. ¶ 38.)

2.  **As a Matter of Law, Intellivision Cannot Reasonably Have Relied on Representations that Are Absent from the Agreement.**

New York courts have held that a sophisticated party may not reasonably rely on oral statements made prior to execution of a written agreement when such statements are omitted from or contradicted by the written agreement.  For example, in *Harris* v. *Halberg*, slip op. 00604, 828 N.Y.S.2d 579 (2d Dep't 2007), the Court affirmed dismissal of a fraudulent inducement claim because plaintiffs' alleged reliance on oral statements that were contradicted by a subsequent written agreement was unreasonable as a matter of law.  The same result should obtain here.

-9-

There is nothing in the Agreement that describes Microsoft's existing or future products in the field of interactive television. The Agreement is a simple assignment that transfers all of Intellivision's rights, title and interest in its interactive television technologies to Microsoft to do with as it pleases. Notably, while Intellivision made a number of representations, warranties and covenants in the Agreement, Microsoft made none whatsoever. In such circumstances, Intellivision—one of whose principals is a lawyer admitted to practice in New York—could not reasonably have relied on statements allegedly made by Mr. Zink that are nowhere to be found in the Agreement.

### 3. As a Matter of Law, Intellivision Cannot Reasonably Have Relied on Representations that It Could Have Discovered Were False through the Exercise of Ordinary Diligence.

New York law imposes an affirmative duty on a party to investigate the truth of representations on which the party relies, and courts hold that reliance on representations without conducting such an investigation is unreasonable as a matter of law. Where, as here, the facts concerning Microsoft's activities in the field of interactive television were not peculiarly within Microsoft's knowledge, but were instead widely known, Intellivision cannot plead ignorance of those facts to save its fraudulent inducement claim. As the First Department recently stated, "[w]here one to whom alleged misrepresentation is made has means to discover the truth by the exercise of ordinary intelligence, yet fails to do so, there can be no showing justifiable reliance to support a claim of fraud." *Peach Parking Corp.* v. 346 *West 40th Street, LLC,* 835 N.Y.S.2d 172, 176 (1st Dep't 2007) (internal citation omitted). *See also Orlando* v. *Kukielka*, 836 N.Y.S.2d 252, 255 (2d Dep't 2007).

-10-

Before Intellivision executed "the body of the Agreement" on January 11, 2001: (i) Microsoft issued six press releases discussing products that contained one or more of Intellivision's "core inventions" and (ii) more than 200 articles were published in newspapers and magazines discussing Microsoft's activities in the field of interactive television, and describing Microsoft products that contained one or more of Intellivision's "core inventions," including the product called UltimateTV.  (Landy August Decl., Exs. 1-9.)  On January 6, 2001, Microsoft founder and CEO Bill Gates gave a keynote speech at the Consumer Electronics Show in Las Vegas—the largest trade show of its kind in the United States—in which he described UltimateTV, including the ability to pause and resume a live television broadcast, something Intellivision claims a "core invention." (Landy August Decl. Ex 7.)  The Court is entitled to take judicial notice of the widespread availability of such information, which is fatal to Intellivision's theory of reliance.  *See Ganino* v. *Citizens Utilities Co*., 228 F.3d 154, 167 n.8 (2d Cir. 2000) (court may take judicial notice of well-publicized stock prices or fact that criminal trial received extensive press coverage).

*           *           *

Intellivision claims it relied upon reassurances that (i) were made after Intellivision executed "the body of the Agreement," (ii) are not present in the Agreement, which contains an integration clause, and (iii) were flatly inconsistent with broadly available information about Microsoft's activities in the field of interactive television.  As a matter of law, Intellivision's reliance claim should be rejected.

-11-

**B.    The Broad Release in the Agreement Is Fatal to Intellivision's Fraudulent Inducement Claim.**

In Paragraph 5 of the Agreement, Intellivision (and anyone acting on its behalf) agreed to release Microsoft from "any and all *claims*, rights, demands, covenants, agreements, contracts, *obligations*, responsibilities, *representations*, . . . *causes of action* which they may have as of the Effective Date of the Agreement, relating to the general subject matter described in the Patent Applications . . . whether known or unknown." (Landy Decl. Ex. 1 at 3 (emphasis added).)  There is no allegation in the Amended Complaint that this release was itself fraudulently induced.  Instead, Intellivision says only that it would have demanded more money for the technologies it assigned to Microsoft had Intellivision known that Microsoft already had products incorporating those technologies.  That, however, is a claim that falls squarely within the scope of the release.

The release is an independent basis for dismissing Intellivision's fraudulent inducement claim.  *See RBS Holdings, Inc.* v. *Wells Fargo Century, Inc.*, No. 06 Civ. 6036, 2007 U.S. Dist. LEXIS 31687, at *18 (S.D.N.Y. Apr. 27, 2007) (granting defendant's motion to dismiss, despite alleged misrepresentations, because plaintiff did "not allege that [defendant] fraudulently induced [plaintiff] to execute the Release").  There is no point in forcing Microsoft to engage in costly discovery and further motion practice when Intellivision unambiguously released the claims it is asserting in this case.  As the court observed in *2 Broadway LLC* v. *Credit Suisse First Boston Mortgage Capital LLC*. No. 00 Civ. 5773, 2001 U.S. Dist. LEXIS 4875, at *18 (S.D.N.Y. Apr. 20, 2001): "It is appropriate to grant a motion to dismiss on the basis of a

-12-

binding release agreement where, as here, the terms of the agreement are clear and unambiguous."

####        C.      The Express Disclaimer of Liability in the Agreement Is Also Fatal to Intellivision's Fraudulent Inducement Claim.

Intellivision alleges that it "has been damaged…by a loss of revenue in the form of royalties, lost opportunities with third parties, lost opportunity in expediting the examination of its patent applications and enforcing its patent rights against others, and lost opportunity in exploiting its own developments." (Am. Comp. ¶ 61.) According to Intellivision, after executing the Agreement with Microsoft, Intellivision "terminated its discussions with various third parties . . . to Intellivision's financial detriment." (Am. Comp. ¶ 62.) The problem with this claim is that Paragraph 6.6 of the Agreement states, in all capital letters, that neither party shall be liable to the other "FOR … DAMAGES OF ANY KIND OR NATURE ARISING FROM THIS AGREEMENT." (Am. Comp. Ex. 1 at 4.)

Again, there is no allegation in the Amended Complaint that this sweeping disclaimer of liability was itself fraudulently induced. Instead, together with the broad release, it reflects a desire by the parties to the Agreement to prevent precisely the sort of belated challenge to the parties' basic bargain that Intellivision seeks to mount. Intellivision may now regret the deal it struck with Microsoft in 2001, but it cannot re-trade that deal at this late stage merely by asserting that in hindsight it should have sought

more advantageous terms.  Consequently, the disclaimer of liability is yet another ground for dismissing Intellivision's fraudulent inducement claim.[1]

### D.    Having Ratified the Agreement, Intellivision May Not Now Assert a Fraudulent Inducement Claim.

Assuming, *arguendo*, that Intellivision could validly claim it was fraudulently induced to enter into the Agreement, Intellivision ratified the Agreement by accepting and retaining its benefits—namely, the $1,000,000 paid by Microsoft—for more than six years before filing the original complaint.  It is well-established that "'one may confirm a transaction voidable for fraud . . . by exercising dominion over the subject-matter of a sale, or even by silence and inaction with knowledge of one's rights.'" *Stauss* v. *Title Guarantee & Trust Co*., 284 N.Y. 41, 45, 29 N.E.2d 462, 464 (1940) quoting *Schenck* v. *State Line Telephone Co*., 238 N.Y. 308, 313, 144 N.E. 592, 593 (1924).  A plaintiff who sits on his hands cannot assert a fraudulent inducement claim years after accepting the benefits of a contract.

> "Where a party desires to rescind a contract upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it.  If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred.  He is not permitted to play fast and loose.  Delay and vacillation are fatal to the right which had before subsisted."

*Wholesale Service Supply Corp.* v. *State*, 103 N.Y.S.2d 820, 828 (N.Y. Ct. Cl. 1951)

*quoting Grymes* v. *Sanders* 93 U.S. 55, 62 (1867).  *See also* RESTATEMENT (SECOND) OF

---

[1]    Under Paragraphs 9.1 (Survival) and 9.5 (Severability), both the release and the disclaimer of liability are severable from the remainder of the Agreement.  (*See* Am. Comp. Ex. 1 at 5, 6.)

CONTRACTS § 380 (1981) (affirmance of contract can forfeit right to void it);

RESTATEMENT (SECOND) OF CONTRACTS § 381 (1981) (unreasonable delay can result in

loss of right to void contract).

      *Stauss* should be controlling here.  Intellivision assigned all of its inter-

active television technology to Microsoft in January 2001 in exchange for $1,000,000,

receipt of which is admitted.  (Am. Comp. ¶ 26, Ex. 1 at 3.)  Intellivision alleges that it

became aware of Microsoft's UltimateTV product in 2002, several years before bringing

suit.  (Am. Comp. ¶ 42.)  If, as Intellivision now contends, its purported discovery of the

UltimateTV product in 2002 showed that Microsoft had misrepresented its activities in

the field of interactive television at the time the Agreement was executed, then

Intellivision should have done something about that back in 2002.  Having treated the

$1,000,000 it got from Microsoft as its own for the last five years, Intellivision has

ratified the Agreement and forfeited any claim it might have had to void the Agreement

on fraudulent inducement grounds.[2/]

### E.    Intellivision's Fraudulent Inducement Claim Is Barred by the Statute of Limitations.

      Under C.P.L.R § 202, where a cause of action accrues outside the State of

New York, a court should apply either the statute of limitations of the state where the

cause of action accrued or of New York, whichever is shorter.  Intellivision's cause of

---

[2/]    Intellivision's allegation that Microsoft lulled Intellivision into a false sense of security in 2002 and/or 2003—four or five years ago—does not excuse its delay in bringing this action.  Nor does it contravene the notion that Intellivision ratified the Agreement by keeping the $1 million purchase price for the technology assigned to Microsoft.

action was filed more than three years too late under Connecticut law, which is where the cause of action accrued. There is no basis for applying the New York statute of limitations to Intellivision's fraudulent inducement claim, but even if there were, the claim would still be untimely.

        **1.**        **Intellivision's Fraudulent Inducement Claim Is Time-Barred under Connecticut Law.**

New York law provides that a fraud is deemed to have occurred where the harm from the fraud was felt. *Dutton* v. *Glass*, No. 04 CV 3496, 2005 U.S. Dist. LEXIS 868 at *9 (S.D.N.Y. 2005 Jan. 20, 2005) (holding that "even if the fraud occurred in New York … it is governed by the law where plaintiffs suffered their injury which generally is the place where plaintiffs resided and sustained the economic impact of their loss"). *See also Sack* v. *Low*, 478 F.2d 360, 365-66 (2d Cir. 1973); *Gross* v. *Diversified Mortg. Investors*, 438 F. Supp. 190, 198 (S.D.N.Y. 1977). At the time it entered into the Agreement with Microsoft, Intellivision's principal place of business was in Connecticut. Moreover, the interactive television technologies assigned by Intellivision to Microsoft were almost certainly developed in Connecticut.[3] And Intellivision's founder resided in Connecticut at the time the Agreement was executed and still does. (Am. Comp. ¶ 2.) Indeed, Attachment C to the Agreement—to which Intellivision ascribes such significance—was faxed to Microsoft from a fax machine in the 203 area code for Connecticut.

---

[3]     The Amended Complaint does not explicitly state that the "barn, garage and attic" in which Intellivision's technologies were allegedly developed were located in Connecticut, but it is safe to assume that they were not located in an apartment in Battery Park City.

-16-

It is clear from the foregoing that the locus of the alleged harm to Intellivision—the only plaintiff in this action—is Connecticut. That one of Intellivision's passive investors lives and practices law in Manhattan does not alter the fact that the fraudulent inducement claim accrued in Connecticut. The statute of limitations for fraud claims in Connecticut is three years. CONN. GEN. STAT. ANN. § 52-577 (West 2007). Thus, Intellivision's fraudulent inducement claim was asserted three years too late.

### 2.     Intellivision's Fraudulent Inducement Claim Is Also Time-Barred under New York Law.

#### a.     Intellivision Was Not a Resident of New York at the Relevant Time.

Intellivision seeks to benefit from the six-year statute of limitations for fraud claims in New York by alleging that it is a resident of New York, but Intellivision does not have the "significant connection with some locality in the State" that is required to be a New York resident under C.P.L.R. § 202. *See Antone* v. *General Motors Corp.*, 64 N.Y.2d 20, 30, 473 N.E.2d 742, 746 (1984). C.P.L.R. § 202 is designed to prevent precisely the sort of forum shopping in which Intellivision is now engaged. The statute prevents a non-resident plaintiff like Intellivision from bringing an action in New York that would be time-barred in the plaintiff's home jurisdiction.

For the purposes of C.P.L.R. § 202, what matters is where Intellivision was resident at the time the cause of action accrued, not where it presently resides. *Antone*, 64 N.Y.2d at 27, 473 N.E.2d at 745. It is crystal clear in the Agreement that Intellivision's principal place of business in January 2001—when the claim accrued— was in Seymour, Connecticut. Intellivision cannot escape Connecticut's three-year

-17-

statute of limitations for fraud claims, which has long since expired.  CONN. GEN. STAT. ANN. § 52-577 (West 2007).

**b.**     **The Fraudulent Inducement Claim Is Untimely in Any Event.**

In New York, a fraudulent inducement claim like the one asserted by Intellivision must be commenced within six years of the date on which the claim accrued. C.P.L.R. § 213(6),(8).  A "cause of action for fraud in the inducement of a contract (and therefore the commencement of the running of the Statute of Limitations) accrues at the time of the execution of the contract."  *In re Ply\*Gem of Laurel, Inc.*, 456 N.Y.S.2d 382, 383 (1st Dep't 1982).  The Agreement was signed by Intellivision's three principals twice, once individually and once on behalf of the joint venture, on January 11, 2001. (Am. Comp., Ex. 1 at 8.)  Intellivision itself refers to those signatures as the "execution" by Intellivision of "the body of the Agreement."  (Am. Comp. ¶ 28.)

Intellivision seeks to avoid the conclusion that its fraudulent inducement claim is untimely by noting that Attachment C to the Agreement was not finalized until January 16, 2001.  Yet, as noted previously, Attachment C does not affect the form of royalty to be paid by Microsoft, *i.e*, lump sum royalty versus per-unit royalty on products incorporating Intellivision's technology.  While the existence of a complete and enforceable contract would be relevant to a breach of contract claim, the effective date of a contract is not dispositive in a fraudulent inducement claim.  The crucial date is the one on which Intellivision executed the body of the Agreement, which all agree was six years and one day before the original complaint was filed.

-18-

**II.      Intellivision's Negligent Misrepresentation Claim Should be Dismissed.**

Under New York law, "an arms-length commercial transaction can only give rise to a negligent misrepresentation claim if a special relationship exists between the parties such that plaintiff's reliance on defendant's representation was justifiable. *EED Holdings* v. *Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 281 (S.D.N.Y. 2004) (internal citations and quotations omitted).  A "special relationship" arises where the defendant "either (1) possesses unique or specialized expertise or (2) occupies a special position of confidence and trust with the injured party." *Id.*  Microsoft plainly did not have "unique or specialized expertise" about the interactive television technology Intellivision claims to have developed.  Furthermore, as noted above, that fact that Microsoft had products incorporating Intellivision's "core inventions" and was developing more such products was widely known at the time Intellivision executed the Agreement. (*See* Landy August Decl. Exs.1 - 9.)  Thus, Intellivision cannot succeed on the first prong of negligent misrepresentation analysis.

Courts have interpreted the "a special position of confidence and trust" prong of negligent misrepresentation analysis to mean that "a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty." *BCH Interim Funding, L.P.* v. *Finantra Capital, Inc.*, 283 F. Supp. 2d 968, 991 (S.D.N.Y. 2003) *citing Stewart* v. *Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992).  As discussed in greater detail in Section V below, Microsoft owed Intellivision no fiduciary duty before or after the Agreement was executed.  The only duties owed by Microsoft to Intellivision

-19-

were contractual, and Intellivision has not asserted any breach of contract claim.  As a result, Intellivision's negligent misrepresentation claim should be dismissed.

**III.    Intellivision's Unilateral Mistake Claim Should Be Dismissed.**

Under New York law, a party may sue to rescind a contract on grounds of unilateral mistake only where it can allege some fraud committed by the other party.  *See Creative Waste Mgmt.* v. *Capitol Envtl. Servs.*, 429 F. Supp. 2d 582, 607 (S.D.N.Y. 2006).  As noted in Section I.A above, Intellivision cannot show that it reasonably relied on statements purportedly made by Microsoft about products incorporating the assigned technology prior to execution of the Agreement.  Given that Intellivision's fraudulent inducement claim is deficient as a matter of law, Intellivision cannot seek to rescind the Agreement based on unilateral mistake.

In addition, Intellivision makes no allegation that it was mistaken as to the effect or meaning of any term of the contract.  Indeed, it affirmatively alleges that Microsoft acquired all of Intellivision's interactive television technologies with no prospective duty to do or refrain from doing anything.  (Am. Comp. ¶ 59.)  Intellivision understood precisely what it was assigning to Microsoft and precisely what it was to receive in return.  Its apparent misgivings after the fact about the basic bargain Intellivision reached with Microsoft is not a proper basis for a unilateral mistake claim.

**IV.    Intellivision's Mutual Mistake Claim Should Be Dismissed.**

A court may reform or rescind a contract which, "by mistake, does not reflect the agreement reached between the parties; however, the burden is on the party seeking relief to establish cause for reformation of the instrument by clear and convincing evidence."  *Shults* v. *Geary*, 660 N.Y.S.2d 497, 499 (3d Dep't 1997) (internal citations

omitted).  To meet this high burden, it was incumbent upon Intellivision to allege with particularity how a mutual mistake prevented the requisite meeting of the minds between the parties.  Under Rule 9(b) of the Federal Rules of Civil Procedure, claims based upon mistake must be pled with particularity.

There is no allegation in the Amended Complaint that Intellivision and Microsoft "shared the same erroneous belief as to a material fact," as required by *Allen* v. *WestPoint-Pepperell, Inc.*, 945 F.2d 40, 46 (2d Cir. 1991).  Intellivision rests its mutual mistake claim on the odd statement that "[i]n the event that Microsoft's aforesaid acts of misrepresentation and concealment were done negligently and/or inadvertently by employees of Microsoft who were unaware of Microsoft's technological developments which incorporated Intellivision's core inventions, the parties' Agreement does not reflect a meeting of the minds *because both parties intended for Microsoft to pay a per-unit royalty on certain products within the scope of Intellivision's patent applications and the Agreement was a result of mutual mistake*."  (Am. Comp. ¶ 70) (emphasis added). Yet, all of Intellivision's other claims rest on the allegation that Microsoft flatly refused to pay such per-unit royalties and that Intellivision eventually agreed to accept only lump sum royalties.  (Am. Comp. ¶¶ 22, 26.)

The allegation in paragraph 70 of the Amended Complaint that Microsoft actually intended to pay per-unit royalties for Intellivision's intellectual property cannot be squared with the allegations in Paragraph 22 that Microsoft flatly rejected a per-unit royalty as "unworkable."  Accordingly, Intellivision's mutual mistake claims should be dismissed.

-21-

**V.    Both of Intellivision's "Mistake" Claims Are Barred by the Statute of Limitations.**

Under C.P.L.R. § 213(6), a cause of action based on mistake must be brought within six years of its accrual.  A claim seeking rescission based on a unilateral mistake accompanied by fraud, or a claim for reformation or rescission based on a mutual mistake, accrues on the date the mistake occurred.  *See First Nat'l Bank* v. *Volpe*, 629 N.Y.S.2d 906, 907 (4th Dep't 1995); *FDIC* v. *Five Star Management, Inc.*, 692 N.Y.S.2d 69, 72 (1st Dep't 1999); *Mills* v. *Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 249 (S.D.N.Y. 2006).  Under either type of mistake claim, Intellivision waited too long to bring suit.

Neither a unilateral nor mutual mistake of legal significance could have occurred after "the body of the Agreement" was executed by Intellivision on January 11, 2001.  The ongoing discussions relating to Attachment C had no bearing on the lump sum royalties to which the parties had already agreed.  Therefore, any claim for reformation or rescission of the Agreement based on mistake is barred by C.P.L.R. § 213 because it accrued more than six years before the original complaint was filed.

**VI.    Intellivision's Breach of Fiduciary Duty Claim Should Be Dismissed.**

Under New York law, "an arms-length commercial transaction generally does not give rise to a fiduciary relationship."  *O'Hearn* v. *Bodyonics*, *Ltd*., 22 F. Supp. 2d 7, 12 (E.D.N.Y. 1998).  Where parties represented by counsel enter into an arms-length agreement, that contract does not give rise to a fiduciary relationship.  It is instead a conventional contractual relationship, and the only remedy available "is to seek damages for breach of contract."  *Cafferty* v. *Scotti Bros. Records*, 969 F. Supp. 193, 205-

-22-

06 (S.D.N.Y. 1997). *See also O'Hearn*, 22 F. Supp. 2d at 12 (holding that "since parties' relationship was purely commercial, no fiduciary relationship existed; defendant's failure to use its best efforts more properly may be considered an action for breach of contract") (internal quotation omitted).

Intellivision candidly concedes that the "Agreement was a purchase agreement whereby Microsoft was acquiring Intellivision's intellectual property rights and creating no ongoing duties on the part of Microsoft." (Am. Comp. ¶ 59). As a result, it is plain that Microsoft had no fiduciary duty to "diligently prosecute" the patent applications it purchased from Intellivision. If Intellivision believed that the Agreement obligated Microsoft to do more than it did to prosecute the assigned patent applications, Intellivision should have asserted a breach of contract claim. It did not—and such a claim would be barred in any case by the release and disclaimer of liability.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed in its entirety with prejudice.

Dated:   New York, New York
         August 17, 2007

Respectfully submitted,

/s/
SULLIVAN & CROMWELL LLP
Steven L. Holley (SH2485)
Robert S. Landy (RL9873)
125 Broad Street
New York, New York  10004
(212) 558-4000

Attorneys for Microsoft Corporation

-24-