UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| INTELLIVISION, a Joint Venture, | ) | |
| | ) | ECF CASE |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 07-CV-4079(JGK) |
| v. | ) | |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW OF PLAINTIFF INTELLIVISION IN OPPOSITION TO
DEFENDANT MICROSOFT'S MOTION TO DISMISS AMENDED COMPLAINT**

LAW OFFICES OF BRUCE D. KATZ & ASSOCIATES

Bruce D. Katz, Esq.
225 Broadway – 37th Floor
New York, NY 10007
(212)233-3434

*Attorneys for Plaintiff*
Intellivision

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT**                                                        1

**A. MICROSOFT'S STATUTE OF
   LIMITATIONS ARGUMENTS ARE MERITLESS**                                         1

    1. IN SIGNING THE PARTIES' AGREEMENT, INTELLIVISION
      RELIED ON MISREPRESENTATIONS MADE BY MICROSOFT
      THROUGHOUT 2000 AND 2001 –NOT JUST ON JANUARY 15, 2001          1

    2. MICROSOFT'S ARGUMENTS RELY UPON AN ERRONEOUS
      EXECUTION DATE OF THE PARTIES' AGREEMENT                         2

    3. MICROSOFT RELIES UPON AN ERRONEOUS ACCRUAL
      DATE OF INTELLIVISION'S CLAIMS OF FRAUD AND MISTAKE              4

    4. N.Y.'S BORROWING STATUTE IS NOT INVOKED IN THIS CASE              5

    5. INTELLIVISION DID NOT RATIFY THE PARTIES' AGREEMENT              6

    6. MICROSOFT'S CONDUCT HAS
      TOLLED THE STATUTE OF LIMITATIONS                               10

    7. EVEN IF INTELLIVISION RATIFIED THE PARTIES'
      AGREEMENT, IT IS ENTITED TO SEEK MONETARY DAMAGES               11

**B.**    **INTELLIVISION HAS DEMONSTRATED REASONABLE RELIANCE**           12

    1. MICROSOFT'S ARGUMENT THAT INTELLIVISION'S
      CLAIMS MUST FAIL BECAUSE THE PARTIES' AGREEMENT
      DOES NOT RESTRICT MICROSOFT'S RIGHT TO USE THE
      ASSIGNED INVENTIONS IS A "RED HERRING"                          12

    2. ALTHOUGH INTELLIVISION IS NOT A SOPHISTICATED
      PURCHASER, IT CONDUCTED DUE DILIGENCE.  INTELLIVISION'S
      CLAIMS ARE NOT DEFEATED SIMPLY BECAUSE IT FAILED
      TO UNCOVER EVIDENCE OF MICROSOFT'S MISREPRESENTATIONS           14

        a. Ordinary Contracting Parties Have No Duty to Exercise Due Diligence       14

        b. The "Sophisticated Purchaser" Caselaw is Inapplicable to this Case        15

    3. MICROSOFT'S HINDSIGHTED AND IMPROPER
      RELIANCE ON PRESS RELEASES AND ARTICLES                         18

                                                                                                    **Page**

      4.  INTELLIVISION'S RELIANCE WAS JUSTIFIABLE AND REASONABLE   21

**C.**     **NEITHER A GENERAL RELEASE NOR A
DISCLAIMER OF LIABILITY SHIELD A PARTY
FROM THE CONSEQUENCES OF ITS OWN FRAUD**                              24

**D.**     **INTELLIVISION HAS STATED A VALID CLAIM
FOR RESCISSION BASED UPON MUTUAL MISTAKE**                           28

**E.**     **INTELLIVISION HAS STATED VALID CLAIMS FOR BREACH
OF FIDUCIARY DUTY AND NEGLIGENT MISREPRESENTATION**                  29

     1.  MCROSOFT OWED INTELLIVISION A FIDUCIARY DUTY             30

     2.  A NEGLIGENT MISREPRESENTATION CLAIM CAN BE
MAINTAINED IN THE ABSENCE OF A FIDUCIARY DUTY                        32

**CONCLUSION**                                                       34

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                     **<u>Page</u>**

*2 Broadway LLC v.*
    *Credit Suisse First Boston Mortgage Capital LLC*,
    2001 U.S. Dist. LEXIS 4875 (S.D.N.Y. April 23, 2001)        2

*422 W. 15th St., Inc. v. Estate of Johnson*,
    258 A.D. 227, 16 N.Y.S.2d 283 (1st Dep't 1939)        9

*Adiel v. Coca-Cola Bottling Co.,*
    1995 U.S. Dist. LEXIS 13141,
    No. 95 CIV. 0725 (WK),
    1995 WL 542432  (S.D.N.Y. Sep. 13, 1995)        33

*Ahern v. Scholz,*
    85 F.3d 774 (1st Cir. 1996)        30

*AIG Global Securities Lending Corp. v.*
    *Banc of America Securities, LLC*,
    2005 U.S. Dist. LEXIS 21605,
    No. 01 Civ. 11448 (S.D.N.Y. Sept. 25, 2005)        14

*Allen v. Westpoint-Pepperell, Inc.,*
    11 F. Supp.2d 277 (S.D.N.Y. 1997)        11-12

*Allen v. Westpoint-Pepperell, Inc.,*
    945 F.2d 40 (2d Cir. 1991)        2, 7, 10, 27, 29, 30

*Apple Records, Inc. v. Capitol Records, Inc.,*
    137 A.D.2d 50, 529 N.Y.S.2d 279, 283 (1988)        30

*Antone v. General Motors Corp.*,
    64 N.Y.2d 20, 473 N.E.2d 742, 484 N.Y.S.2d 514 (1984)        6

*@Wireless Enterprises, Inc. v. AI Consulting, LLC*,
    2006 U.S. Dist. LEXIS 79874 (W.D.N.Y. October 30, 2006)        32

*Bank of Am. Corp. v. Lemgruber,*
    385 F. Supp.2d 200 (S.D.N.Y. 2005)        14, 15, 22, 29, 30

*Banque Arabe et Internationale D'Investissement*
    *v. Maryland Nat'l Bank,*
    57 F.3d 146 (2d Cir.1995)        2

*Banque Franco-Hellenique de Commerce*
    *Int'l et Maritime, S.A. v. Christophides*,
    106 F.3d 22 (2d Cir. 1997)           15

*Barrett v. U.S.*,
    622 F. Supp. 574 (S.D.N.Y. 1985)       26

*Bickhardt v. Ratner*,
    871 F. Supp. 613 (S.D.N.Y. 1994)       2

*Bloss v. Va'ad Harabonim of Riverdale*,
    203 A.D.2d 36, 610 N.Y.S.2d 197 (1st Dep't 1994)    27

*Boley v. Pineloch Assoc., Ltd.*,
    700 F.Supp. 673 (S.D.N.Y. 1988)       33

*Bremen* v. *Zapata Offshore Co.*,
    407 U.S. 1, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972)   20

*Bridge Capital Investors II v. Small*,
    144 Fed. Appx. 762, 2005 WL 1621046 (11th Cir. 2005)   5

*Brooklyn Nat'l Bank of New York v. Werblow*,
    263 A.D. 884, 32 N.Y.S.2d 169 (2d Dep't 1942)    27

*Cantor Fitzgerald Inc. v. Lutnick*,
    313 F.3d 704 (2d Cir. 2002)         6

*Casey v. Masullo Brothers Builders, Inc.*,
    218 A.D.2d 907, 630 N.Y.S.2d 599 (3d Dep't 1995)   22

*Catton v. Defense Technology Systems, Inc.*,
    2006 U.S. Dist. LEXIS 205,
    No. 05 Civ. 6954 (S.D.N.Y. January 6, 2006)    14

*Century Pac., Inc. v. Hilton Hotels Corp.*,
    2004 U.S. Dist. LEXIS 6904,
    No. 03 Civ. 8258(SAS),
    2004 WL 868211 (S.D.N.Y. Apr. 21, 2004)    33

*Cetnar v. Kinowski*,
    263 A.D.2d 842, 693 N.Y.S.2d 730 (3d Dep't 1999)   25

*Chase v. Columbia National Corp.*,
    832 F. Supp. 654 (S.D.N.Y. 1984)       25

*Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*,
    88 A.D.2d 461, 453 N.Y.S.2d 750 (2d Dep't 1982)   12

*Commercial Coin Laundry Sys. v. McGraw*,
    2005 WL 3481459,
    No. 256026
    (Mich. December 20, 2005)         5

*Consolidated Edison, Inc. v. Northeast Utilities*,
    249 F. Supp.2d 387 (S.D.N.Y. 2003)         17

*Corva v. United Services Automobile Ass'n*,
    108 A.D.2d 631, 485 N.Y.S.2d 264 (1st Dep't 1985)         21

*Cucchiaro v. Cucchiaro*,
    165 Misc.2d 134, 627 N.Y.S.2d 224
    (Sup. Ct. Orange County 1995)         27

*Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*,
    1988 U.S. Dist. LEXIS 2916,
    No. 85 Civ. 3439 (JFK) (S.D.N.Y. Apr. 8, 1988)         34

*Dimon Inc. v. Folium, Inc.*,
    48 F. Supp.2d 359 (S.D.N.Y. 1999)         14, 21, 23, 25, 26, 32

*Doehla v. Wathne Ltd., Inc.*,
    1999 U.S. Dist. LEXIS 11787,
    No. 98 Civ. 6087 (S.D.N.Y. Aug. 3, 1999)         14

*DuPont v. Perot*,
    59 F.R.D. 404 (S.D.N.Y. 1973)         11

*Dutton v. Glass*,
    No. 04 CV 3496, 2005 U.S. Dist. LEXIS 868         6
    (S.D.N.Y. January 20, 2005)

*Dynamics Corp. of Am. v. International Harvester Co.*,
    429 F. Supp. 341 (S.D.N.Y. 1977)         4

*Eastman Kodak Co. v. Wachovia Bank Nat'l Ass'n.*,
    2007 WL 2406919,
    No. 02-CV-6441T.
    (W.D.N.Y. August 21, 2007)         2

*E*Trade Fin. Corp. v. Deutsche Bank AG*,
    420 F. Supp. 2d 273 (S.D.N.Y. 2006)         26

*FDIC v. Frank L. Marino Corp.*,
    74 A.D.2d 620, 425 N.Y.S.2d 34 (2d Dep't 1980)         27

*Ferry v. Poughkeepsie Galleria Co.,*
      197 A.D.2d 913, 602 N.Y.S.2d 267 (4th Dep't 1993)                27

*General Stencils, Inc. v. Chiappa*,
      18 N.Y.2d 125, 219 N.E.2d 169, 272 N.Y.S.2d 33 (1966)            11

*GLM Corp. v. Klein,*
      665 F. Supp. 283 (S.D.N.Y. 1987)                                 30

*The Golden Budha Corp. v.*
      *The Canadian Land Company of America,*
      931 F.2d 196 (2d Cir. 1991)                                   10, 11

*Goldsmith v. Nat'l Container Corp.,*
      287 N.Y. 438, 40 N.E.2d 242 (1942)                               11

*Griffel v. Belfer,*
      10 N.Y.2d 902, 179 N.E.2d 518 (1961)                            25

*Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,*
      748 F.2d 729 (2d Cir. 1984)                                     15

*Grupo Sistemas Integrales de Telecommunicacion*
      *de C.V. v. AT & T Communications, Inc.,*
      No. 92-7862, 1996 WL 312535 (S.D.N.Y. June 10, 1996)           33

*G.S.C. Holding Corp. v. Cervoni,*
      69 A.D.2d 809, 415 N.Y.S.2d 57
      (2d Dep't), *lv. to appeal den.,*
       47 N.Y.2d 710, 419 N.Y.S.2d 1026 (1979)                       26

*Haberman v. Greenspan,*
      82 Misc.2d 263, 368 N.Y.S.2d 717
      (Sup. Ct. Richmond Co. 1975)                                    2

*Hanley v. Aperitivo,*
      1998 WL 307376,
      No. 97 CV 5768,
      (S.D.N.Y. June 11, 1998)                                        5

*Hanley v. Café Des Artistes, Inc.*,
      1999 WL 688426 ,
      No. 97 CV 9360,
      (S.D.N.Y. September 3, 1999)                                    5

*Harris v. Hallberg,*
      2007 NY Slip Op. 604, 36 A.D.3d 857,
      828 N.Y.S.2d 579 (2d Dep't 2007)                               16

*Harsco Corp. v. Segui,*
    91 F.3d 337 (2d Cir. 1996)    17

*Hughes v. BCI International Holdings, Inc.,*
    452 F.Supp.2d 290 (S.D.N.Y.2006)    2

*Hydro Investors, Inc. v. Trafalgar Power, Inc.,*
    227 F.3d 8 (2d Cir. 2000)    32

*The Independent Order of Foresters v.*
    *Donald, Lufkin & Jenrette, Inc.,*
    157 F.3d 933 (2d Cir. 1998)    11

*JP Morgan Chase Bank v. Winnick,*
    350 F. Supp.2d 393 (S.D.N.Y. 2004)    15, 18

*Jackson v. State,*
    210 A.D. 115, 205 N.Y.S. 658 (4th Dep't 1924)    24

*Janian v. Barnes,*
    294 A.D.2d 787, 742 N.Y.S.2d 445 (3d Dep't 2002)    25

*Kimmell v. Schafer,*
    89 N.Y.2d 257 675 N.E.2d 715 (1996)    32

*Koulajian v. Trek Bicycle Corp.*, No. 90 CV 3156,
    1992 WL 28884 (S.D.N.Y. 1992)    6

*Lazard Freres & Co. v Protective Life Ins. Co.,*
    108 F.3d 1531 (2d Cir. 1997)    22

*Leon v. Murphy,*
    988 F.2d 303 (2d Cir.1993)    5

*Liberty Media Corp. v. Vivendi Universal, S.A.*
    *( In re Vivendi Universal, S.A. Sec. Litig.),*
    2004 U.S. Dist. LEXIS 7015.,
    Nos. 02-5571, 03-2175,
    2004 WL 876050 (S.D.N.Y. April 22, 2004)    33

*Litton Inds., Inc. v. Lehman Bros. Kuhn Loeb Inc.,*
    767 F.Supp. 1220 (S.D.N.Y.1991),
    *rev'd on other grounds,* 967 F.2d 742 (2d Cir.1992)    30

*Long Island Lighting Co. v. Transamerica Delval, Inc.*,
    646 F. Supp. 1442 (S.D.N.Y. 1986)    4-5

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
    354 F. Supp.2d 293 (S.D.N.Y. 2004)        26

*Mallis v. Bankers Trust Co.*,
    615 F.2d 68 (2d Cir. 1980), *cert. denied*,
    522 U.S. 864, 118 S. Ct. 169, 139 L. Ed. 2d 1126 (1997)    22

*Manhattan Motorcars, Inc. v. Automobili Lamborghini*,
    2007 U.S. Dist. LEXIS 49641 (S.D.N.Y. July 9, 2007)    32

*Mandelblatt v. Devon Stores, Inc.*,
    132 A.D.2d 162, 521 N.Y.S.2d 672 (1st Dep't 1987)    30

*Mangini v. McClurg*,
    24 N.Y.2d 556, 301 N.Y.S.2d 508, 249 N.E.2d 386 (1969)    26

*In re Marketxt Holdings Corp.*, Ch. 11 Case No. 04-12078,
    2006 Bankr. LEXIS 2746 (Bankr. S.D.N.Y. 2006)    25

*McLaughlin & Stern, L.L.P. v. Lipkin*,
    288 A.D.2d 65, 733 N.Y.S.2d 17 (1st Dep't 2001)    27

*Mercogliano Lumber Corp. v. Sea Cliff Homes, Inc.*,
    31 Misc.2d 1078, 221 N.Y.S.2d 920 (Sup. Ct., Queens County 1961)    10

*Nat'l Westminster Bank v. Ross*,
    676 F. Supp. 48 (S.D.N.Y. 1987)    28

*Oko v. Walsh*,
    2006 N.Y. Slip. Op. 2732, 28 A.D.3d 529,
    814 N.Y.S.2d 655 (2d Dep't 2006)    16

*OnBank & Trust Co. v. F.D.I.C.*,
    967 F. Supp. 81 (W.D.N.Y. 1997)    24

*Orlando v. Kukielka*,
    836 N.Y.S.2d 252 (2d Dep't 2007)    17

*Pappas v. Harrow Stores, Inc.*,
    140 A.D.2d 501, 528 N.Y.S.2d 404 (2d Dept. 1988)    32

*Patell Indus. Mach. Co., Inc. v. Toyoda Machinery U.S.A., Inc.*,
    880 F. Supp. 96 (N.D.N.Y. 1995)    24

*Peach Parking Corp. v. 346 West 40th Street, LLC*,
    836 N.Y.S.2d 252 (1st Dep't 2007)    17

*Pearl v. City of Long Beach,*
    296 F.3d 76 (2d Cir. 2002)    11

*Penato v. George,*
    52 A.D.2d 939, 383 N.Y.S.2d 900 (1976)    30

*Phoenix Racing Ltd. v. Lebanon Valley Auto Racing Corp.,*
    53 F. Supp. 2d 199 (N.D.N.Y. 1999)    11-12

*Polycast Technology Corp. v. Uniroyal, Inc.,*
    1988 U.S. Dist. LEXIS 9648,
    No. 87 Civ. 3297,
    1988 WL 96586, at *10 (S.D.N.Y. Aug. 31, 1988)    32-34

*In re Ply*Gem of Laurel, Inc.,*
    91 A.D.2D 513,
    456 N.Y.S.2d 382 (1st Dep't 1982)    4

*RBS Holdings, Inc. v. Wells Fargo Century, Inc.*,
    2007 U.S. Dist. LEXIS 31687 (S.D.N.Y. April 27, 2007)    26

*Rekis v. Lake Minnewaska Mountain Houses, Inc.,*
    573 N.Y.S.2d 331 (3d Dep't 1991)    29

*Renda v. Frazer,*
    75 A.D.2d 490, 429 N.Y.S.2d 944 (4th Dep't 1980)    11

*Robare v. Fortune Brands, Inc.,*
    2007 NY Slip. Op. 3228, 39 A.D.3d 1045,
    833 N.Y.S.2d 753 (3d Dep't 2007)    11

*Ross v. Louise Wise Services, Inc.*,
    2006 NY Slip Op 2803,
    28 A.D.3d 272, 812 N.Y.S.2d 325 (1st Dep't 2006)    11

*Royal Am. Managers, Inc. v. IRC Holding Corp.*,
    885 F.2d 1011 (2d Cir. 1989)    15

*Royal Hair Pin Corp. v. Rieser Co., Inc.,*
    218 N.Y.S.2d 773 (Sup. Ct. Kings County 1961)    9

*Sabo v. Delman*,
    3 N.Y.2d 155, 164 N.Y.S.2d 714 (1957)    24, 25

*Schenck v. State Line Tel. Co.*,
    238 N.Y. 308 144 N.E. 592 (1924)    7

*In re Schick,*
    232 B.R. 589 (S.D.N.Y. 1999)                                             11

*Simcuski v. Saeli,*
    44 N.Y.2d 442, 377 N.E.2d 713, 406 N.Y.S.2d 259 (1978)                  10, 11

*Sterling Nat'l Bank & Trust Co. of New York v. Giannetti,*
    53 A.D.2d 533, 384 N.Y.S.2d 176 (1st Dep't 1976)                         25

*In re Steyer*,
    70 N.Y.2d 990, 521 N.E.2d 429, 526 N.Y.S.2d 422 (1988)                   11

*Stryker v. Rusch*,
    8 A.D.2d 244, 187 N.Y.S.2d 663 (3d Dep't 1959)                          25

*Stuart Silver Assoc., Inc. v. Baco Dev. Corp.*,
    245 A.D.2d 96, 665 N.Y.S.2d 415 (1st Dep't 1997)                        16

*Suez Equity Investors, L.P. v.Toronto Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001)                                              32

*Tahini Investments, Ltd. v. Bobrowsky,*
    99 A.D.2d 489, 470 N.Y.S.2d 431 (2d Dep't 1984)                        21-23

*Todd v. Pearl Woods, Inc.,*
    20 A.D.2d 911, 248 N.Y.S.2d 975 (2d Dep't 1964), *aff'd*,
    15 N.Y.2d 817, 205 N.E.2d 861, 257 N.Y.S.2d 937 (1965)                 21, 22

*Tomka Re Holdings, Inc. v.Loughlin,*
    2004 U.S. Dist. LEXIS 8931 (S.D.N.Y. May 19, 2004)                      33

*Towers Realty Corp. v. Fox*,
    278 A.D. 74, 103 N.Y.S.2d 437 (1st Dep't 1951)                         10, 12

*Triangle Underwriters, Inc. v. Honeywell, Inc.*,
    604 F.2d 737 (2d Cir. 1979)                                              4

*Turner v. Mutual Benefit Health & Accident Ass'n,*
    5 Misc.2d 524,160 N.Y.S.2d 883 (Sup.Ct.1957)                            29

*UniCredito Italiano SPA v. JPMorgan Chase Bank,*
    288 F. Supp. 2d 485 (S.D.N.Y. 2003)                                     23
*Waltree Ltd. v. Ing Furman Selz L.L.C.,*
    97 F. Supp. 2d 464 (S.D.N.Y. 2000)                                      14

*Weaver Organization, Inc. v. Manette,*
    41 A.D.2D 138, 341 N.Y.S.2d 631 (1st Dep't 1973)                        21

*Wells Fargo Bank Northwest v.  Taca Int'l Airlines,*
247 F. Supp.2d 352 (S.D.N.Y. 2002)                                           17

*Wiener v. Lazard Freres & Co.,*
241 A.D.2d 114, 672 N.Y.S.2d 8 (1st Dep't 1998)                              30

*Yedlin v. Rubin,*
219 A.D. 694, 220 N.Y.S. 545, (2d Dep't 1927),
*aff'd*, 247 N.Y. 529, 161 N.E. 170 (1928)                                    7

*Young v. Keith,*
112 A.D.2d 625, 492 N.Y.S.2d 489 (3d Dep't 1985)                             2

*Yurish v. Sportini,* 123 A.D.2d 760, 507 N.Y.S.2d 234 (2d Dep't 1986)       24

## **Statutes and Rules**

N.Y. C.P.L.R. §202                                                          5-6

Fed.R.Civ.P. 12(b)(6)                                                        29

## **Other**

13 A.L.R.2d 807, at §10.                                                     16

Restatement (Second) of Contracts, section 159, cmt. b, illus. 3            15

Restatement (Second) of Contracts, section 172, cmt. b, illus. 2            15

Restatement (Second) of Torts, §874, cmt. A                                 30

19A N.Y. Jur.2d Compromise, Accord and Release §103                         28

60A N.Y. Jur.2d Fraud and Deceit §226                                       28

60A N.Y. Jur.2d Fraud and Deceit §217                                       11

21 N.Y.Jur.2d *Contracts* § 121, at 528 (1982)                              29

Plaintiff Intellivision submits this memorandum of law in opposition to the motion filed by defendant Microsoft Corporation ("Microsoft") on August 17, 2007 to dismiss the Amended Complaint filed by Intellivision in the above-captioned action on July 27, 2007.

## PRELIMINARY STATEMENT

Microsoft does not deny that it defrauded Intellivision.  Instead, it seeks to shift the blame to Intellivision for carelessly allowing itself to be misled.  According to Microsoft, Intellivision is not entitled to any recovery because: (1) it signed the parties' Agreement *before* Microsoft made any misrepresentations; (2) it brought suit *one day* too late; (3) it ratified the parties' Agreement by accepting payment from Microsoft's of one-half the contract price; (4) it cannot show reasonable reliance on Microsoft's misrepresentations because Microsoft's development of a product embodying one of Intellivision more than twelve core inventions was publicly disclosed; and (5) Microsoft had no duty of candor since there was no fiduciary relationship between the parties.

Microsoft's seemingly compelling arguments are based upon a mischaracterized version of the facts alleged in the Amended Complaint and are entirely without merit.

## A.  MICROSOFT'S STATUTE OF LIMITATIONS ARGUMENTS ARE MERITLESS

### 1.  IN SIGNING THE PARTIES' AGREEMENT, INTELLIVISION RELIED ON MISREPRESENTATIONS MADE BY MICROSOFT THROUGHOUT 2000 AND 2001 –NOT JUST ON JANUARY 15, 2001

Microsoft argues that Intellivision could not have reasonably (or possibly) relied on Microsoft's alleged misrepresentations because Intellivision's principals executed the parties' Agreement on January 11, 2001 – four days *before* Microsoft is alleged to have made its misrepresentations.

Microsoft's argument is entirely disingenuous.  As alleged at ¶¶18-26 of the Amended Complaint, Intellivision relied on false representations made by Microsoft throughout 2000 and January 2001.  Microsoft's false representations were merely *confirmed* by Microsoft on January 15,

2001, the day before Intellivision signed Attachment C to the parties' Agreement and delivered the signed Agreement to Microsoft.  In executing different portions of the parties' Agreement in December 2000 and on January 11 and 16, 2001, Intellivision was relying on representations made by Microsoft throughout 2000.[1]

**2.    MICROSOFT'S ARGUMENTS RELY UPON AN ERRONEOUS EXECUTION DATE OF THE PARTIES' AGREEMENT**

Relying upon an incomplete and unenforceable portion of the Agreement ultimately reached by the parties, Microsoft further argues that Intellivision's fraudulent inducement and mistake claims are barred by the statute of limitations because Intellivision's principals executed the Agreement on January 11, 2001 – six years and one day before filing this lawsuit and, thus, one day beyond New York's six-year statutes of limitations for actions based on fraud and mistake.

It is beyond legitimate dispute that the parties' Agreement was incomplete in material respects on January 11, 2006 when the body of the Agreement was signed on January 11, 2001.  *See* Amended Compl., ¶¶27-37.  When Intellivision's principals signed the body of the Agreement on January 11, 2007, the parties understood and agreed that a complete or enforceable integrated agreement did not yet exist and had not yet been executed by Intellivision.  *See* Amended Compl., ¶29.  The complete Agreement was neither executed by Intellivision *nor delivered to Microsoft* until January 16, 2001.

---

[1]  It matters not if Microsoft's acts are found to be affirmative misrepresentations or acts of concealment, as both are actionable.  *See Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991); *Bickhardt v. Ratner*, 871 F. Supp. 613, 618 (S.D.N.Y. 1994).  A party claiming fraudulent concealment must demonstrate that the opposing party had a duty to disclose the material information in question.  *Id.* (citing *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995)).  Even in the absence of a fiduciary relationship, a duty to disclose will "arise when one party to a contract has superior knowledge which is not available to both parties", *Allen,* 945 F.2d at 45 (citing *Young v. Keith,* 112 A.D.2d 625, 627, 492 N.Y.S.2d 489, 490-91 (3d Dep't 1985), or when the defendant knew that the "plaintiff was acting under a mistaken belief with respect to a material fact." *Eastman Kodak Co. v. Wachovia Bank Nat'l Ass'n.*, 2007 WL 2406919, No. 02-CV-6441T (W.D.N.Y. August 21, 2007) (citing *Hughes v. BCI International Holdings, Inc.,* 452 F.Supp.2d 290, 303 (S.D.N.Y.2006).  *See also, Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Haberman v. Greenspan,* 82 Misc.2d 263, 265, 368 N.Y.S.2d 717, 720 (Sup.Ct. Richmond Co. 1975).

In calculating the statute of limitations for an action based on fraudulent inducement of contract, no court applying New York law has ever relied upon the date of execution of a portion of a contract. If Microsoft's argument were correct, one could conceivably rely, for the purpose of calculating the statute of limitations, on Intellivision's December 2000 execution of the patent application assignments comprising Attachment B of the Agreement. However, like the body of the Agreement, the assignments were only a portion of an agreement that had not yet come into existence and was still in discussion. That Intellivision signed different portions of the Agreement on different dates indicates only that an agreement as to the form of those respective portions and does not reflect an intention to be bound to a final agreement not yet in existence.

Microsoft's argument is further belied by the express terms of the Agreement. Paragraph 1 defines the term "Agreement" to mean "this document and attachments thereto." In its opening paragraph at Pg. 1, the Agreement states that it is not effective until the "date of the last signature below". Attachment C was signed by Intellivision's principals on January 16, 2001; whereupon the original signed agreement was sent to Microsoft for execution – which occurred on January 19, 2001. By its terms, the Agreement was not effective until January 19, 2001.[2]

The Agreement includes the body (pgs. 1-8) and Attachments A-C. The body of the Agreement was signed by Intellivision's principals on January 11, 2001 and the patent application assignments of Attachment B were signed by Intellivision's principals on December 13, 26 and 28, 2000, respectively. However, until a unanimous agreement was reached as to all material terms, including the terms of Attachment C, the parties were aware that their agreement was neither final nor binding. Moreover, the signed body of the incomplete Agreement was retained by Intellivision until formal execution of Attachment C on January 16, 2001.

---

[2] Microsoft offers the unsupported argument that the January 16 and 19, 2001 dates of execution by the parties are relevant only to determining accrual of a cause of action for breach of contract and are irrelevant for purposes of a claim of fraudulent inducement. There is no support for this argument.

The language of Attachment C was neither agreed upon, reduced to an agreed-upon writing, nor executed by Intellivision's principals until January 16, 2001.  Thus, this action was timely filed.

Microsoft implies without support that Attachment C is immaterial because it does not alter the terms of the body of the Agreement and does not relate to Intellivision's allegations of fraud. However, Attachment C defines the sole condition triggering Microsoft's duty to make an $850,000 payment (45% of the full contract price) to Intellivision.  It is an indisputably material and essential provision of the parties' Agreement.  In its absence, the parties merely had the framework of an agreement.  Attachment C defines when, and if, Microsoft's duty to pay 45% of the contract price would never accrue.  Attachment C was executed on January 16, 2001 – one day *after* Microsoft confirmed the misrepresentations that it had made to Intellivision throughout 2000 and repeated in January 2001 (*See* Amended Compl., ¶¶18-26).  Before Attachment C was agreed to, there was no meeting of the minds and, thus, no contract.

### 3.   MICROSOFT RELIES UPON AN ERRONEOUS ACCRUAL DATE OF INTELLIVISION'S CLAIMS OF FRAUD AND MISTAKE

Even if the parties' Agreement had been executed on January 11, 2001, Intellivision's claims sounding in fraud and mistake would not be time-barred.

 Microsoft erroneously relies on *In re Ply*Gem of Laurel, Inc.,* 91 A.D.2d 513, 456 N.Y.S.2d 382, 383 (1st Dep't 1982) to support its contention that the statute of limitations for Intellivision's fraud claim began to run on January 11, 2001 and, thus, expired one day before Intellivision filed its Complaint on January 12, 2007.

"[F]or fraudulent inducement of contract; the cause of action accrues when the document is executed and when the party alleging fraud has given consideration and thus suffered damage." *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 748 (2d Cir. 1979).  *See also Dynamics Corp. of Am. v. International Harvester Co.*, 429 F. Supp. 341, 355 (S.D.N.Y. 1977) (same); *Long Island Lighting Co. v. Transamerica Delval, Inc.*, 646 F. Supp. 1442, 1449 (S.D.N.Y. 1986) (same).

In a state court action, a cause of action for fraudulent inducement accrues upon "execution" of the contract.[3]  In a federal action, "[a]lthough state law furnishes the statute of limitations itself, the question of when the limitations period begins to run is determined by federal law."  *Hanley v. Café Des Artistes, Inc.*, 1999 WL 688426, *7, No. 97 CV 9360 (S.D.N.Y September 3, 1999) (citing *Hanley v. Aperitivo,* 1998 WL 307376, *7, No. 97 CV 5768 (S.D.N.Y June 11, 1998).  Under federal law, the statute of limitations begins to run "when the plaintiff 'knows or has reason to know' of the injury that is the basis of the action."  *Leon v. Murphy,* 988 F.2d 303, 309 (2d Cir.1993).  All courts in this Circuit that have addressed the issue have held that a cause of action for fraudulent inducement of contract accrues when the contract has been fully executed and when the party alleging fraud has given consideration and thus suffered damage.

Under ¶ 2.1 of the parties' Agreement, transfer of ownership of Intellivision's patent applications to Microsoft did not take effect until Microsoft made its initial payment of $1,000,000 as required by ¶3(A) of the Agreement.  That payment was made in February 2001.  *See* Amended Compl., ¶44.  Accordingly, Intellivision did not give consideration or suffer damage until February 2001, when ownership of its patent applications was transferred to Microsoft.  Intellivision's Original Complaint was timely filed on January 12, 2007.

## 4.    N.Y.'S BORROWING STATUTE IS NOT INVOKED IN THIS CASE

Microsoft argues that New York's borrowing statute, NY CPLR §202, mandates application of Connecticut's three-year statute of limitations rather than New York's six-year limitations period because Intellivision was a resident of Connecticut when the contract was executed.

---

[3]  No New York state court addressing this issue has held that "execution" means execution of only a portion of a contract, or execution of a contract that is retained in the signatory's possession until a final contract is signed.  Courts that have addressed the issue have relied upon execution of the parties' final, enforceable agreement (e.g., the contract's effective date) for statute of limitations purposes.  *See, e.g., Commercial Coin Laundry Sys. v. McGraw*, 2005 WL 3481459, *1, No. 256026 (Mich. 2005) (limitations period commenced on "effective date" of contract); *Bridge Capital Investors II v. Small*, 144 Fed. Appx. 762, 763 2005 WL 1621046, *1 (11th Cir. 2005) (statute of limitations of fraudulent inducement claim began to run on date both parties executed agreement).

NY's borrowing statute is inapplicable to this case. Microsoft's argument disregards the allegations contained in ¶1 of Intellivision's Amended Complaint. Intellivision was a resident of New York *and* Connecticut before, during, and after it negotiated and entered into its Agreement with Microsoft - -and until today.

Pursuant to NY CPLR §202, an action filed by a *nonresident* plaintiff (unlike Intellivision), seeking to recover for causes of action arising outside of New York, "requires application of the shorter statute of limitations period as well as all applicable tolling provisions, provided by either New York or the state where the cause(s) of action accrued." *Dutton v. Glass*, 2005 U.S. Dist. LEXIS 868, \*7, No. 04 CV 3496 (S.D.N.Y. January 20, 2005) (citing *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002)). CPLR §202 is invoked only when a non-resident plaintiff sues in New York over a cause of action that accrued out of state. It has no application to the facts of this case. Intellivision was a resident of New York before, during and after the parties entered into their Agreement, and it suffered injury in New York. That Intellivision had its principal place of business in Connecticut is of no moment. Although a party can have but one domicile, it can have more than one residence. *See, e.g., Koulajian v. Trek Bicycle Corp.*, 1992 WL 28884, \*3, No. 90 CV 3156 (S.D.N.Y. February 11, 1992) (New York draws a distinction between residency and domicile for purposes of the borrowing statute … Trek also concedes that a person can be a resident of more than one state") (citing *Antone v. General Motors Corp.*, 64 N.Y.2d 20, 473 N.E.2d 742, 484 N.Y.S.2d 514, 571-18 (1984)).

## 5.    <u>INTELLIVISION DID NOT RATIFY THE PARTIES' AGREEMENT</u>

Microsoft argues that Intellivision ratified the parties' Agreement because it became aware of Microsoft's misrepresentations in 2002 but did not seek to rescind the agreement for five years. This is untrue.

An action for rescission must be initiated without unreasonable delay.  *Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 47 (2d Cir. 1991) (citing *Schenck v. State Line Tel. Co.*, 238 N.Y. 308, 313, 144 N.E. 592, 594 (1924)).  However, when the defendant is responsible for a plaintiff's delay in seeking rescission, the defendant is estopped from relying on such delay.  *Id.* (citing *Yedlin v. Rubin*, 219 A.D. 694, 699, 220 N.Y.S. 545, 549-50 (2d Dep't 1927), *aff'd*, 247 N.Y. 529, 161 N.E. 170 (1928)).

As alleged in greater detail at ¶¶42-52 of Intellivision's Amended Complaint, Intellivision did not sit on its rights for five years before filing this lawsuit.  After becoming aware of Microsoft's misrepresentations in 2002, Intellivision confronted Microsoft, also in 2002.  Microsoft simply offered Intellivision additional false representations calculated to persuade Intellivision to defer the filing of a lawsuit.  In fact, Microsoft falsely persuaded Intellivision that it would be better off financially if it did not sue.

Microsoft made the initial payment of $1,000,000 required by ¶3(A) of the parties' Agreement in February 2001.  However, ¶3(B) sets forth a second payment requirement of $850,000 (approximately 45% of the full contract price).  The second payment obligation is triggered only if the Patent Office allows a patent claim having the language set forth in Attachment C of the Agreement.  To prevent Intellivision from earlier seeking rescission of the Agreement, Microsoft falsely stated that its "Ultimate TV" set-top box was a financial disaster and had been permanently discontinued in early 2002.  Consequently, Intellivision would not be entitled to monetary damages.

Microsoft also falsely advised Intellivision that the Patent Office Examiner in charge of the Intellivision patent applications indicated that he would be allowing a claim having the language set forth in Attachment C -- thus triggering Intellivision's right to receive an $850,000 payment from Microsoft.  Since the Intellivision patent applications were then owned by Microsoft, Intellivision had

no way to verify the truth of this statement. An Examiner will speak only to the attorney or agent of record about a pending patent application.

From 2003-2005, Microsoft assured Intellivision that the claim language of Attachment C would be allowed and that the Examiner simply requested additional information from Microsoft prior to allowance. On one occasion, Microsoft advised Intellivision that the Examiner would not allow the claim until he received a supplemental affidavit from the inventor (one of Intellivision's principals) stating that the acts constituting Intellivision's reduction to practice of the invention occurred in the United States. The supplemental affidavit was provided. However, the claim was never allowed.

Intellivision was falsely informed by Microsoft, and believed, that an additional payment of $850,000 was a certainty. Intellivision was falsely informed by Microsoft, and believed, that Microsoft's pre-existing use of the assigned technologies extended only to its already-discontinued Ultimate TV product. In reliance upon these false representations by Microsoft, Intellivision deferred the filing of a lawsuit. Intellivision awaited the $850,000 payment required under ¶3(B) of the contract, only to learn in October 2006 that Microsoft's representations and promises were fraudulent.

Despite advising Intellivision that its development efforts were limited to the Ultimate TV set-top box product, Microsoft had already developed a software version of Ultimate TV which was incorporated into the Windows Operating System. Microsoft knew that such a development was a material consideration to Intellivision and, despite this, Microsoft misrepresented the nature of its development efforts.

Furthermore, despite its representations to Intellivision that allowance of a specific patent claim was certain, Microsoft was not diligently prosecuting the Intellivision patent applications to ensure that Intellivision received payment under ¶3(B) of the parties' Agreement. Instead, Microsoft

was busy preparing, filing and aggressively pursuing its own patent applications based upon Intellivision's inventions. *See* Katz Dec., ¶¶ 12-16. One of the co-inventors of Microsoft's patent applications is a Microsoft in-house patent attorney charged with handling the prosecution of the assigned Intellivision patent applications. *Id.*

Microsoft's false assurances were made for the purpose of convincing Intellivision not to earlier file suit. No Patent Examiner ever advised or led Microsoft attorneys to believe that he would allow a claim having the language set forth in Attachment C. In fact, the Examiner consistently rejected that claim for the same reasons, and his rejection was upheld by the Patent Office Board of Appeals in July 2006. Intellivision was unaware of this until October 2006 because Microsoft did not provide Intellivision with copies of documents filed with and received from the Patent Office, as required by the parties' Agreement. *See* Amended Compl., ¶54.

In October 2006, Intellivision learned that Microsoft had lost a Patent Office appeal of the Examiner's rejection of a claim having the language set forth in Attachment C, and that Microsoft would soon be releasing its Windows Vista™ Operating System which incorporates some of Intellivision's core inventions. Intellivision quickly obtained the undersigned counsel, who diligently filed suit three months later, on January 12, 2007.

Accordingly, Microsoft is responsible for Intellivision's delay in seeking rescission of the parties' Agreement and is estopped from relying on such delay.

Furthermore, the issue of estoppel and the question of whether or not Intellivision's delay bars rescission raise questions of fact that cannot be resolved on a motion to dismiss. New York courts have held that affirmance of a contract is not necessarily affirmance and ratification of the fraud inducing it. Waiver of the cause of action for inducing the contract by fraud is a matter of intention, and an issue of fact to be established on trial. *See, e.g., Royal Hair Pin Corp. v. Rieser Co., Inc.,* 218 N.Y.S.2d 773 (Sup. Ct. Kings Co. 1961); *422 W. 15th St., Inc. v. Estate of Johnson*, 258 A.D. 227,

228, 16 N.Y.S.2d 283, 284 (1st Dep't 1939); *Towers Realty Corp. v. Fox*, 278 A.D. 74, 103 N.Y.S.2d

437 (1st Dep't 1951); and *Mercogliano Lumber Corp. v. Sea Cliff Homes, Inc.,* 31 Misc.2d 1078, 221

N.Y.S.2d 920 (Sup. Ct. Queens Co. 1961).

Accordingly, whether Intellivision's delay in filing suit was reasonable whether it serves as a

ratification to preclude rescission of the Agreement, and whether Microsoft should b estopped from

relying on such delay are factual issues that cannot now be resolved. *Allen v. Westpoint-Pepperell,*

*Inc., supra*, at 47 ("At this point in the litigation, however, there is little evidence probative of the

reasonableness of any delay in bringing this action"). Intellivision's claim for rescission based on

fraudulent inducement and mistake should not be dismissed as a matter of law.

### 6. MICROSOFT'S CONDUCT HAS TOLLED THE STATUTE OF LIMITATIONS

In New York, "it is the rule that a defendant may be estopped to plead the Statute of

Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from

filing a timely action." *The Golden Budha Corp. v. The Canadian Land Company of America,* 931

F.2d 196, 200 (2d Cir. 1991) (citing *Simcuski v. Saeli,* 44 N.Y.2d 442, 448-49, 377 N.E.2d 713, 716,

406 N.Y.S.2d 259, 262 (1978)). The plaintiff is said to bear the burden of establishing that the action

has been brought within a reasonable time after the facts forming the basis for the estoppel no longer

are operational. *Id.* Intellivision has satisfied this burden.

As discussed in Section A(5) above, once confronted by Intellivision in 2002, Microsoft

induced Intellivision to defer the filing of a lawsuit by falsely representing to Intellivision that

Intellivision would be entitled to an additional $850,000 payment and that Microsoft's only product

embodying Intellivision's core inventions was permanently discontinued. Microsoft concealed its

further development efforts concerning Intellivision's core inventions (Windows Vista™), and

concealed that it was pursuing, at Intellivision's expense, its own patent applications based on

Intellivision's inventions.

10

"Whether in any particular instance the plaintiff will have discharged his responsibility of due diligence in this regard must necessarily depend on all the relevant circumstances." *Golden Budha, id.* at 200 (citing *Simcuski,* 44 N.Y.2d at 450, 377 N.E.2d at 717, 406 N.Y.S.2d at 263). In the case at bar, as in *Golden Budha* and *Simcuski*, "it is not possible or appropriate . . . on the present motion addressed to the pleading, presenting us as it must with only a skeletal record, to determine whether this plaintiff met [its] obligation of due diligence when [it] instituted the present action". *Id.* (citing *Simcuski,* 44 N.Y.2d at 451, 377 N.E.2d at 717, 406 N.Y.S.2d at 263-64). Indeed, it is questionable whether an equitable estoppel defense to a statute of limitations claim under circumstances such as those revealed here even can be resolved on a summary judgment motion." *Id.* (citing *Renda v. Frazer,* 75 A.D.2d 490, 496, 429 N.Y.S.2d 944, 948 (4th Dep't 1980)). *See also, In re Steyer*, 70 N.Y.2d 990, 521 N.E.2d 429, 526 N.Y.S.2d 422 (1988); *General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 219 N.E.2d 169, 272 N.Y.S.2d 33 (1966); *Pearl v. City of Long Beach*, 296 F.3d 76, 82-83 (2d Cir. 2002); *The Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940-41 (2d Cir. 1998); *Robare v. Fortune Brands, Inc.*, 2007 NY Slip. Op. 3228, 39 A.D.3d 1045, 833 N.Y.S.2d 753 (3d Dep't 2007); *Ross v. Louise Wise Services, Inc.*, 2006 NY Slip Op 2803, 28 A.D.3d 272, 812 N.Y.S.2d 325 (1st Dep't 2006).

## 7.    EVEN IF INTELLIVISION RATIFIED THE PARTIES' AGREEMENT, IT IS ENTITED TO SEEK MONETARY DAMAGES

Even if Intellivision is ultimately found to have ratified the parties' Agreement and that its delay is not excused by Microsoft's conduct, Intellivision's claim for damages should not be dismissed. Under New York law, "a plaintiff is not precluded from bringing an action for damages for fraud or deceit although he or she has affirmed the contract subsequent to discovering the fraud. 60A N.Y. Jur.2d Fraud and Deceit §217. *See, e.g., DuPont v. Perot,* 59 F.R.D. 404, 410 (S.D.N.Y.1973) (quoting *Goldsmith v. Nat'l Container Corp.,* 287 N.Y. 438, 40 N.E.2d 242, 244 (1942)). *See also In re Schick,* 232 B.R. 589 (S.D.N.Y. 1999); *Allen v. Westpoint-Pepperell, Inc.*, 11

F. Supp. 2d 277 (S.D.N.Y. 1997); *Phoenix Racing Ltd. v. Lebanon Valley Auto Racing Corp.,* 53 F.

Supp.2d 199 (N.D.N.Y. 1999); *Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.,* 88

A.D.2d 461, 453 N.Y.S.2d 750 (2d Dept. 1982); *Towers Realty Corp., supra; Royal Hair Pin Corp.,*

*supra.*

**B.     INTELLIVISION HAS DEMONSTRATED REASONABLE RELIANCE**

> **1.     MICROSOFT'S ARGUMENT THAT INTELLIVISION'S
> CLAIMS MUST FAIL BECAUSE THE PARTIES' AGREEMENT
> DOES NOT RESTRICT MICROSOFT'S RIGHT TO USE THE
> ASSIGNED INVENTIONS IS A "RED HERRING"**

Microsoft argues that, as a matter of law, Intellivision could not have reasonably relied on any

misrepresentations made by Microsoft concerning its intended use of Intellivision's core inventions –

because no such representations are contained in the parties' Agreement.  Microsoft further argues

that if Intellivision intended to restrict Microsoft's otherwise unfettered right to use the assigned

technologies, it was incumbent on Intellivision to insist on restrictive language in the parties'

Agreement.  In the absence of any restrictive language, Microsoft argues that it was permitted to use

the assigned technologies any way it pleased.  Thus, according to Microsoft, Intellivision cannot

demonstrate reasonable reliance.

Microsoft's arguments are based entirely on a "straw man."  Intellivision does not allege that

the parties' Agreement imposed any restrictions on Microsoft's right to use the assigned

technologies.  Nor does Intellivision allege reliance on any representations that Microsoft would not

use the assigned technologies.

In foregoing a per-unit royalty in exchange for the right to use its inventions, Intellivision

relied on Microsoft's repeated representations that it had not *already* produced and was not currently

developing products embodying Intellivision's core inventions.  Intellivision explicitly advised

Microsoft that if it had already developed a product encompassed by Intellivision's patent

applications, or was in the process of developing such a product, a per-unit royalty would be

essential.  Since Microsoft repeatedly assured Intellivision that it had not already developed and was not in the process of developing such a product, a per-unit royalty was entirely unworkable.[4]

According to Microsoft, no tangible product was then in existence, or envisioned, from which a royalty rate could be determined.  Intellivision assigned technologies that could be embodied in many different product categories.  In the absence of any existing, planned, or envisioned product, there was simply no way for the parties to fashion a royalty rate.  If a product were envisioned by Microsoft that incorporated all of the assigned technologies as major product features, a relatively large royalty rate would be justified.  On the other hand, if Microsoft envisioned a product that incorporated only one of the assigned inventions as a minor feature of the product, a relatively smaller royalty rate would be justified.  Between these two extremes lie a countless number of possibilities.  Thus, the facts, as falsely portrayed by Microsoft, made it impossible for the parties to arrive at a per-unit or revenue-based royalty rate.

Microsoft's misrepresentations were *not* related to its future use of the assigned technologies, but to its past and current development of products embodying the assigned technologies.  These material misrepresentations induced Intellivision to forego a per-unit royalty on such products.  Had Microsoft disclosed its product development efforts to Intellivision, the parties could have reached a mutually-agreeable royalty rate – or no agreement at all.

Microsoft's misrepresentations were egregious.  By the January 19, 2001 contract execution date, Microsoft had already developed its Ultimate TV set-top box product that incorporated Intellivision's core inventions as major selling features.  It was also in the process of incorporating software to manipulate live TV into its Windows operating system.  Since the time the parties' Agreement was executed in 2001, many millions of computers embodying Intellivision's core

---

[4] Since Microsoft was a software producer and had not historically introduced hardware devices like the "Ultimate TV" set-top box, Intellivision's reliance on Microsoft's representation that it had not developed such a hardware device was reasonable.

13

inventions have been sold with the "Media Center Edition" of the Windows operating system – despite Microsoft's false representations to Intellivision that it had not developed any such products.

More recently, Intellivision's core inventions have been incorporated into Microsoft's Windows Vista™ operating system which will reside on some 95% of all PCs sold on a worldwide basis. *See* Amended Complaint, ¶14.

Accordingly, Microsoft's argument that reasonable reliance cannot be demonstrated in the absence of language in the parties' Agreement restricting Microsoft's use of the assigned technologies is entirely without basis. The material misrepresentations relied on by Intellivision concerned Microsoft's manner of *payment* for its acquisition and use of Intellivision's technologies and not a promise to refrain from use of the assigned technologies.

**2. ALTHOUGH INTELLIVISION IS NOT A SOPHISTICATED PURCHASER, IT CONDUCTED DUE DILIGENCE. INTELLIVISION'S CLAIMS ARE NOT DEFEATED SIMPLY BECAUSE IT FAILED TO UNCOVER EVIDENCE OF MICROSOFT'S MISREPRESENTATIONS**

**a. Ordinary Contracting Parties Have No Duty to Exercise Due Diligence**

Under New York law, in evaluating whether a plaintiff has justifiably relied on an alleged misrepresentation, a Court may consider, among other things, the sophistication and expertise of the plaintiff in financial matters, the existence of a fiduciary relationship, access to the relevant information, concealment of the fraud, and the opportunity to detect the fraud. *Bank of Am. Corp. v. Lemgruber,* 385 F. Supp.2d 200, 230 (S.D.N.Y. 2005).[5]

---

[5] These factors raise disputed issues of fact that cannot be resolved in the context of a motion to dismiss. *Catton v. Defense Technology Systems, Inc.,* 2006 U.S. Dist. LEXIS 205, *38 & n. 122, No. 05 Civ. 6954 (S.D.N.Y. January 6, 2006) (citing *Waltree Ltd. v. Ing Furman Selz L.L.C.,* 97 F. Supp. 2d 464, 469 (S.D.N.Y. 2000) (declining to dismiss the case although there were some facts indicating that reliance was unreasonable); *Doehla v. Wathne Ltd., Inc.,* 1999 U.S. Dist. LEXIS 11787, No. 98 Civ. 6087, 1999 WL 566311, at *13-14 (S.D.N.Y. Aug. 3, 1999) (same); *Dimon, Inc. v. Folium, Inc.,* 48 F. Supp. 2d 359, 372 (S.D.N.Y. 1999) (same)). *See also, AIG Global Securities Lending Corp. v. Banc of America Securities, LLC,* 2005 U.S. Dist. LEXIS 21605, *30 & n. 5, No. 01 Civ. 11448 (S.D.N.Y. Sept. 25, 2005). Furthermore, the Amended Complaint contains allegations as to each of these factors which, when taken as true, mandate denial of Microsoft's motion.

"Ordinarily there is no duty to exercise due diligence, and [courts] have described the necessary showing of care as 'minimal diligence' or 'negating its own recklessness.'" *JP Morgan Chase Bank v. Winnick*, 350 F. Supp.2d 393, 406 (S.D.N.Y. 2004) (citing *Banque Franco-Hellenique de Commerce Int'l et Maritime, S.A. v. Christophides*, 106 F.3d 22, 26-27 (2d Cir. 1997) (quoting *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015-16 (2d Cir. 1989)).

This standard is reflected in the Restatement (Second) of Contracts. For instance, section 159, cmt. b, illus. 3 suggests that simply because a fact is one of public record, it still does not obviate the ability of the recipient of a misrepresentation from avoiding the contract. Further, section 172, cmt. b, illus. 2 contains the following example which demonstrates that even if one party chooses not to conduct an investigation he or she may still avoid the contract:

> 2. A, seeking to induce B to make a contract to buy land, tells B that the land is free from encumbrances. Unknown to either A or B, C holds a recorded and unsatisfied mortgage on the land. B could easily learn this by walking across the street to the register of deeds in the courthouse but does not do so. B is induced by A's statement to make the contract. B's reliance is justified since his fault does not amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing, and the contract is voidable by B.

### b.    The "Sophisticated Purchaser" Caselaw is Inapplicable to this Case

Sophisticated business entities are held to a higher standard than ordinary parties to commercial transactions. New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the businesses they are acquiring. *Lemgruber, supra,* 385 F. Supp.2d at 230 (citing *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.").[6]

---

[6] All cases relied upon by Microsoft involve claims of fraudulent inducement made by sophisticated

Microsoft's attempts to liken this case to the "sophisticated purchaser" line of cases (*Grumman* and its progeny) conflicts with the allegations of the Amended Complaint. Although Microsoft argues that Intellivision is too sophisticated to have relied on Microsoft's misrepresentations, ¶9 of the Amended Complaint alleges that Intellivision developed the inventions it assigned to Microsoft in a home office/laboratory located, at various times, in a barn, attic and basement. The Amended Complaint provides no support for a conclusion that Intellivision's members were sophisticated in matters of a business or financial nature. In fact, they are not.

On the other hand, Microsoft (like *Grumman*) is one of the world's largest and most profitable corporations. The facts alleged in Intellivision's Amended Complaint do not support Microsoft's contention that the parties' Agreement was the result of an arm's-length negotiation between sophisticated entities. In any event, the relative sophistication of the parties is a factual issue that cannot be resolved in the context of a motion to dismiss.

The "sophisticated purchaser" cases relied on by Microsoft are inapposite. For instance, in *Harris v. Hallberg*, 2007 NY Slip Op. 604, 36 A.D.3d 857, 828 N.Y.S.2d 579 (2d Dep't 2007) and *Oko v. Walsh*, 2006 N.Y. Slip. Op. 2732, 28 A.D.3d 529, 814 N.Y.S.2d 655 (2d Dep't 2006), the plaintiffs alleged reliance on oral representations that were flatly contracted by the express terms of their written agreements. In *Oko,* the complaint alleged reliance on an oral representation of loan approval based on a mortgage pre-approval certificate issued by the defendant-appellant. The Court held that such reliance was unreasonable in light of the clear, written and contradictory provision in the mortgage pre-approval certificate stating that the pre-approval did not constitute a loan approval or commitment. In *Harris,* the Court held that an attorney's reliance on an oral representation made

---

purchasers or investors. Cases in which a seller alleges fraud by a purchaser have not applied the same standard. Liability has been denied only where the seller learned of the fraud while the contract was still executory. *See* 13 A.L.R.2d 807, at **§**10.

by the defendant was unreasonable in light of a flatly contradictory provision in the parties' written agreement.

*Stuart Silver Assoc., Inc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 665 N.Y.S.2d 415 (1st Dep't 1997), is equally inapposite. There, the Court held that a sophisticated real estate investor's reliance on oral representations was unreasonable in light of, *inter alia,* the investor's failure to review any of the offering materials, consult with an attorney and/or accountant, or even visit the property.

In *Peach Parking Corp. v. 346 West 40th Street, LLC*, 836 N.Y.S.2d 252 (1st Dep't 2007) and *Orlando v. Kukielka,* 836 N.Y.S.2d 252 (2d Dep't 2007), the plaintiff purchasers conducted their own independent investigations, which revealed that certain representations made by the seller defendants were untrue. In both cases, the Courts astutely recognized that the plaintiffs could not have relied upon representations they knew to be untrue. Even so, the *Kukielka* Court dismissed fraud claims solely as to a third-party business broker and refused to do so as to the business seller who made the false representations.

Also inapposite are cases such as *Harsco Corp. v. Segui,* 91 F.3d 337, 345 (2d Cir. 1996)*, Consolidated Edison, Inc. v. Northeast Utilities*, 249 F.Supp.2d 387 (S.D.N.Y. 2003) and *Wells Fargo Bank Northwest v. Taca Int'l Airlines,* 247 F. Supp.2d 352, 369 (S.D.N.Y. 2002). In each such case, courts held that ultra-sophisticated contracting parties engaged in multi-million and/or multi-billion dollar transactions involving lengthy periods of negotiation, voluminous all-inclusive contracts containing extensive, carefully-worded representations and detailed disclaimers, cannot avoid contracts on the ground of fraudulent inducement – when, in addition to the foregoing facts, the plaintiffs had unfettered access to and/or were in possession of information that revealed the true nature of facts that had allegedly been the subject of misrepresentation.

Intellivision has not alleged reliance on oral representations that conflict with any terms of the parties' written Agreement. Nor did Intellivision fail to conduct any form of due diligence.

Intellivision's principals, who are not sophisticated business people, conducted online searches to learn about Microsoft's products and determine the veracity of Microsoft's representations. *See* Amended Compl., ¶25. On multiple occasions, Intellivision's principals questioned Microsoft as to whether it had already developed, was in the process of developing, or planned to develop or introduce any products utilizing Intellivision's core inventions. Each time, Microsoft falsely advised Intellivision that it had not. Under the circumstances, it cannot be said that Intellivision's reliance on Microsoft's misrepresentations was unreasonable simply because Intellivision attempted to but failed to uncover online evidence of Microsoft's misrepresentations.

The sophisticated purchaser caselaw relied on by Microsoft has no relevance to this case. Intellivision, an unincorporated venture of three individuals, lacked the resources and manpower to uncover evidence of Microsoft's fraud. Nor did Intellivision possess the financial and business sophistication of the plaintiffs in the "sophisticated plaintiff" line of cases. Even if it did, Intellivision had no access to any proprietary Microsoft information.

### 3.    MICROSOFT'S HINDSIGHTED AND IMPROPER RELIANCE ON PRESS RELEASES AND ARTICLES

Microsoft seeks to rely on press releases and brief extracts of articles obtained from a LEXIS/NEXIS database in an effort to demonstrate that it did not conceal its development efforts and that the details of such efforts were available to Intellivision. In fact, Microsoft seeks for the Court to take judicial notice of these materials.

The press releases and articles relied on by Microsoft should be excluded from consideration. They are not evidence in this case and lack a proper foundation. Nor are they referenced by, attached to or incorporated by reference in Intellivision's original or amended complaints. As such, they cannot be considered on a motion to dismiss. *JP Morgan Chase Bank v. Winnick*, 350 F. Supp.2d 393, 397 & n.2 (S.D.N.Y. 2004) ("Defendants also reference disclosures made in press releases issued prior to the time-period of the loans. These documents are outside of the evidentiary record,

and are not attached to or incorporated by reference in the complaint. As such, they cannot properly be considered on a motion to dismiss").

Microsoft has provided absolutely no proof that any of the press releases and/or articles on which it seeks to rely were actually posted to the Internet on their 2000 and 2001 publication dates. Although original press releases and articles may have existed in 2000 and/or 2001, they might not have been put online until much later. Thus, there is no basis to conclude that any of these materials would have been accessible to Intellivision when it conducted Internet searches as part of its due diligence in 2000 and 2001.

Even if they are considered in the context of the present motion, the press releases and extracts of online publications introduced by Microsoft do not lead to the conclusion that Intellivision could not have reasonably relied on Microsoft's verbal misrepresentations.

The LEXIS/NEXIS searches conducted by Microsoft's counsel are misleading because they are the result of highly-targeted online searches conducted by Microsoft's counsel using the benefit of hindsight. The searches were conducted based on the trademark (Ultimate TV) and the specific type of product (DVR, PVR) Microsoft concealed from Intellivision. Absent advance knowledge that Microsoft developed a product known as either a "PVR" or "DVR" that it intended to sell under the trademark "Ultimate TV", no such targeted search could have been performed. Stated otherwise, because Microsoft concealed this information, Intellivision's principals had no way of similarly targeting their searches in 2000.

In fact, absent prior knowledge of the "Ultimate TV" trademark or a Microsoft PVR`or DVR, one would have encountered extraordinary difficulty in attempting to uncover evidence of Microsoft's misrepresentations due to the nearly infinite number of online publications relating to Microsoft.

19

For instance, a September 14, 2007 Yahoo search of the word "Microsoft" yielded some 808 *million* search results! Each of these results comprises a website leading to yet one or more additional websites. *See* Katz Dec., ¶9. The vast majority of the results are entirely unrelated to Microsoft's pre-2001 development efforts in the field of any of Intellivision's core incentions. When Intellivision conducted its own online searches in 2000, it could not have been expected to find anything to conflict with Microsoft's verbal representations in such a massive amount of Microsoft-related media coverage.

Even a narrowly-tailored Yahoo search conducted on September 14, 2007 and designed to yield results relating to Microsoft's endeavors into the "pausing" of live television ("Microsoft and pause") yielded over six million largely irrelevant search results, *id.* at ¶10, the vast majority of which are entirely unrelated to the pausing of live television and/or were not posted to the Internet in 2000 when Intellivision conducted its own online searches.

Absent advance knowledge of a specific Microsoft trademark ("Ultimate TV) or product name (i.e., "DVR", or "PVR"), no single individual or small group of individuals could have been expected to uncover evidence of Microsoft's misrepresentations within the virtually infinite number of Microsoft-related online publications. Microsoft knew this and was fully aware that Intellivision would be forced to rely on its verbal representations. Microsoft may have announced its intentions to the press. However, it did not disclose them to Intellivision. No reasonable amount of investigation by even the most sophisticated party would have likely revealed the false nature of Microsoft's representations. As noted, Intellivision's own Internet searches in 2000 and 2001 for products embodying Intellivision's twelve core inventions did not reveal any of the press releases or articles introduced by Microsoft in its motion papers or any other publication relating to Microsoft's Ultimate TV or any similar product. *See* Amended Complaint, ¶25.

Even if the press releases now introduced by Microsoft were available for viewing on the Internet in 2000 and/or January 2001, a July 18, 2007 search of Microsoft's press release website revealed that there were more than 427 press releases issued by Microsoft from June 2000 through January 2001.

Intellivision certainly cannot have been expected to study the overwhelming amount of publicly available information relating to Microsoft, one of the world's largest companies, as part of its due diligence efforts.  Not even the most sophisticated entities have ever been held to such a high standard.

### 4.    INTELLIVISION'S RELIANCE WAS JUSTIFIABLE AND REASONABLE

Under New York law, a person has the right to rely on representations, where, as is the case here, the party making the representations has superior knowledge of the subject matter of the transaction.  *See Corva v. United Services Automobile Ass'n,* 485 N.Y.S.2d 264, 266 (1st Dep't 1985). New York courts have consistently and correctly refused to tolerate a doctrine that would allow tortfeasors to make material misrepresentations and then escape liability on the ground that their victims, had they only been more diligent, could have uncovered and avoided the fraud.  *See, e.g., Weaver Organization. Inc. v. Manette,* 41 A.D.2d 138, 341 N.Y.S.2d 631 (1st Dep't 1973).  *See also, Dimon Inc. v. Folium, Inc.*, 48 F. Supp.2d 359, 368-69 (S.D.N.Y. 1999) ("The New York cases recognize that the peculiar knowledge exception applies not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty" – denying motion to dismiss based on lack of reasonable reliance) (citing *Tahini Investments, Ltd. v. Bobrowsky,* 99 A.D.2d 489, 490, 470 N.Y.S.2d 431, 432-33 (2d Dep't 1984) (reliance arguably justified where plaintiff had no practical way of knowing that purchased land had been used as industrial waste dump) and *Todd v. Pearl Woods, Inc.,* 20 A.D.2d 911, 248 N.Y.S.2d

21

975, 977 (2d Dep't 1964) (facts discoverable by review of public records held peculiarly within defendant's knowledge)). *See also Lazard Freres & Co. v Protective Life Ins. Co.,* 108 F.3d 1531, 1542 & n. 9 (2d Cir. 1997).[7]

Even in the case of a sophisticated plaintiff, "[w]hen matters are held to be peculiarly within defendant's knowledge, it is said plaintiff may rely without prosecuting an investigation, as he has no independent means for ascertaining the truth." *Bank of Am. Corp. v. Lemgruber,* 385 F. Supp.2d 200, 230-31 (S.D.N.Y. 2005) (citing *Lazard Freres & Co. v Protective Life Ins. Co.,* 108 F.3d 1531, 1542 (2d Cir. 1997); *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir. 1980), *cert. denied*, 522 U.S. 864, 118 S. Ct. 169, 139 L. Ed. 2d 1126 (1997); *Tahini Investments, Ltd. v. Bobrowsky,* 99 A.D.2d 489, 490, 470 N.Y.S.2d 431, 433 (2d Dep't 1984); *Todd v. Pearl Woods, Inc.,* 20 A.D.2d 911, 248 N.Y.S.2d 975 (2d Dep't 1964) (plaintiff justifiably relied on misrepresentations of facts "peculiarly within the knowledge of defendants" even though plaintiffs could have ascertained the truth through inspection of public records), *aff'd*, 15 N.Y.2d 817, 205 N.E.2d 861, 257 N.Y.S.2d 937 (1965)). *See also Casey v. Masullo Brothers Builders, Inc.*, 218 A.D.2d 907, 630 N.Y.S.2d 599 (3d Dep't 1995) ("If, however, as plaintiffs contend, 'the facts were peculiarly within the knowledge of the defendant[] and were willfully misrepresented, [then] failure of [a purchaser] to ascertain the truth by inspecting the public records [will] not [be] fatal'")).

Intellivision did not simply take Microsoft at its word concerning its absence of development efforts relating to Intellivision's core inventions. It conducted its own online searches in an effort to corroborate Microsoft's representations. Unable to uncover any search results in conflict with any of Microsoft's representations, Intellivision had no reason to doubt those representations. Even if Microsoft did disclose its "Ultimate TV" product to the press, the "peculiar knowledge" exception

---

[7] As discussed in Section B(3) above, since Intellivision was unaware of any particular product that had been developed by Microsoft (i.e., a "PVR" or "DVR") and was certainly unfamiliar with the trademark ("Ultimate TV") chosen by Microsoft for such product, discovery of the truth concerning Microsoft's development efforts would have been extraordinarily difficult.

still applies to the facts of this case for the foregoing reasons.  *See also, UniCredito Italiano SPA v. JPMorgan Chase Bank,* 288 F. Supp. 2d 485, 499-500 (S.D.N.Y. 2003) ("if the plaintiff has the means of learning the facts *and* disclaims reliance on the defendant's representations, there simply is no reason to relieve it of the consequences of both its failure to protect itself and its bargain to absolve the defendant of responsibility.  On the other hand, if the plaintiff has conducted the appropriate due diligence and reasonably believes that it has corroborated the defendant's representations, then a different result may be warranted") (quoting *Dimon Inc. v. Folium, Inc.,* 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999)).

The truth about Microsoft's development efforts at the time the parties negotiated and entered into their January 2001 agreement was "peculiarly within the knowledge of" Microsoft.  Intellivision could not have discovered the truth without a great degree of difficulty.  Microsoft made no such documents available to Intellivision.  Nor could Intellivision have reviewed the infinite amount of information on the Internet relating to Microsoft to uncover the truth.  Without knowing that Microsoft intended to introduce a "PVR" or "DVR" product under the trademark "Ultimate TV", Intellivision would have had no ability to narrow its search.  Since Microsoft falsely represented that no products had been developed that incorporated Intellivision's core inventions, Intellivision had no choice but to assume that there were no documents for it to review concerning any such products.  Intellivision most assuredly could not review all of Microsoft's internal development records.  In view of the enormity of Microsoft's development efforts and online press coverage, had Intellivision undertaken to review all such materials in 2000 or January 2001, such an endeavor could still be underway.  The task of uncovering Microsoft's misrepresentations would have been extraordinarily difficult.  Although Intellivision certainly did review information concerning Microsoft's existing and upcoming products, it simply did not happen along information relating to Microsoft's "Ultimate TV: product or any similar product.

23

In any event, whether or not Intellivision had access to any information that revealed Microsoft's misrepresentations is, of course, a disputed factual issue that cannot now be resolved as a matter of law.  *See, e.g., Jackson v. State,* 210 A.D. 115, 205 N.Y.S. 658 (4th Dep't 1924) (although a sophisticated buyer, access was limited); *Tahini, supra* (triable issue of fact whether buyer could have ascertained that industrial waste drums were buried on the property bought); *Yurish v. Sportini,* 123 A.D.2d 760, 507 N.Y.S.2d 234 (2d Dep't 1986) (gross receipts of delicatessen business in the peculiar knowledge of sellers where buyer alleged it had "virtually no way of confirming" seller's representations); *OnBank & Trust Co. v. F.D.I.C.,* 967 F. Supp. 81, 86 (W.D.N.Y. 1997) (although a sophisticated buyer, a question of fact whether information was made available during due diligence and whether the loan irregularities would have been detected anyway); *Patell Indus. Mach. Co., Inc. v. Toyoda Machinery U.S.A., Inc.,* 880 F. Supp. 96, 98 (N.D.N.Y. 1995) (a question of fact whether in peculiar knowledge where substantial cost to fly out to inspect machinery and inspection might not have disclosed problem).

## C.   NEITHER A GENERAL RELEASE NOR A DISCLAIMER OF LIABILITY SHIELD A PARTY FROM THE CONSEQUENCES OF ITS OWN FRAUD

Microsoft argues that it should not be held accountable for defrauding Intellivision because the "General Release" (¶5) and "Disclaimer of Liability" (¶6.6) of the parties' Agreement constitute a waiver of Intellivision's right to claim that it was fraudulently induced to enter into the Agreement.

The New York Court of Appeals rejected precisely the same argument in a factually analogous case involving the assignment of patent rights.  The Court held that a contractual waiver or release of rights does not shield a party from acts of fraud.  *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714 (1957).[8]

---

[8]  In its initial motion to dismiss, which was voluntarily withdrawn, Microsoft further argued that the general merger clause (¶9.7) of the Agreement precluded any liability for fraudulent inducement.  In opposing Microsoft's motion, Intellivision cited a significant body of caselaw following the New

Were the law otherwise, "a defendant would have it in his power to perpetrate a fraud with immunity, depriving the victim of all redress, if he simply has the foresight to include a merger clause in the agreement.  Such, of course, is not the law."  *Sabo,* 3 N.Y.2d at 161.[9]  Accordingly, "the parol evidence rule has no application in a suit brought to rescind a contract on the ground of fraud.  In such a case, it is clear, evidence of the assertedly fraudulent oral misrepresentation may be introduced to avoid the agreement."  *Id.* 3 N.Y.2d at 161.

Under New York law, neither a waiver nor a release of rights precludes a party from claiming fraud in the inducement of the very instrument by which the party waived his rights.  *Sabo, supra,* 143 N.E.2d at 909 ("… a written waiver *in any form* cannot operate to shield a party from his own fraud.  For the courts to give effect to such a clause would be violative of both public policy and morality, since an ultimate finding of fraud must of necessity vitiate the contract relied upon").  *See also Sterling Nat'l Bank & Trust Co. of New York v. Giannetti,* 53 A.D.2d 533, 384 N.Y.S.2d 176, 176 (1st Dep't 1976).[10]

*Griffel v. Belfer,* 10 N.Y.2d 902, 179 N.E.2d 518 (1961) is closely analogous.  The plaintiff sold a tract of land to a purchaser in exchange for an up-front payment and a 1/32 percentage of profits earned from the exploitation of mineral rights.  Some time later, the defendant falsely advised the plaintiff that he had found only "dry holes" on the land and persuaded the plaintiff to agree to

---

York Court of Appeals decision in *Sabo,* in holding that a party cannot escape the consequences of its own fraud through the use of a general merger clause.

[9] The plaintiff in *Sabo,* like here, alleged that he was fraudulently induced to assign his patent rights to the defendant based on the defendant's false representations as to his intention to develop and promote of the patented technology.

[10] Likewise, a general merger clause – stating that no verbal undertakings or conditions not contained in the writing are to be binding on either party – does not prohibit the introduction of parol evidence to show fraudulent inducement.  *Sabo.  See also, Chase v. Columbia National Corp.*, 832 F.Supp. 654, 662 (S.D.N.Y. 1984); *In re Marketxt Holdings Corp.*, 2006 Bankr. LEXIS 2746 (Bankr. S.D.N.Y. 2006); *Dimon, Inc. v. Folium, Inc.,* 48 F. Supp. 2d 359, 367 (S.D.N.Y. 1999); *Cetnar v. Kinowski*, 263 A.D.2d 842, 693 N.Y.S.2d 730 (3d Dep't 1999); *Janian v. Barnes*, 294 A.D.2d 787, 742 N.Y.S.2d 445 (3d Dep't 2002); *Stryker v. Rusch,* 8 A.D.2d 244, 187 N.Y.S.2d 663 (3d Dep't 1959).

release any claim to profits from mineral rights in exchange for $50. At the time, however, the defendant actually found a source of gas underlying the land and was engaged in contract negotiations worth as much as $100,000,000. The release was summarily discarded and held to be no bar to the plaintiff's claim of fraudulent inducement.

Although a general release ordinarily bars even claims of which the releasor was unaware when the release was executed, "the rule is inapplicable in cases of fraud or where the releasee "is silent after becoming aware that the releasor is acting upon a mistaken belief as to a material fact." *Dimon, Inc. v. Folium, Inc.*, 48 F. Supp.2d 359, 366 (S.D.N.Y. 1999) (citing *Barrett v. U.S.,* 622 F. Supp. 574, 584 (S.D.N.Y. 1985)). *See also, Mangini v. McClurg,* 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 513, 249 N.E.2d 386 (1969) (inapplicable where fraud alleged); *G.S.C. Holding Corp. v. Cervoni,* 69 A.D.2d 809, 810, 415 N.Y.S.2d 57, 58 (2d Dep't), *lv. to appeal den.,* 47 N.Y.2d 710, 419 N.Y.S.2d 1026 (1979) (same). The foregoing principal applies to the instant case.[11]

Microsoft's reliance on *2 Broadway LLC v. Credit Suisse First Boston Mortgage Capital LLC*, 2001 U.S. Dist. LEXIS 4875 (April 23, 2001 S.D.N.Y) and *RBS Holdings, Inc. v. Wells Fargo Century, Inc.*, 2007 U.S. Dist. LEXIS 31687 (S.D.N.Y. April 27, 2007) is misplaced. In both cases, the claims addressed the scope of a release rather than its validity. In *RBS Holdings*, fully aware of the defendant's conduct, the plaintiff nonetheless executed a release waiving its right to assert any claims arising before a certain date. The plaintiff later sued, asserting that its claims were outside the scope of the release and, unlike here, the plaintiff not allege that it was fraudulently induced to enter the transaction associated with the release. Intellivision's Amended Complaint clearly alleges that it

---

[11]  *See also E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 284 (S.D.N.Y. 2006) ("A release that employs general terms will not bar claims outside the parties' contemplation at the time the release was executed. New York law does not construe a general release to bar claims for injuries unknown at the time the release was executed, even when the release contains broad language") (citing *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp.2d 293, 299 (S.D.N.Y. 2004)).

was fraudulently induced to enter into the parties' Agreement -- including the release and disclaimer of liability. *See, e.g.,* Amended Compl., ¶59.

Numerous other cases have reaffirmed the basic principle that a general contractual waiver of rights does not waive the right to claim fraudulent inducement. *See, e.g., McLaughlin & Stern, L.L.P. v. Lipkin,* 288 A.D.2d 65, 733 N.Y.S.2d 17 (1st Dep't 2001) (former law firm partner who executed a release could attack the release on the basis of fraud, where he alleged that his former partner had secretly diverted a fee); *Bloss v. Va'ad Harabonim of Riverdale,* 203 A.D.2d 36, 610 N.Y.S.2d 197, 198 (1st Dep't 1994) ("A release, even though properly executed, may, nonetheless, be void. Where fraud or duress in the procurement of a release is alleged, a motion to dismiss should be denied"); *Ferry v. Poughkeepsie Galleria Co.,* 197 A.D.2d 913, 602 N.Y.S.2d 267, 268 (4th Dep't 1993) ("Although plaintiffs' commercial lease contained a provision waiving the right to trial by jury of any action arising out of that lease, that waiver does not apply to plaintiffs' causes of action alleging that plaintiff Ferry was induced to enter into the lease agreement by defendant's fraudulent misrepresentations."); *FDIC v. Frank L. Marino Corp.,* 74 A.D.2d 620, 425 N.Y.S.2d 34, 35 (2d Dep't 1980) ("A waiver of the right to assert a setoff or counterclaim is not against public policy and has been enforced by this court. However, such a waiver will not be enforced so as to bar a viable setoff or counterclaim sounding in fraud"); *Brooklyn Nat'l Bank of New York v. Werblow,* 263 A.D. 884, 884-85, 32 N.Y.S.2d 169 (2d Dep't 1942) ("Obviously the setting up of the compromise agreement as a bar to the first cause of action does not avoid plaintiff's right to recover, since plaintiff's claim is for damages sustained by reason of defendant's fraud in inducing plaintiff to execute the compromise agreement and necessarily is predicated upon the fact that the compromise agreement and all its provisions are valid and binding …This release does not purport to release the cause of action averred in the complaint. On the contrary, it constitutes a part of the very foundation of the cause of action alleged.") (citation and internal quotation marks omitted)); *Cucchiaro v.*

27

*Cucchiaro,* 165 Misc.2d 134, 627 N.Y.S.2d 224, 227-28 (Sup. Ct. Orange Co. 1995) (holding that

"plaintiff's waiver of equitable distribution is binding only to the extent that the Court finds that the

separation agreement was not fraudulently induced"); *Nat'l Westminster Bank v. Ross,* 676 F.Supp.

48, 54 (S.D.N.Y. 1987) (holding that defendant's allegation of fraud "supersedes his waiver of the

right to assert counterclaims").  *See also,* 19A N.Y. Jur.2d Compromise, Accord and Release §103

("A releasor is entitled to be relieved from the consequences of the release obtained by fraud,

misrepresentation, or deceit.  A release obtained through fraud may on that basis be rendered

invalid." (footnotes omitted)); 60A N.Y. Jur.2d Fraud and Deceit §226 ("While a party who, after

having been defrauded, compromises the matter in relation to which fraud was committed with full

knowledge the fraud will be concluded by a valid compromise or settlement, he or she does have the

right to relief from the fraud, notwithstanding a settlement, where it appears that he or she entered

into the settlement without knowledge of the fraud.") (footnotes omitted).

Because it is so well established under New York law that a release is void if induced by

fraud, Intellivision's waiver of "any claims" against Microsoft does not preclude it from contesting

that provision as having been fraudulently obtained.

**D.      INTELLIVISION HAS STATED A VALID CLAIM**
**         FOR RESCISSION BASED UPON MUTUAL MISTAKE**

The alternative ground for rescission alleged by Intellivision is mutual mistake.  The alleged

mistake is a mutual lack of awareness shared by Intellivision's principals and Microsoft employees

that Microsoft had, in fact, already developed products embodying Intellivision's core inventions and

was in the process of developing more such products, and that, had the parties been aware of this fact,

a per-unit royalty rate would have been reached.  The Amended Complaint alleges that, at the time

the parties negotiated their agreement, Intellivision was unaware of Microsoft's developments and (in

alternative pleading) that Microsoft employees were similarly mistaken as to their company's

developments.  The Amended Complaint further alleges that had the parties been aware of the facts,

28

they would have reached a per-unit royalty. These allegations raise questions of fact that have not been resolved at this stage of the litigation.

Microsoft's counsel argues, entirely without support, that Microsoft flatly rejected Intellivision's insistence on a per-unit royalty. However, this argument mischaracterizes the Amended Complaint, which alleges that the denial of a per-unit royalty was based upon the absence of any existing or envisioned product from which a reasonable royalty rate can be determined. In the absence of such a product, a royalty rate could not be arrived at.

Thus, the parties' mutual mistake was a lack of awareness by both Intellivision principals and Microsoft employees concerning Microsoft's development efforts. In a company with tens of thousands of employees, such a lack of awareness is certainly not out of the realm of possibility. The facts alleged in the Amended Complaint implicate the necessary elements for rescission based on mutual mistake: both parties shared the same erroneous belief as to a material fact, and their acts did not in fact accomplish their mutual intent. *See Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 46 (2d Cir. 1991) (citing *Rekis v. Lake Minnewaska Mountain Houses, Inc.,* 573 N.Y.S.2d 331, 335 (3d Dep't 1991); *Turner v. Mutual Benefit Health & Accident Ass'n,* 5 Misc.2d 524, 530-31, 160 N.Y.S.2d 883, 890-91 (Sup. Ct.1957); 21 N.Y.Jur.2d *Contracts* § 121, at 528 (1982)). Intellivision's Amended Complaint states a claim of mutual mistake sufficient to survive a challenge under Fed.R.Civ.P 12(b)(6).

**E.    INTELLIVISION HAS STATED VALID BREACH OF FIDUCIARY
          DUTY AND NEGLIGENT MISREPRESENTATION CLAIMS**

Microsoft argues that Intellivision's claims for breach of fiduciary duty and negligent misrepresentation should be dismissed because there was no fiduciary relationship between the parties.

1.    **MICROSOFT OWED INTELLIVISION A FIDUCIARY DUTY**

Under New York law, "[a] fiduciary relation exists between two persons when one of them is under a duty to act or to give advice for the benefit of the other upon matters within the scope of the relation." *Bank of Am. Corp. v. Lemgruber,* 385 F. Supp.2d 200, 224 (S.D.N.Y. 2005) (citing *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 168, 521 N.Y.S.2d 672, 676 (1st Dep't 1987); *Restatement (Second) of Torts* § 874, cmt. A)). While "any inquiry into whether such obligation exists is necessarily fact-specific to the particular case," courts "will look to whether a party reposed confidence in another and reasonably relied on another's superior expertise or knowledge." *Wiener v. Lazard Freres & Co*., 241 A.D.2d 114, 122, 672 N.Y.S.2d 8, 14 (1st Dep't 1998) (citations omitted). Such a duty can sometimes arise out of a contractual relationship. See *Mandeblatt,* 521 N.Y.S.2d at 676 ("It is well-settled that the same conduct which may constitute the breach of contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself"); *GLM Corp. v. Klein,* 665 F. Supp. 283, 286 (S.D.N.Y. 1987) ("If a contract establishes a relationship of trust and confidence between the parties, … then a fiduciary duty arises from the contract which is independent of the contractual obligation.").

"Under New York law, a fiduciary relationship includes 'both technical fiduciary relations and those informal relations which exist whenever one [person] trusts in, and relies upon, another.' " *Ahern v. Scholz,* 85 F.3d 774, 794 (1st Cir. 1996) (applying New York law) (citing *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir. 1991) (quoting *Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900, 904-05 (1976)); *Apple Records, Inc. v. Capitol Records, Inc.,* 137 A.D.2d 50, 529 N.Y.S.2d 279, 283 (1988) (noting that fiduciary relationship can be found between close friends or where confidence is based upon prior business dealings). "New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting

superiority or influence over the first." *Litton Inds., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 767 F.

Supp. 1220, 1231 (S.D.N.Y.1991), *rev'd on other grounds,* 967 F.2d 742 (2d Cir.1992).

A fiduciary relation exists between Microsoft and Intellivision because, *inter alia*, the parties'

Agreement creates an ongoing relationship between the parties that requires Intellivision to repose

confidence and trust in Microsoft.  As discussed in above and alleged in the Amended Complaint,

Microsoft's obligation to make an $850,000 payment under the Agreement is contingent upon

allowance of a patent claim having the language set forth in Attachment C of the Agreement.  Since

ownership of the patent applications was transferred to Microsoft under the Agreement, Microsoft

assumed responsibility for prosecuting the assigned Intellivision patent applications.  Intellivision's

right to the $850,000 payment was dependent upon Microsoft's handling of the assigned applications.

Accordingly, Microsoft has a fiduciary duty to diligently prosecute the patent applications

assigned by Intellivision to Microsoft to obtain allowance of a claim having the language contained in

Attachment C of the parties' Agreement and was under a further duty to provide Intellivision with

accurate and correct information concerning the prosecution of the assigned applications.  Microsoft

breached its duty.[12]

---

[12]  Paragraphs 73-75 of the Amended Complaint specify how Microsoft breached its fiduciary duty. For instance, paragraph 73 alleges the following alleged breaches: (1) Failing to diligently prosecute the assigned patent applications to obtain allowance of a claim having the language contained in Attachment C; and by (2) its acts of misrepresentation and concealment occurring throughout 2003 – 2006, after execution of the parties' agreements, including, (a) misrepresentations made by Microsoft to Intellivision from 2002 through 2005 that a claim having the language contained in Attachment C would be allowed, and (b) concealment of Patent Office communications revealing that the Examiner had no intention of allowing a claim having the language of Attachment C, including concealment of Microsoft's July 2006 loss of a Patent Office appeal as to such claim; (3) Microsoft's concealment of its development of a software version of Intellivision's core technologies for incorporation into the Windows® Operating System; and (4) Microsoft's preparation, filing and diligent prosecution of patent applications based on Intellivision technologies and falsely naming Microsoft employees as sole inventors, in lieu of diligent prosecution of the assigned Intellivision patent applications, for the purpose of destroying the value of the assigned Intellivision patent applications in the event such applications must be reassigned to Intellivision.

### 2.    A NEGLIGENT MISREPRESENTATION CLAIM CAN BE MAINAINED N THE ABSENCE OF A FIDUCIARY DUTY

Microsoft argues that because it owed Intellivision no fiduciary duty, Intellivision's negligent misrepresentation claim should be dismissed.  Since there was, in fact, a fiduciary relationship between the parties, Microsoft's motion should be denied.  However, while a special relationship is required, a fiduciary relationship is not a prerequisite to a claim of negligent misrepresentation.[13]

The special relationship and duty required for a negligent misrepresentation claim is based on consideration of the following three factors: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose."  *Manhattan Motorcars, Inc. v. Automobili Lamborghini*, 2007 U.S. Dist. LEXIS 49641, *19 (S.D.N.Y. July 9, 2007) (citing *Suez Equity Investors, L.P. v.Toronto Dominion Bank,* 250 F.3d 87, 103 (2d Cir. 2001)).

A simple commercial relationship, such as that between a franchisor and franchisee, does not constitute the kind of special relationship necessary for a negligent misrepresentation claim.  *Id.* (citing *Dimon, Inc. v. Folium, Inc.,* 48 F. Supp.2d 359, 373 (S.D.N.Y. 1999)).  However, courts have found a special relationship and duty, for example, where a defendant sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information.  *Id.* (citing *Kimmell v. Schafer,* 89 N.Y.2d 257,

---

[13]  Under New York law, a claim of negligent misrepresentation must satisfy the following five elements: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that it should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  *Manhattan Motorcars, Inc. v. Automobili Lamborghini*, 2007 U.S. Dist. LEXIS 49641, *19 (S.D.N.Y. July 9, 2007) (citing *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir. 2000)).  *See also Pappas v. Harrow Stores, Inc.,* 140 A.D.2d 501, 504, 528 N.Y.S.2d 404, 407 (2d Dept. 1988).

264-65, 675 N.E.2d 715(1996)).  A commercial relationship may also become a special relationship where "the parties … enjoy a relationship of trust and reliance 'closer … than that of the ordinary buyer and seller."' *@Wireless Enterprises, Inc. v. AI Consulting, LLC*, 2006 U.S. Dist. LEXIS 79874 (W.D.N.Y. October 30, 2006) (citing *Polycast Technology Corp. v. Uniroyal, Inc.,* 1988 U.S. Dist. LEXIS 9648, No. 87 Civ. 3297, 1988 WL 96586, at *10 (S.D.N.Y. Aug. 31, 1988)).  Courts have found a special relationship and duty, for example, where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information.  *Id.* (citing *Century Pac., Inc. v. Hilton Hotels Corp.,* 2004 U.S. Dist. LEXIS 6904, No. 03 Civ. 8258(SAS), 2004 WL 868211 at *8 (S.D.N.Y. Apr. 21, 2004)).  *See also, Adiel v. Coca-Cola Bottling Co.,* 1995 U.S. Dist. LEXIS 13141, 95 CIV. 0725 (WK), 1995 WL 542432 at *5 (S.D.N.Y. Sep. 13, 1995) ("Ordinarily, New York courts do not recognize a fiduciary relationship between a franchisee and franchisor.")

"Courts in this circuit have held that a determination of whether a special relationship exists is highly fact-specific and generally not susceptible to resolution at the pleadings stage." *Century Pac., Inc. v. Hilton Hotels Corp.,* 2004 U.S. Dist. LEXIS 6904, 2004 WL 868211 at *8 (citation and internal quotation marks omitted).  Nonetheless, "plaintiffs must allege at least some of the factors from which a court could conclude that such a relationship has been established." *Boley v. Pineloch Associates, Ltd.,* 700 F.Supp., 673, 681 (S.D.N.Y. 1988).

Courts entertaining such a motion have proceeded with marked caution because, under New York law, "determining whether a special relationship exists ordinarily requires a fact-intensive, case-by-case inquiry. *Tomka Re Holdings, Inc. v.Loughlin,* 2004 U.S. Dist. LEXIS 8931, *17 (S.D.N.Y. May 19, 2004) (citing *Liberty Media Corp. v. Vivendi Universal, S.A. ( In re Vivendi Universal, S.A. Sec. Litig.),* 2004 U.S. Dist. LEXIS 7015., Nos. 02-5571, 03-2175, 2004 WL 876050, *13 (S.D.N.Y. April 22, 2004) (denying motion to dismiss claim because negotiated corporate acquisition

potentially gave rise to special relationship); *Grupo Sistemas Integrales de Telecommunicacion de C.V. v. AT & T Communications, Inc.,* No. 92-7862, 1996 WL 312535 at *9 (S.D.N.Y. June 10, 1996) ("Those courts that have found, applying New York law, that no special relationship existed have typically done so, not at the pleading stage, but after trial, on the basis that plaintiffs failed to carry their evidentiary burden."); *Polycast Technology Corp. v. Uniroyal, Inc.,* 1988 U.S. Dist. LEXIS 9648, No. 87 Civ. 3297 (JMW), 1988 WL 96586, at *12 (S.D.N.Y. August 31, 1988) (special relationship inferred from extended negotiation period between the parties prior to the transaction, seller's assurances as to the earnings projections, and seller's superior information about the subject of the transaction)).  *See also, Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.,* 1988 U.S. Dist. LEXIS 2916, No. 85 Civ. 3439 (JFK) (S.D.N.Y. Apr. 8, 1988) (same).

In this case, Intellivision has alleged that after lengthy negotiations, Microsoft assumed full responsibility for prosecuting Intellivision's patent application and that its right to receive payment of 45% of the contract price was dependent upon Microsoft's prosecution efforts, thereby creating a long-term relationship that still persists today.  The parties' transaction was more than a simple sale. The parties engaged in lengthy negotiations prior to Microsoft's acquisition of Intellivision's assets in which Microsoft allegedly made representations -- based on their superior information -- regarding Microsoft's development activities.  *Polycast,* 1988 WL 96586, at *12 (special relationship existed where extended negotiation period between the parties before purchase of seller's subsidiary, seller vouched for the earnings projections and had superior information regarding the subsidiary throughout the negotiation).

Applying the law as summarized above, at this stage in the proceedings, Intellivision's allegations are sufficient to overcome a motion to dismiss.

34

## **CONCLUSION**

For all of the foregoing reasons, Intellivision respectfully submits that Microsoft's motion to dismiss the Amended Complaint in this action should be denied in its entirety.

Dated: September 24, 2007          Respectfully submitted,

LAW OFFICES OF BRUCE D. KATZ & ASSOCIATES


By:    /s/ Bruce D. Katz             
       Bruce D. Katz, Esq.
       225 Broadway – 37th Floor
       New York, NY 10007
       (212)233-3434

       *Attorneys for Plaintiff*
       Intellivision, a joint venture

## CERTIFICATE OF SERVICE

I hereby certify that true copies of the foregoing Memorandum of Law of Plaintiff Intellivision in Opposition to Defendant Microsoft's Motion to Dismiss Amended Complaint and Declaration of Bruce D. Katz, Esq., have been served on defendant by depositing on September 24, 2007 an envelope containing the same with the United States Postal Service, postage prepaid, addressed to plaintiffs' counsel as follows:

Steven L. Holley, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004-2498


_____/s_____
Bruce D. Katz, Esq.