UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

INTELLIVISION, a Joint Venture,

                   Plaintiff,          07 Civ. 4079 (JGK)

      - against -              **MEMORANDUM OPINION
AND ORDER**

MICROSOFT CORPORATION,

                  Defendant.
————————————————————————

JOHN G. KOELTL, District Judge:

    The plaintiff, Intellivision, brings this diversity action against Microsoft Corporation ("Microsoft").  The plaintiff asserts five causes of action in the Amended complaint: (1) fraudulent inducement; (2) unilateral mistake; (3) mutual mistake; (4) negligent misrepresentation; and (5) breach of fiduciary duty.  Microsoft now moves to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

I

    For the purposes of this motion to dismiss, the following facts as alleged in the Amended Complaint are accepted as true. Intellivision is an unincorporated joint venture formed by three principles, Bruce Adams, Paul Hoffman, and John Daniels.  (Am. Compl. ¶ 1.)  Intellivision was formed in New York and

maintained offices in New York City and Connecticut. At all relevant times, John Daniels was a resident of Connecticut, Bruce Adams was a resident of New Jersey, and Paul Hoffman was a resident of New York. (Am. Compl. ¶¶ 1, 2.) Microsoft is a corporation organized under the laws of the state of Washington where it also has its principal place of business. (Am. Compl. ¶ 3.)

Intellivision was formed in part to develop "interactive television and related technologies" and was engaged in the commercial exploitation of twelve "core inventions" related to interactive television and television set-top box technology. (Am. Compl. ¶¶ 6-7.) These core inventions are disclosed in numerous patent applications filed in the United States and abroad, and the United States Patent and Trademark Office ("PTO") has issued a patent based on one of Intellivision's patent applications. (Am. Compl. ¶¶ 11-13.) Technology developed by Intellivision has already been incorporated into many consumer electronics products including the Digital Video Recorder ("DVR") as well as Microsoft's Windows Media Center and Windows Vista operating system. (Am. Compl. ¶ 10.)

In 1999, at an interactive television trade show in New York City, Intellivision representatives discussed its technology with John Colombo, a business development manager for Microsoft. (Am. Compl. ¶ 16.) Intellivision subsequently

initiated further discussions with Mr. Colombo about
Intellivision's technology, and in 2000 Microsoft invited
representatives of Intellivision to visit Microsoft's WebTV
campus in Mountain View, California.  (Am. Compl. ¶¶ 17-18.)
During the visit, Microsoft provided Intellivision with an
overview of Microsoft's activities and developments in the area
of television.  (Am. Compl. ¶ 18.)  In response to questioning
from Intellivision representatives, Microsoft executives,
including Anthony Faustini, stated that Microsoft had not
developed and was not engaged in the development of a set-top
box or software incorporating any of Intellivision's core
inventions.  (Am. Compl. ¶ 18.)  During and after the visit, Mr.
Faustini told Intellivision representatives that Microsoft was
interested in purchasing Intellivision's intellectual property
for defensive purposes.  (Am. Compl. ¶ 19.)

     Microsoft and Intellivision subsequently engaged in
negotiations over a purchase of Intellivision's intellectual
property.  During the course of these negotiations,
Intellivision made an offer combining an up-front cash payment
and a per-unit royalty on products within the scope of
Intellivision's patent applications.  (Am. Compl. ¶¶ 20-21.)
Intellivision indicated to Microsoft's attorney that it would
insist on a royalty if Microsoft planned on introducing any such
products.  (Am. Compl. ¶ 22.)  Microsoft's attorney informed

Intellivision that a royalty payment would be "unworkable" because none of Intellivision's patent applications had yet issued as patents and Microsoft had not developed, was not developing, and at the time did not intend to develop any products incorporating Intellivision's core inventions. (Am. Compl. ¶ 22.) Microsoft's attorney made these representations in the fall of 2000 and again on January 15, 2001, confirming the representations of Microsoft executives made earlier in 2000. (Am. Compl. ¶¶ 23, 38.) In an attempt to confirm these representations, Intellivision conducted online searches in 2000 and January 2001 which did not yield any information that conflicted with the representations. (Am. Compl. ¶ 25.)

In January 2001, Intellivision entered into an agreement in which Intellivision agreed to assign its patent applications to Microsoft (the "Agreement"). (Am. Compl. ¶ 27.) In December 2000, Intellivision's principals executed the assignments. (Am. Compl. ¶ 28.) On January 11, 2001, Intellivision's principals executed the "body of the Agreement" and retained the signed original in their possession (Am. Compl. ¶¶ 28, 33.) The Agreement provided that Microsoft would pay Intellivision $1,000,000 within thirty days of the effective execution of the Agreement. (Agreement ¶ 3(A), Am. Compl. Ex. 1.) At that time, the parties had not reached a final agreement as to the terms of Attachment C of the Agreement, which set out the language of a

4

patent claim that, if allowed by the Patent Office, would trigger Microsoft's obligation to pay Intellivision an additional $850,000. (Am. Compl. ¶¶ 28, 31; see Agreement ¶ 3(B).) The parties subsequently reached an agreement as to the language of Attachment C and Intellivision's principals executed Attachment C on January 16, 2001. (Am. Compl. ¶¶ 31, 33.) Intellivision delivered the signed copies of the body of the Agreement as well as the assignments and Attachment C to Microsoft and an officer of Microsoft executed the Agreement on January 19, 2001. (Am. Compl. ¶¶ 32, 34.) "Agreement" is defined as "this document and attachments thereto," and the Agreement states that it is effective "on the date of the last signature below." (Am. Compl. ¶¶ 30, 35.)

In reliance on Microsoft's aforementioned representations, Intellivision agreed to forego a per-unit royalty as part of the Agreement and agreed to a general merger clause, a disclaimer of liability, a general release, and a forum-selection clause. (Am. Compl. ¶¶ 26, 38, 59.) The Agreement "creat[ed] no ongoing duties on the part of Microsoft." (Am. Compl. ¶ 59.)

Approximately one week after the Agreement was fully executed, Microsoft launched a national advertising campaign for its "Ultimate TV" product, a television set-top box incorporating the technology embodied in the patent applications assigned by Intellivision to Microsoft pursuant to the

Agreement.  (Am. Compl. ¶¶ 39-40.)  Microsoft was also developing or had developed a software-based version of Ultimate TV during the period it represented to Intellivision that it was not developing any products embodying the technology in Intellivision's patent application.  (Am. Compl. ¶¶ 39-40.)

Intellivision discovered Microsoft's misrepresentations in 2002 after Microsoft had discontinued Ultimate TV.  (Am. Compl. ¶¶ 42.)  In 2002 and 2003 Intellivision insisted on rescission of the Agreement or reformation of the Agreement to incorporate a royalty, but Microsoft convinced Intellivision not to sue on the grounds that the Ultimate TV set-top box had been discontinued and therefore it would be in Intellivision's financial interest to await allowance of the patent claim set forth in Attachment C so that Intellivision could claim the additional $850,000 under the Agreement.  (Am. Compl. ¶¶ 43, 45, 49.)  At the same time, Microsoft concealed from Intellivision that it had developed or was in the process of developing a software-based version of Ultimate TV that would be incorporated into its Windows operating system and misrepresented facts with respect to the prosecution of the patent application containing the claim language in Attachment C.  (Am. Compl. ¶¶ 46-47.)  In particular, Microsoft told Intellivision that the examiner had indicated that he intended to allow the claim after he received additional information. (Am. Compl. ¶¶ 47-48.)  In October 2006,

Intellivision learned that in July 2006 Microsoft had lost a
Patent Office appeal of the examiner's rejection of the claim
language from Attachment C.  (Am. Compl. ¶ 54.)  Intellivision
also learned that Microsoft's Windows Vista Operating System,
which was slated for release, incorporated some of
Intellivision's core inventions.  (Am. Compl. ¶ 54).
Intellivision filed the current lawsuit on January 12, 2007.


                                II

     In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true and all
reasonable inferences must be drawn in the plaintiff's favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d
Cir. 1995).  The Court should not dismiss the complaint if the
plaintiff has stated "enough facts to state a claim to relief
that is plausible on its face."  Twombly v. Bell Atlantic Corp.,
127 S. Ct. 1955, 1974 (2007); see also Iqbal v. Hasty, 490 F.3d
143, 157-58 (2d Cir. 2007).

     In addition, Rule 9(b) states that "[i]n all averments of
fraud or mistake, the circumstances constituting fraud or
mistake shall be stated with particularity."  Rule 9(b) requires
that a complaint "adequately specify the statements it claims
were false or misleading, give particulars as to the respect in

which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).

III

The Court must first determine the substantive law applicable to the plaintiff's claims. The defendant argues that either New York or Connecticut law applies. In response, the plaintiff does not argue for the application of the law of any particular state, but instead argues that the choice of law analysis raises issues of fact that cannot be determined on a motion to dismiss. The parties agree that the forum selection clause and the choice-of-law provision in the Agreement do not apply to the claims asserted in the Amended Complaint.[1]

A federal court sitting in diversity applies the choice of law rules of the state in which it sits. Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998). Where there is no actual conflict of laws, New York dispenses with the choice of law analysis. Id. If there is an actual conflict, "the relevant

---

[1] The Agreement provides: "This Agreement will be governed by and interpreted in accordance with the laws of the State of Washington, exclusive of its choice-of-law provisions. Any dispute regarding any alleged breach of this Agreement shall be resolved in the federal or state courts of the State of Washington, and [Intellivision] agrees that it will not contest the jurisdiction of such courts." (Agreement ¶ 9.2.) The parties' agreement not to rely on this provision apparently is based on the parties' agreement that the claims in this case are not based on any alleged breach of the Agreement.

analytical approach to choice of law in tort actions is the
'interest analysis'" where "'the law of the jurisdiction having
the greatest interest in the litigation will be applied.'"
Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531,
1539 n. 5 (2d Cir. 1997) (quoting Schultz v. Boy Scouts, 480
N.E.2d 679, 684 (1985)).

    In weighing the interests that two jurisdictions may have
in the application of their law to a particular tort cause of
action, the New York choice of law rules distinguish between
"conduct regulating" and "loss allocating" rules.  Lee v.
Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999).  "Where the
parties are domiciled in different states, the locus of the tort
will almost always be determinative in cases involving conduct-
regulating" rules.  Krock v. Lipsay, 97 F.3d 640, 646 (2d Cir.
1996).

    The parties have not submitted any authority demonstrating
that there is an actual conflict of laws between the law of New
York and the law of Connecticut with respect to the plaintiff's
claims of unilateral mistake, mutual mistake, or breach of
fiduciary duty, nor does it appear that there is any actual
conflict.[2]  Therefore, the Court will apply New York law to these
claims.

---

[2] Compare Chimart Assocs. v. Paul, 489 N.E.2d 231, 233-34 (N.Y. 1986), with
Harlach v. Metro. Prop. & Liab. Ins. Co., 602 A.2d 1007, 1009-10 (Conn. 1982)
(mutual mistake and unilateral mistake); compare Muller-Paisner v. TIAA, 446

A

Under Connecticut law, "[t]he essential elements of an action for fraud are: "(1) false representation made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party acted upon that false representation to his detriment." Goldstein v. Unilever, No. 397881, 2004 WL 1098789, at *9 (Conn. Super. Ct. May 3, 2004) (quoting Leonard v. Commissioner of Revenue Services, 264 Conn. 286, 296 (2003)); see also Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 979 (2d Cir. 1996). Under New York law, in addition to the elements under Connecticut law, a plaintiff asserting a claim for fraud based on false statements must also allege that the plaintiff's reliance was reasonable. See, e.g., Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994); Dooner v. Keefe, Bruyette & Woods, Inc., 157 F. Supp. 2d 265, 277 (S.D.N.Y. 2001). The defendant cites to no Connecticut appellate court requiring a showing of reasonable reliance under Connecticut law for a claim of fraud. See Goldstein, 2004 WL 1098789, at *10 (Conn. Super. Ct. May 3, 2004) ("'[R]easonable reliance' is not an element of fraud."); but see Tyson v. Louis Marine Ltd., No.

---

F. Supp. 2d 221, 229-30 (S.D.N.Y. 2006), with Biller Assocs. v. Peterken, 849 A.2d 847, 851-52 (Conn. 2004) (breach of fiduciary duty).

CV040104074S, 2005 WL 2981642, at *4 (Conn. Super. Ct. Oct. 18, 2005).[3]

Furthermore, New York and Connecticut law conflict with respect to the issue of whether a release or disclaimer of representations can operate as a bar to a claim of fraud. Under New York law, "where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it had disclaimed reliance upon." Harsco Corp. v. Segui, 91 F.3d 337, 345 (2d Cir. 1996) (citing Danann Realty Corp. v. Harris, 157 N.E.2d 597 (N.Y. 1959)). Under Connecticut law, however, such a disclaimer may bar claims for innocent misrepresentation, but does not act as a bar to either fraudulent or negligent misrepresentation. See, e.g., Gibson v. Capano, 699 A.2d 68, 71-72 (Conn. 1997) (citing 2 Restatement (Second), Contracts § 196). Because Microsoft relies on a

---

[3] In any event, even if such a showing was required under Connecticut law, the Court would not grant the motion to dismiss on that basis, because the plaintiff's allegations are sufficient to raise issues of fact with respect to whether the plaintiff's reliance was reasonable. See Hackett v. Marquardt & Roche/Meditz & Hackett, Inc., No. X02CV990166881S, 2002 WL 31304216, at *5 (Conn. Super. Ct. Sept. 17, 2002) ("Even if fraudulent inducement does require the plaintiff's reliance to be reasonable, the court would deny summary judgment. . . . The issue of the reasonableness of reliance is one for the trier of fact, especially given that the plaintiff has supplied evidence of statements by [the defendant] that might have induced the plaintiff. . . .") While Microsoft argues that any reliance was unreasonable in view of the information publicly available about Microsoft's development of the technology at issue, the arguments advanced by Microsoft at most raise issues of fact as to whether Intellivision's reliance was reasonable based on their investigation and the availability of information that contradicted the alleged misrepresentations.

specific disclaimer in the Agreement, the Court must resolve whether New York or Connecticut law would be applied to that issue.

B

With respect to the plaintiff's claim for negligent misrepresentation the defendant concedes that, unlike New York law, Connecticut law does not require a plaintiff to establish a "special relationship." Compare Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (New York law), with Williams Ford, Inc. v. Hartford Courant Co., 657 A.2d 212, 220 (Conn. 1995) (Connecticut law). The defendant argues that a lack of a special relationship between the parties is a basis for dismissal of the plaintiff's claim of negligent misrepresentation, and therefore there is an actual conflict between the law of New York and the law of Connecticut with respect to these claims.

C

The Court therefore must apply interest analysis to the plaintiff's claims for fraudulent inducement and negligent misrepresentation. The issues raised by the parties with respect to these claims require a more detailed analysis of the elements of these claims under New York and Connecticut law.

12

Because the elements of these claims are based on conduct regulating rules, New York courts would apply the law of the place of the tort if there is a difference in the substantive law.  See Emjayco v. Morgan Stanley & Co., No. 95 Civ. 8546 (DLC), 1996 WL 452266, at *4 (S.D.N.Y. Aug. 8, 1996); see also Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commercial Mortgage Corp., 265 F. Supp. 2d 366, 378 (S.D.N.Y. 2003) (noting fraud and negligent misrepresentation rules are conduct regulating), aff'd, 96 F. App'x 750 (2d Cir. Apr. 22, 2004); La Luna Enterp., Inc. v. CBS Corp., 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999) (noting fraud rules are conduct regulating).

"[A] cause of action for fraud arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally, the plaintiff's residence."  Sack v. V.T. Low, 478 F. 2d 360, 366 (2d Cir. 1973); see also id. at 365 ("[W]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made.") (quoting First Restatement of Conflicts, § 377, note 4); Dutton v. Glass, No. 04 Civ. 3496, 2005 WL 146503, at *2 (S.D.N.Y. Jan. 20, 2005) (collecting cases).

In the Agreement, Intellivision's principal place of business is listed as Connecticut.  (Agreement 1.)  Therefore, the Court concludes that, for the purposes of the choice of law

analysis, the alleged fraud and negligent misrepresentations occurred in Connecticut.[4] As a result, to the extent there is an actual conflict between the law of New York and the law of Connecticut, New York's choice of law rules require the application of Connecticut law to the plaintiff's claims for fraudulent inducement and negligent misrepresentation.

IV

A

Microsoft argues that Intellivision is barred by the Agreement from asserting claims based on the alleged misrepresentations.  In particular, Microsoft points to Section 5, which states, in relevant part:

> 5.  Release: Upon payment . . . [Intellivision] . . . absolutely and forever discharges MICROSOFT . . . from any and all claims, rights, demands, covenants, agreements, contract, obligations, responsibilities, representations, [and] warranties . . . relating to the general subject matter described in the Patent Applications or to any other pause technology or system . . . .

(Agreement 3).[5]

---

[4] The plaintiff argues that Intellivision resided in both New York and Connecticut when the causes of action accrued.  However, under New York law, "it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership," Gramercy Equities Corp v. Dumont, 531 N.E.2d 629, 632 (N.Y. 1988).  Furthermore, "[w]hen no individual partner is suing or being sued, a partnership's sole legal residence under New York law is where it maintains its principal place of business." McMahan & Co. v. Donaldson, Lufkin & Jenrette Securities Corp., 727 F.Supp. 833, 834 (S.D.N.Y. 1989) (internal quotation marks and citation omitted).  Therefore, for the purposes of the choice of law analysis, Intellivision resided in Connecticut, its principal place of business.
[5] Microsoft originally made a similar argument on the basis of Section 6.6.  However, at argument, counsel for Microsoft conceded that the release

14

As discussed above, such a disclaimer does not operate as a bar to a claim for fraudulent or negligent misrepresentation under Connecticut law. Having concluded that Connecticut law applies to these claims for the purposes of this motion to dismiss, the Court could not find that the release provision in the Agreement operates to bar the plaintiff's claims for fraudulent or negligent misrepresentation.

The defendant also argues that the claim for fraudulent inducement should be dismissed because the applicable statute of limitations has expired and on the grounds that the plaintiff ratified the Agreement by retaining the initial $1,000,000 payment even after discovering the existence of Ultimate TV in 2002.[6] However, the plaintiff alleges continuing misrepresentations through 2006 and argues that those misrepresentations, along with the additional $850,000 payment to which it might have been entitled under the Agreement, raise issues of fact as to whether the defendant should be estopped from raising the statute of limitations or ratification as defenses to the plaintiff's claim of fraudulent inducement. The

argument was based on Section 5 of the Agreement. (Tr. 27:13-17, March 21, 2008.)

[6] Pursuant to N.Y. C.P.L.R. § 202, where a cause of action filed by a non-resident plaintiff accrues outside New York, a court should apply either the statute of limitations of the state where the cause of action accrued or New York, whichever is shorter. In this case, as discussed above, the cause of action accrued in Connecticut to a resident of Connecticut, and therefore Connecticut's three-year statute of limitations would apply. Conn. Gen. Stat. Ann. § 52-577; see Dutton, 2005 WL 146503 at *2.

Court could not conclude as a matter of law that the claim for fraudulent inducement should be dismissed on these grounds.

B

Microsoft argues that Intellivision has failed to state a claim for negligent misrepresentation, but does so under New York law.  Under Connecticut law, which follows the Restatement (Second) of Torts, "[o]ne who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Williams Ford, 657 A.2d at 220 (quoting Restatement (Second) of Torts (1977)); see also D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 520 A.2d 217, 223-224 (Conn. 1987).  Connecticut law does not require the existence of a special or fiduciary relationship to recover for negligent misrepresentation.  See Williams Ford, 657 A.2d at 222.

The plaintiff has sufficiently alleged (1) misrepresentations in connection with a business transaction; (2) that the defendant knew or should have known that the statements were untrue; and (3) that the plaintiff justifiably

relied upon the alleged misrepresentations.  Id.  Therefore, there is no basis to dismiss the claim for negligent misrepresentation.

C

The plaintiff has also asserted a claim of mutual mistake. "In the proper circumstances, mutual mistake . . . may furnish the basis for reforming a written agreement" where "the signed writing does not express [the] agreement" reached by the parties.  Chimart, 489 N.E.2d at 233-34.  However, there is a "heavy presumption" that a written agreement accurately reflects the intention of the parties and the plaintiff must show both the existence of the mistake and the actual content of the agreement between the parties.  Id. at 234; see also Investors Ins. Co. of America v. Dorinco Reinsurance Co., 917 F.2d 100, 105 (2d Cir. 1990).

In the Amended Complaint, the plaintiff does not allege that the Agreement fails to reflect the actual agreement between the parties.  In particular, the plaintiff does not allege that the parties intended that the Agreement provide for a per-unit royalty.  Instead, the plaintiff argues that had the Microsoft representatives who negotiated the Agreement been aware that Microsoft had developed or intended to develop products

17

incorporating Intellivision's core inventions, the parties would have agreed to a per-unit royalty.

This allegation is plainly insufficient. See John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co., 717 F.2d 664, 671 (2d Cir. 1983) (affirming the dismissal of a claim of mutual mistake where there was no showing that the defendant did not intend to agree to the contents of the agreement). Therefore, Intellivision's claim of mutual mistake must be **dismissed**.

D

The plaintiff's claim for unilateral mistake must be dismissed for substantially the same reasons as the plaintiff's claim for mutual mistake. See, e.g., Winmar Co. v. Teachers Ins. and Annuity Assoc. of Am., 870 F.Supp. 524, 537 (S.D.N.Y. 1994) ("In order to succeed on a reformation claim based on unilateral mistake, a plaintiff must demonstrate that 'the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement.'") (quoting Chimart, 498 N.E.2d at 234); see also Harlach, 602 A.2d at 1010 ("[R]eformation is also available in equity when the instrument does not express the true intent of the parties owing to mistake of one party coupled with fraud . . . or inequitable conduct on the part of the other.") (quoting Home Owners' Loan Corp v.

18

Stevens, 179 A. 330, 331-32 (1935)) (alterations in original and
quotation marks and citations omitted).  In any event, the
plaintiff does not respond to the defendant's arguments with
respect to this claim, and therefore the plaintiff's claim can
be deemed abandoned and dismissed.  See, e.g., Hanig v. Yorktown
Central School District, 384 F. Supp. 2d 710, 723 (S.D.N.Y.
2005).  Therefore, Intellivision's claim of unilateral mistake
is **dismissed**.

E

Finally, the plaintiff has asserted a claim for breach of
fiduciary duty.  The elements of breach of fiduciary duty that
must be proven are, first, a fiduciary relationship between the
parties, and second, that the duty has been breached.  Cramer v.
Devon Group, Inc., 774 F.Supp. 176, 184 (S.D.N.Y.1991).

Microsoft argues that Microsoft did not owe a fiduciary
duty to Intellivision.  However, the Court could not conclude as
a matter of law based solely on the pleadings that no fiduciary
duty existed.  The plaintiff alleges that Microsoft owed
continuing obligations to the plaintiff, including to provide
Intellivision with communication from the PTO with respect to
the patent prosecution of the claim language of Attachment C.
(Agreement 3.)  Microsoft's prosecution of the claim contained
in Attachment C arguably created a relationship of trust and

19

confidence between the parties, because the plaintiff would be entitled to an additional $850,000 if the claim in Attachment C was allowed.   Contrary to Microsoft's argument, the Agreement was not a simple one-time, arms-length transaction, but rather implicated an ongoing relationship between the parties in connection with the patent prosecution.   See, e.g., Muller-Paisner v. TIAA, 446 F. Supp. 2d 221, 229-30 (S.D.N.Y. 2006) ("When examining whether a fiduciary relationship exists under New York law, a court examines whether one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first.") (citation and internal quotation marks omitted).[7] Therefore, there is no basis to dismiss this claim as a matter of law.

CONCLUSION

The Court has considered all of the parties' arguments.   To the extent not specifically addressed, they are either moot or without merit.   Therefore, for the reasons stated above, the defendant's motion to dismiss is **granted in part and denied in**

---

[7] Microsoft argues that the plaintiff is precluded from arguing that the Agreement created a fiduciary relationship between the parties because the Amended Complaint states that the "Agreement . . . creat[ed] no ongoing duties on the part of Microsoft."  (Am. Compl. ¶59.)  However, the plaintiff is entitled to plead in the alternative, and elsewhere in the Amended Complaint the plaintiff alleges that Microsoft did owe the plaintiff ongoing duties under the Agreement.  (See, e.g., Am. Compl. ¶¶72-74.)

**part**.  The motion is **granted** with respect to the plaintiff's claims for unilateral mistake and mutual mistake, and those claims are therefore **dismissed**.  The motion is **denied** with respect to the plaintiff's claims for fraudulent inducement, negligent misrepresentation, and breach of fiduciary duty.

**SO ORDERED.**

Dated:    New York, New York
          August 20, 2008

                                              John G. Koeltl
                                    United States District Judge

21