UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| INTELLIVISION, a Joint Venture, BRUCE ADAMS, | ) | |
| JOHN DANIELS and PAUL HOFFMAN, | ) | ECF CASE |
| | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | |
| v. | ) | 07-CV-4079(JGK)(MHD) |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

## DECLARATION OF PAUL HOFFMAN

1.      I, Paul Hoffman, am a plaintiff in the above-captioned action. I submit this

declaration in opposition to the motion for summary judgment filed by defendant Microsoft

Corp.  I have personal knowledge of all facts stated herein, except those that are stated to be

made on information and belief, if any.

2.      I am a 1986 graduate of the State University of New York at Stony Brook, at

which I received a B.E.E.E. (electrical engineering).  I have several years of experience as an

electronics engineer and have designed electronic circuitry for guidance systems, time standards

(quartz and cesium clocks) for satellites, and various processes for the production of large scale

semiconductor integrated circuits.  While still employed as an electronics engineer, I attended

law school at St. John's University School of Law, where I graduated in 1992 and achieved the

ranking of second in my class.  Thereafter, I was employed by the firm of Adams & Wilks and

engaged in the preparation and prosecution of patent applications.  Over the last 20 years, I have

drafted and prosecuted well over 1000 patent applications.  In 1993, patent prosecution work I

did at Adams & Wilks the prior year was ranked within the top ten in quality in the United

States.

3.      I am also a co-founder of plaintiff Intellivision, where I was engaged in the

development of products embodying the technologies disclosed in the patent applications filed

by my co-plaintiff, John Daniels, and assigned to Microsoft pursuant to the parties' Agreement at

issue in this lawsuit (Second Amended Complaint, Ex. 1).  The assigned patent applications (and

all subsequently-filed continuation applications) will be referred to herein as the Daniels Patent

Applications.

4.      This lawsuit concerns the enormously valuable intellectual property rights to the

Digital Video Recorder ("DVR").  Tens of millions of DVRs are in use throughout the country.

The vast majority of these DVRs are contained in television set-top boxes supplied by cable TV,

satellite TV and/or Internet Protocol TV (IPTV) operators, which typically charge subscription

fees of approximately $10 per month.  The approximately 55 million DVRs currently in use in

this country at a monthly subscription fee of $10 generate some $6.6 billion in annual revenue

and carry insignificant overhead expense since they comprise little more than a hard disk drive

contained within the case of an already-existing television set-top box.  The DVR has become

one of the most successful consumer electronics products and has supplanted the ubiquitous

VCR as an integral component of the home theater system.

5.      By means of a series of misrepresentations detailed in the second amended

complaint and described in greater detail in my deposition transcript and those of John Daniels

and Bruce Adams, Microsoft acquired a portfolio of patent applications encompassing virtually

all features of the DVR from myself, Bruce Adams and John Daniels in January 2001.

6.     Throughout 2000 and in January 2001, Microsoft repeatedly advised us that it had no plans to enter the DVR market.  Before meeting with Microsoft representatives at its WebTV campus in Mountain View, California in 2000, my co-plaintiffs and I were confident that Microsoft was likely to become a leader in the DVR field.  However, during and after our meeting in Mountain View, Microsoft assured us that it had no intent to enter the DVR market at all.

7.     In view of Microsoft's vast resources and extensive commercial reach, my partners and I viewed Microsoft's decision to abandon the DVR market as having a potentially significant negative impact on the value of the Daniels Patent Applications.  At the time of our negotiations with Microsoft, the only other DVR manufacturers were start-up companies, Tivo and ReplayTV, and neither of these companies had yet sold a substantial number of DVRs or earned a profit.   Microsoft's decision to abandon the DVR market led us to believe that sales of DVRs would be far less than we previously believed.  However, Microsoft's representations were false at the time they were made.  In fact, Microsoft launched a national advertising campaign for its Ultimate TV DVR a week or so after execution of the parties' Agreement.

8.     Nonetheless, Microsoft's false representations caused my partners and I to withdraw our demand for a per-unit royalty or an increased purchase price in lieu thereof; and to agree to a far lower purchase price than we would have absent Microsoft's misrepresentations.  If we had known the truth, we would never have entered in the parties' Agreement under the same payment terms.

9.     Furthermore, a significant factor in our decision to enter into the Agreement with Microsoft is that my co-plaintiffs and I had a continued desire to build a profitable business in the interactive television industry.  Microsoft representatives consistently represented to us that

3

Microsoft considered itself to be engaged an ongoing business relationship with Intellivision. However, soon after executing the parties' Agreement, it became clear that Microsoft's representations in this regard were also untrue.  That Microsoft had no interest in maintaining an ongoing business relationship with us was evident in its failure to respond to our communications.  Furthermore, it was also explained to me by Ronald Zink that the actual purpose of the consulting agreement Microsoft entered into with John Daniels was simply to prevent him from working for a competitor; and that, contrary to prior representations by Antony Faustini, Microsoft never had any intent to give John Daniels any work to do pursuant to his consulting agreement.  Our ability to engage Microsoft in a long term relationship was a motivating factor for us to enter into an agreement with Microsoft.  Thus, it was surprising to learn that Microsoft had falsely represented the existence of such a relationship.

10.     The parties' Agreement resulted in the assignment from myself, John Daniels and Bruce Adams of a portfolio of DVR-related patent applications filed by John Daniels.  John Daniels is a prolific inventor, having earned twenty-eight issued patents in diverse technologies and having thirty-seven pending patent applications published over the past seven years alone. Among his many inventions is the DVR.  Indeed, as stated in an affidavit of John Daniels I filed with the Patent Office in 1999 on John's behalf, Mr. Daniels initially conceived of the DVR over twenty years ago.[1]  The basis of his invention is the concept (previously believed-to-be-impossible) that live TV could be manipulated by pausing, rewinding and cueing.  In the Daniels Patent Applications, Mr. Daniels demonstrates that this can be achieved by recording a received

---

[1]  The DVR is a video recording device typically embodied as a television set-top box that records video in digital format to an internal hard disk drive.  The DVR enables "trickplay" features, including the ability to "pause" and "rewind" live television.  Introduced in 1999, there are nearly some 58 million DVRs in consumers' homes. Although standalone DVRs are sold at consumer electronics retail outlets, most DVRs have been distributed by cable TV operators on a subscription basis to cable TV subscribers.

television signal onto a specially-designed video recorder and displaying the output of the video recorder (rather than the received television signal) on a television set.

11.     Specifically, Mr. Daniels earliest-filed patent application (filed on March 29, 1993), discloses a specially-designed video recorder capable of enabling a viewer to pause, rewind or cue live TV.  This specially-designed video recorder is capable of continuously recording a received television signal and *simultaneously* playing back a previously-recorded portion thereof.  Although the ability to manipulate live TV (by pausing, rewinding or cueing) requires the use of such a video recorder, conventional video recording devices available at the time of Mr. Daniels's invention lacked this capability.[2]

12.     As set forth in an affidavit of John Daniels filed with the Patent Office in September 1999, in the early 1990's Mr. Daniels developed a recording apparatus capable of simultaneously recording a television signal and playing back a previously-recorded portion thereof   so that a viewer could manipulate the display of live TV.  After demonstrating a working analog prototype implemented with multiple VCRs, Mr. Daniels devised a practical digital embodiment using a disk storage unit (e.g., a hard disk drive).  Notably, however, a serious problem existing throughout the early 1990's was that conventional hard disk drives lacked sufficient performance characteristics to enable them to simultaneously record an incoming television signal and play back a previously-recorded portion of the received television signal.[3]

---

[2]  For instance, a conventional VCR is capable of continuously recording a television signal and playing back the same portion being recorded.  However, the VCR could not play back a previously-recorded portion of the signal during the ongoing recording.

[3]  As discussed at ¶13 of the report of plaintiffs' technical expert, Nathaniel Polish, Ph.D., the ability of a DVR to pause, rewind or cue live TV requires the use of a recording apparatus capable of continuously storing one or more streams of digital content (such as a received television signal) and simultaneously playing back a previously-stored portion of that content.  However, disk drives commercially available at the time of the 1993 and 1994 filing dates of the earliest-filed Daniels Patent Applications could not perform these required functions.  Disk drives then available had sufficient performance to record digitized video content.  However, they lacked sufficient performance

13.     To overcome the limitations of conventional hard disk drives commercially available at the time of his invention, Mr. Daniels' earliest-filed patent application discloses a storage architecture that relies on the timed use of a temporary storage device (e.g., a buffer) to supplement a high capacity disk storage unit to facilitate the simultaneous recording and playback functions.  Stated otherwise, the temporary storage device would be used, for example, to store portions of the received television signal during periods of time when the hard disk drive is busy and unable to do so (such as when a previously-stored portion of the signal is being read out from the hard disk drive).  This feature of Mr. Daniels's invention is referred to herein as the "**DVR-enabling architecture**."

14.     In one embodiment, the DVR-enabling architecture disclosed in the earliest-filed Daniels Patent Application uses a first buffer to temporarily store a "current" portion of the received television signal (before being written to the hard disk drive).  At the same time, a second buffer is used to temporarily store a previously-received (and previously-recorded) portion of the television signal selected for output and display.  While the first buffer is storing a "current" portion of the signal as it is being received, the second buffer is outputting for display an "earlier" (previously-stored) portion of the signal.

15.     The DVR-enabling architecture invented by Mr. Daniels enables the use of a single hard disk drive as an archival storage medium to store large quantities of video signals and further enables the manipulation of live TV by continuously recording a signal containing broadcast quality video and simultaneously reading out a previously-stored portion of the broadcast quality video.  By using Mr. Daniels DVR-enabling architecture, a viewer could

---

to store a received television signal and simultaneously read out a previously-stored portion of the television signal. The earliest-filed Daniels Patent Application discloses various configurations that enable the simultaneous recording of a received video signal and the reading out of a previously-stored portion of that signal.

"pause" or "rewind" a live broadcast since any previously-received portion of the television signal can be stored in the second storage buffer for output and display.

16.    Use of first and second buffers in the foregoing manner sufficiently reduces the burden otherwise imposed on the hard disk drive and enables a viewer to manipulate the display of live television by performing trickplay functions such as "pause" and "rewind."

17.    Mr. Daniels' DVR-enabling architecture has served as the enabling architecture of all of the tens of millions of DVRs made commercially available since the introduction of the DVR in 1999.

18.    Since 1993, some two dozen patent applications have been filed in the U.S. and abroad to cover Mr. Daniels DVR-related inventions.[4]  Mr. Daniels filed his initial patent application on March 29, 1993.  This patent application discloses, *inter alia*, the DVR-enabling architecture described above.  In 1994, 1996, 1997, 2000 and 2002, additional continuation-in-part ("CIP") patent applications were filed in the U.S. and abroad to cover enhancements to Mr. Daniels' DVR-enabling architecture.[5]  The inventions disclosed in Mr. Daniels' CIP patent applications include nearly all of the features found in the tens of millions of DVRs sold to consumers since 1999.[6]

---

[4]  The "Daniels Patent Applications" include U.S. Patent Application Serial Nos. 11/250,807; 11/097,807; 10/970,294; 10/970,439; 10/970,440; 10/970,512; 10/970,492; 10/094,167; 09/993,780; 09/992,190; 09/952,582; 09/993,814; 09/447,629; 08/900,417; 08/848,895; 08/641,517; 8/306,642; and 08/038,240.  In addition, some of Intellivision's "core inventions" are covered in U.S. Provisional Patent Application Serial Nos. 60/114,668 and 60/014,959; Japanese Patent Application No. 10-2259225; Australian Patent Application No. 148995/97; and International (PCT) Patent Application No. PCT/US97/18372.  Further, U.S. Patent Nos. 7,437,751 and 6,973,669 have been issued by the U.S. Patent and Trademark Office based on two of the Intellivision patent applications.

[5]  A continuation-in-part is an application filed during the lifetime of an earlier application, repeating some substantial portion or all of the earlier application and *adding matter not disclosed* in the earlier application.  *See* 37 CFR 1.53(b).

[6]  For instance, the Daniels CIP patent applications disclose the use of a scrollable/searchable electronic programming guide ("EPG") to enable "one-click" programming of the DVR; generation of a viewer profile based on viewer interests and/or viewing habits to perform "automatic" recording of television programs and/or targeted distribution of advertising; the use of the DVR to enable Video-on-Demand ("VOD"); the pausing of a live broadcast upon a viewer's selection of an embedded hyperlink (e.g., to enable the viewer to view an advertiser's website or embedded content without missing any portion of a currently viewed television program); the ability to remotely program the DVR (e.g., over the internet, wired or cellular telephone, etc.); and the wireless distribution of

19.     I was personally involved in negotiations with Microsoft representatives including Ronald Zink and Antony Faustini concerning Microsoft's acquisition of the Daniels Patent Applications.   At all times, it was made clear to Microsoft that it would be purchasing from plaintiffs an extensive (and the only known) portfolio of patent applications that encompass virtually all functional aspects and applications of the DVR    one of the most successful consumer electronics product in history.

20.     Plaintiffs' initial contact with Microsoft concerning the Daniels Patent Applications took place in February 2000 when I sent an email to John Colombo, a Microsoft business development manager at its WebTV campus in Mountain View, California.  I met Mr. Colombo at an interactive television trade show in Manhattan during the summer of 1999.  At the time I met Mr. Colombo, it was Intellivision's primary goal to build relationships with companies in the consumer electronics, broadcasting, and interactive television industries. Although it was our initial desire to become associated with a consumer electronics company (i.e., Sharp Electronics, Pioneer, Panasonic, or the like) to engage in the joint development of a DVR and become the "third" DVR company (along with Tivo and ReplayTV), we later changed our focus to building a company engaged in interactive television content development.  To establish such relationships, we relied on the Daniels Patent Applications to give us credibility and leverage with large companies that might otherwise not have had any interest in dealing with us.

21.     I have been advised that Microsoft seeks dismissal of plaintiffs' claims as being time barred under Connecticut statutes of limitations for fraud and negligent misrepresentation actions.  It is also my understanding that in its August 20, 2008 decision, the Court deemed

---

the output of the DVR throughout the home. These features of the Daniels' CIP applications have been implemented in tens of millions of DVRs sold to consumers.

Connecticut law applicable because the parties' Agreement state that is the location of Intellivision's "principal place of business."  I respectfully submit that this conclusion was erroneous.

22.     Intellivision is a New York-domiciled joint venture formed in 1999 by Bruce Adams and John Daniels and me.[7]  From the date of its formation in 1999 through the January 2001 termination of its independent development activities in the interactive television industry, Intellivision's principal place of business was located in New York City - at 50 Broadway, 31st Floor, New York, New York.  Shortly before the parties entered into the Agreement at issue in this case in January 2001, Bruce Adams, John Daniels and I recognized that the contemplated assignment to Microsoft of the patent applications owned by us (referred to throughout plaintiffs' summary judgment opposition papers as "the Daniels Patent Applications") along with various additional interactive television developments owned by Intellivision would make it necessary for Intellivision to cease all independent development activities in the interactive television industry on the date of execution of our agreement with Microsoft.[8]  Stated otherwise, in view of the contemplated assignment to Microsoft of all of its intellectual property, Intellivision would cease to be engaged in the development of interactive television technology on the date of execution of the parties' Agreement.

---

[7]  Intellivision's predecessor-in-interest, Intelasync, maintained its principal place of business in Minnesota and a second office in Connecticut.

[8]    Namely, under Paragraph 2.1 of the parties' Agreement, executed in January 2001 (Second Amended Complaint, Ex. 1), the individual plaintiffs, John Daniels, Bruce Adams and Paul Hoffman, assigned to Microsoft all of their right, title and interest in and to the existing patent applications identified in the agreement (the Daniels Patent Applications").   The Daniels Patent Applications were owned exclusively by Messrs. Daniels, Adams and Hoffman, and were never the property of Intellivision.  In addition, Intellivision (rather than the individual plaintiffs), was the owner of certain "Other Inventions" in the interactive television field.  These "Other Inventions" consisted largely of enhancements and improvements to the interactive television technologies disclosed in the Daniels Patent Applications, but which were not yet themselves the subject of any pending patent applications. Under Paragraph 2.2 of the parties' Agreement, Intellivision assigned to Microsoft all of its right, title and interest in these "Other Inventions."

23.     On the other hand, John Daniels, a Connecticut resident, had already entered into a two-year consulting agreement with Microsoft.  Under that agreement, John was required to continue to develop interactive television technologies on behalf of Microsoft.  Accordingly, we decided as a group that John Daniels' Connecticut work address would become the location of Intellivision's principal place of business simultaneously with the January 2001 execution of the parties' Agreement.  This is why the parties' Agreement identifies Intellivision as having its principal place of business in Connecticut even though Intellivision's principal place of business was consistently in New York until the date of execution of the parties' Agreement.  We believed that by moving the location of Intellivision's principal place of business to Connecticut would make it easier for us to separate John's interactive television development activities in Connecticut (all of which were to be owned by Microsoft) from the development activities of Bruce Adams and myself in New York (none of which would be owned by Microsoft).  Although we intended to form a second business entity in New York to make this distinction clearer, we did not do so; which is why Intellivision still had a New York address after execution of the parties' Agreement.  In fact, when John Daniels moved from his Seymour, Connecticut residence within two months after execution of the Agreement, Intellivision vacated its office in Seymour, which was in close proximity to John's residence.  As a result, Intellivision's principal (and only) place of business reverted back to New York City within two months after execution of the parties' Agreement.

24.     Bruce Adams, John Daniels and I formed Intellivision as a joint venture in 1999 for the purpose of developing, patenting, commercializing and/or licensing interactive television and related technologies and developments.  Intellivision's development efforts included the design of products embodying certain "core inventions" relating to pioneering advancements in

interactive television and television set-top-box technology disclosed in the Daniels Patent

Applications.  However, none of the Daniels Patent Applications were ever owned by

Intellivision.  At the time they were assigned to Microsoft, the Daniels Patent Applications were

owned by Bruce Adams, John Daniels and me.

      25.     Importantly, Intellivision was formed to develop products and technology - and

not to exploit patent applications.  Microsoft seeks to characterize Intellivision as a Non-

Practicing Entity ("NPE"), also commonly referred to as a "Patent Troll".  An NPE is an entity

that acquires patents covering a certain technology and does not practice the inventions but

instead licenses and or sells the patents under threat of litigation.  Unlike an NPE, Intellivision

was not formed for the purpose of exploiting the Daniels Patent Applications, as alleged by

Microsoft.  Nor did Intellivision at any time own any of those patent applications.  Intellivision

was formed for the purpose of developing and commercializing interactive television and related

technologies, including but not limited to the technologies disclosed in the Daniels Patent

Applications.  More specifically, Intellivision was formed for the purpose of creating,

developing, patenting, commercializing and/or licensing interactive television and related

technologies and developments, including the development of products and services embodying

the technologies disclosed in the Daniels Patent Applications.  In connection with its

development activities, Intellivision's predecessor-in-interest was the first entity to develop and

introduce a video recording device providing the viewer with the ability to "pause" and "rewind"

live television.  Intellivision also developed and demonstrated to Microsoft and others actual

working prototypes of products it developed, including its own DVR platform, a wireless home

gateway capable of distributing DVR output wirelessly to multiple television sets and computers

throughout a home, and a handheld tablet with wireless capability.

26.     The Daniels Patent Applications include broad disclosure of DVR structure and functionality, and further disclose various novel aspects of personal video recording and/or interactive television technology.  For instance, the disclosure further includes, *inter alia*:

> Enhanced, interactive on-screen programming guides.  This core technology relates to intuitive on-screen programming guides that are searchable (such as by genre, actor/actress, director, date, etc.) and allow the simplified control of a large number of viewing options and the direct control of an associated set-top-box;

> Use of embedded "links" contained in a video broadcast that, when "selected" cause an operation to be performed, such as the setting of a record date and time, the display of additional information, etc.;

> Simplified "one-click" recording of a wide variety of viewing options;

> The creation of a "viewer profile" that causes the set top box to automatically record programs that are deemed to be consistent with a particular viewer's interests;

> Remote programming of the set top box over a network (such as the internet);

> Interactive TV applications (such as viewer participation television programs);

> Video-on-demand applications that can be implemented with minimal investment in head-end capital equipment;

> Exploiting largely unused broadcast media and unused portions of broadcast bandwidth for use in transmitting "bits" of video content to set-top-boxes enable enhanced programming, real-time video-on-demand and near video-on-demand programming;

> Supplementing video programming produced and broadcast by others with additional content;

> Networking applications including the concept of a "home gateway"; and

> Enhancements to the aforesaid technologies including remote programming capabilities, networking capabilities and online capabilities enabling the switching between live television and broadband content.

27.     The disclosure of the Daniels Patent Applications extends to various aspects of personal video recording technology that do not require digital recording techniques.  Different aspects of the technologies are identified at ¶7 of the second amended complaint, such as the use of an electronic programming guide ("EPG") to control a remote video recorder, such as a VCR. The term PVR is believed to be an acronym for Personal Video Recorder or Personal Video

Recording, and has been used by plaintiffs to identify enhanced video recording capabilities that do not require the use of digital recording techniques.

28.      Microsoft alleges that plaintiffs approached "a couple of dozen firms" in an effort to sell their patent applications, and that these "couple of dozen firms" expressed little interest in acquiring the patent applications.  There is no truth to this statement.  During my deposition, I described the nature and purpose of my contacts with "a couple of dozen firms" and the various partnerships I sought to establish with those firms on behalf of Intellivision.  As I explained, plaintiffs' contacts with "a couple of dozen firms" and the resulting partnerships with Intellivision were not in any way related to efforts to license and/or sell the Daniels Patent Applications, but to engage with such companies in the joint development of interactive television products, services and/or content:

> Back then, everybody was partnering with everybody to do everything.  Nothing got done.  But everybody was trying to create -- and I'm excluding us -- what I perceived at the time to be a false sense that they had something going on, and you'd see partners and you'd see all these different companies and cable channels and things like that.  *And we were trying to do that, to establish relationships at some point, but we wanted to generate content to distribute to this new -- using this new technology, and that's why we did this*.  We weren't trying to create a dot-com bubble buster.   We weren't trying to create this company that would somehow exploit the confusion and hysteria that was surrounding the Internet.  We were trying to establish legitimate partnerships with companies.

> And John, being extremely creative, was deriving or developing -- better term -- applications, concepts for applications for use of his content and how it could be distributed, and there was a tremendous amount of interest.  That's why, it might seem odd now, but that's why there were substantial companies that were interested in partnering with us.  Because it was such a common thing, to create a partnership.  It was not exclusive.  They were doing it with everybody.  But there was a lot of interest in us.

(Hoffman Dep. at 72-74.)

29.      The few firms that expressed an interest in acquiring the Daniels Patent Applications did not give plaintiffs an idea of the "fair market value" of the applications.  Offers

extended by a few firms merely gave plaintiffs an indication of the "initial" offer that those few firms were willing to make to acquire the Daniels Patent Applications.  There is no open market for the sale or trading of patents and/or patent applications; and there are many factors that influence a company's interest in acquiring a patent application.  Offers extended by a few companies did not give us any indication of a "fair market value."  Valuation of the Daniels Patent Applications is dependent upon the anticipated level of commercialization of the disclosed inventions.

30.    Furthermore, plaintiffs had only brief, initial discussions with companies that extended an offer to purchase the Daniels Patent Applications.  Issues such as per-unit royalties had not been discussed.  Further, an additional component of any agreement we would have entered with any third party would be the existence of an ongoing business relationship with Intellivision.  The amount of a per-unit royalty, and the nature and anticipated profitability of an ongoing business relationship would greatly affect the price at which plaintiffs would have been willing to assign the Daniels Patent Applications.  Intellivision's discussions with third parties were too immature to have reached any definitive agreement as to terms such as per-unit royalties and/or ongoing business relationships.  Thus, the few offers we received were only components of an assignment that would have included additional terms.  Thus, the few unsolicited offers we received did not give any indication of a "fair market value."  Since there is no open market for patents, the "fair market value" of a patent is usually measured by assessing its income potential over its lifetime.

31.    Intellivision entered into discussions with a couple of dozen firms regarding the joint development of one or more set top box products, consumer electronics products, interactive television content, and/or subscription-based television services.  Ultimately,

licensing and/or sale of the Daniels Patent Applications became a focal point of plaintiffs'
discussions with only three firms, which expressed interest in acquiring and/or licensing the
Daniels Patent Applications based upon their recognition that the Daniels Patent Applications
would provide a broad range of exclusivity in a new product category then projected to become
the fastest growing consumer electronics product in history.

32.     Intellivision also disputes Microsoft's characterization of its discussions with
third parties as "unsuccessful."  None of Intellivision's discussions with third parties terminated
in a rejection.  Plaintiffs terminated its discussions largely because they were induced to enter
into an agreement with Microsoft.

33.     Bruce Adams and I met with General Instrument executives concerning the
possibility of a joint development project between Intellivision and General Instrument.  At the
time of our meetings with General Instrument, it was our understanding that General Instrument
was not then engaged in the development or sale of DVRs but was considering them for future
products and was interested in working with Intellivision.  At the close of one meeting between
myself, Bruce Adams, and a group of General Instrument executives, Donald Merino (a former
General Instrument vice president and licensing director), advised Mr. Adams and me that
General Instrument was interested in acquiring the Daniels Patent Applications and entering into
a development agreement with Intellivision.  Mr. Merino instructed us to send him a written
proposal including a $5 million payment for the sale of the Daniels Patent Applications and an
ongoing business relationship.  Although Mr. Merino indicated that acquisition of the Daniels
Patent Applications was General Instruments' primary interest, plaintiffs' willingness to sell
(rather than license) the Daniels Patent Applications to General Instrument was motivated in part
by the possibility of establishing an ongoing business relationship with General Instrument

relating to product design, software design, and/or content generation.  However, shortly after this meeting with Donald Merino, General Instrument was acquired by Motorola.  In fact, the acquisition took place before plaintiffs sent their written proposal to Donald Merino.  After sending their proposal to Donald Merino, it came to plaintiffs' attention that Mr. Merino was no longer employed by General Instrument as a result of the acquisition.  Although General Instrument expressed a continued interest in pursuing a relationship with Intellivision, plaintiffs decided to investigate the possibility of establishing a more lucrative ongoing business relationship with a company engaged in the development of software and/or interactive television content or services, such as Microsoft.

34.     Plaintiffs did not approach Sharp to "sell" the Daniels Patent Applications.  It was plaintiffs' desire to engage in a joint development project with Sharp.  At the time, plaintiffs primary interest was in developing a software platform that would reside on a DVR hardware platform designed, manufactured, and distributed by Sharp.  Contrary to Microsoft's allegation, Sharp did not indicate that it "was not interested" in acquiring the Daniels Patent Applications, Sharp simply advised plaintiffs that it decided not to develop and/or manufacture a DVR.

35.     Nor did Intellivision approach Gemstar to sell the Daniels Patent Applications.  At the time plaintiffs approached Gemstar, it was plaintiffs' desire to jointly develop DVR-related products, services and/or content that could utilize broadcast bandwidth made available to Gemstar for the distribution of its ubiquitous electronic programming guide.

36.     As the first company to introduce a DVR, ReplayTV expressed an interest in reviewing plaintiffs' intellectual property for a potential purchase that would include an upfront payment and establishing an ongoing business relationship with plaintiffs.   During my deposition, I explained that ReplayTV was interested in acquiring plaintiffs' patent applications,

but that plaintiffs' discussions with ReplayTV also had "something to do with content":

> Now, were we going to be a DVR manufacturer? No, because that's what they were. **So I don't know how far or what direction these discussions took, but it had something to do with content**, and they were interested in buying the patent applications. I don't know if it was an offer, but they mentioned a figure, that I recall.

(Hoffman Dep. at 98.)

37.     Microsoft also falsely implies that plaintiffs' rejection of ReplayTV's offer of $3 million in stock to acquire the Daniels Patent Applications somehow reflects finality of our discussions with ReplayTV.  Plaintiffs did not decide to forego any relationship with ReplayTV solely because ReplayTV made an initial offer of $3 million in the form of stock.  Instead, we deferred further discussions with ReplayTV to investigate more lucrative options for an ongoing business relating to the creation and distribution of interactive television content.

38.     We neither knew nor had any reason to know of the existence before 2001 of any DVR developed by Microsoft.  Microsoft has itself taken the position that it neither manufactured nor sold any DVRs.  *See* Statement No. 26 in Microsoft's Rule 56.1 Statement. This  made it difficult for my partners and I to have known of Microsoft's DVR-development activities without being advised of such activities by Microsoft.  For similar reasons, it was not unreasonable for us to have relied on Microsoft's representations throughout 2000 and up through January 2001 that it had not developed a DVR and did not then plan to do so.  Microsoft is a software company; whereas a DVR is a consumer electronics product.  It was certainly reasonable to believe Microsoft's representations.

39.     In my February 7, 2000 email letter to John Colombo, a business development manager at Microsoft's WebTV division, I stated "since WebTV is already using PVR technology . . . we believe it would be in your company's best interest to acquire our rights."  My email was intended as a "sales pitch" to Microsoft based on the educated belief that Microsoft's

WebTV division likely had an interest in DVRs and had experimented with them.  My belief was based on the knowledge that WebTV was an internet service provider accessible through a proprietary WebTV appliance designed to format and display internet content on a television set. I was also aware that the WebTV service included a customizable on-screen Electronic Program Guide ("EPG"), and that the WebTV appliance was connectable to a VCR to enable the subscriber to control the VCR's recording capabilities through the on-screen EPG.  Stated otherwise, WebTV utilized "Personal Video Recording" (or PVR) technology, as that technology is described at ¶7 (2) and (4) of plaintiffs' second amended complaint (EPG and "one click recording" capabilities).   The core technologies itemized at ¶7 of the second amended complaint are the essence of "Personal Video Recording" technology.    even if such recording technology uses magnetic tape.  My February 2000 email to Microsoft does not suggest that I had any knowledge that Microsoft planned to enter the DVR market.  Indeed, had I known that Microsoft was engaged in the development of DVR products and sale of corresponding subscription services, I most assuredly would not have waited until February 2000 to email WebTV business development manager John Colombo, who I met at a New York City trade show in July 1999 (as mentioned in my February 2000 email).

40.    In my February 7, 2000 email, I wrote that "[w]e also believe that these rights would be extremely valuable to your [parent] company, who is clearly interested in incorporating PVR functionality in its own operating systems."  Although Microsoft ultimately did incorporate DVR functionality into the Windows operating system, this did not occur until several years after my February 2000 email.  Microsoft relies on my February 2000 email to establish that, as a matter of law, plaintiffs knew about Microsoft's DVR-related activities.  However, Microsoft certainly does not allege that I had access to its confidential development activities or firsthand

knowledge of its future products several years in advance.  My statements are nothing more than educated guesses.

41.    In negotiating the parties' Agreement, Microsoft advocated against the payment of a per-unit royalty for various reasons.  However, the most significant reason given was that a per-unit royalty was unworkable largely because Microsoft had not developed any products that incorporated DVR functionality.  Without knowing the nature of a product, it would be difficult to determine a royalty rate.  However, Microsoft's representations were untrue, as it had already developed its Ultimate TV DVR and was about to launch it.  Thus, a royalty rate could have been easily arrived at since the nature of the product was known.

42.    Microsoft representatives consistently represented to plaintiffs that it had no intention to develop a DVR.  Thus, neither Intellivision nor Microsoft entered into negotiations to license the Daniels Patent Applications.  Had Microsoft expressed any interest in licensing the Daniels Patent Applications, we would have known that it was planning to enter the DVR market.  However, our negotiations with Microsoft were directed at the outright acquisition assignment of the Daniels Patent Applications.  Furthermore, Microsoft negotiated with the individual plaintiffs on their own behalf, and on behalf of Intellivision.

43.    Microsoft never "gave" plaintiffs' a power of attorney.  In March 2005, Microsoft filed with the Patent and Trademark Office a power of attorney authorizing Microsoft attorneys along with Bruce Adams and John Daniels authority to prosecute U.S. Appln. Ser. No. 11/097,807.  However, it was not until July 2008 that plaintiffs learned of this.  Since then, Intellivision has made substantial progress in obtaining allowance.  Currently, none of the claims of the patent application stands rejected on the basis of any prior art reference.

44.     In dealing with Microsoft, the individual plaintiffs suffered from a serious vulnerability arising from the tremendous disparity in bargaining positions between themselves and Microsoft.  Further, the individual plaintiffs lacked critical technical knowledge and information possessed by Microsoft.  Additionally, once Microsoft unilaterally took over prosecution of the assigned patent applications, the individual plaintiffs were unable to participate in prosecution of the assigned patent applications and to communicate with examiners at the Patent Office regarding the Daniels Patent Applications since Microsoft unilaterally revoked the power of attorney that permitted plaintiffs from communicating with Patent Office examiners regarding the Daniels Patent Applications.

45.     Plaintiffs also relied on Microsoft's superior knowledge of the internal architecture of the DVR to draft and file meaningful claims that cover important features of the DVR.  Despite its superior knowledge, Microsoft never pursued claims reciting the DVR-enabling architecture discussed above.  Yet, this is precisely the feature deemed patentable in U.S.  Patent No. 5,774,186 to Brodsky et al., issued on June 30, 1998 and U.S. Patent No. 6,018,612 to Thomason et al., issued on January 25, 2000, disclose and claim the DVR-enabling architecture discussed above.  The Brodsky and Thomason patents are both based on patent applications filed long after the earliest-filed Daniels Patent Application.  These issued patents further support plaintiffs' position as to the patentability of the subject matter disclosed by the Daniels Patent Applications.  Again, Microsoft does not deny that Mr. Daniels' DVR-enabling architecture is patentable.  Instead, it has simply and inexplicably failed to pursue any claims directed to this novel enabling architecture of all DVRs.

46.     Microsoft had a strong motive to defraud plaintiffs.  Microsoft's WebTV division originated the DVR in 1998.  However, it is undisputed that Ronald Zink, an in-house Microsoft

patent attorney who was at the time responsible for the preparation and filing of patent

applications based on developments at Microsoft's WebTV division, neglected to file even a

single patent application covering any aspect of Microsoft's innovative DVR work.[9]  Mr. Zink

was fully aware of Microsoft's plans to generate billions of dollars in revenue by charging

monthly DVR subscription fees.  Yet, Mr. Zink misrepresented and denied those intentions to

plaintiffs to prevent them from learning the enormous value of their portfolio of DVR-related

patent applications.

47.     Mr. Zink knew that if he disclosed Microsoft's aggressive DVR marketing plans,

plaintiffs would not withdraw their demand for a per-unit royalty or an increased purchase price

in lieu thereof; or that plaintiffs would simply decline to enter into an agreement with Microsoft

and, instead, bring suit for patent infringement promptly upon issuance of one of their patent

applications.  Indeed, as Mr. Zink was aware, a patent infringement suit would have been a

relatively easy task for plaintiffs    since two of them are registered patent attorneys.  Mr. Zink

also knew that if Microsoft were compelled to pay substantial patent infringement damages to

plaintiff and/or required to pay a significant amount to acquire the Daniels Patent Applications,

his own negligence in failing to seek patent protection for Microsoft's own DVR innovations

would be exposed.  Stated otherwise, a lawsuit or unreasonable monetary demand from plaintiffs

would reveal to Microsoft the damage caused by Mr. Zink's failure to file patent applications

covering Microsoft's DVR innovations.  To avoid personal embarrassment, to avoid exposing

Microsoft to significant infringement damages, and to prevent Microsoft from the need to expend

---

[9]  During a July 14, 2009 discovery conference, Magistrate Dolinger ordered Microsoft to produce all documents
responsive to plaintiffs' Document Request No. 55 which, as voluntarily narrowed by plaintiffs, sought copies of
patent applications and issued patents to the extent any such applications have matured into issued patents that
disclose or claim aspects of DVR technology.  Microsoft did not produce a single patent application relating to any
aspect of DVR technology that described or claimed any of its early DVR innovations.  *See* Transcript of
Proceedings, July 14, 2009, at 22-24.

substantial patent acquisition fees due largely to his own neglect, Mr. Zink falsely advised

plaintiffs that Microsoft had no plans to develop a DVR.

48.    Believing Mr. Zink's representations that behemoth Microsoft abandoned any

plans to enter the DVR market, plaintiffs agreed to forego a per-unit royalty and sold Microsoft

the Daniels Patent Applications in exchange for a smaller payment and the promise of a

profitable ongoing relationship with Microsoft, the world's largest software producer.

49.    Nor does the fact that in 1999 Microsoft jointly developed with Echostar

Communications Corp. a set top box containing a satellite television receiver and built-in DVR

demonstrate the absence of disputed issues of material fact.  Plaintiffs do not dispute that a

product called the "Echostar Dishplayer 500" was made available for sale in 1999 or 2000.  Nor

do plaintiffs deny that Microsoft may have been involved in its development.  However, the

existence of such a product certainly does not demonstrate the absence of disputed issues of

material fact.  The Echostar Dishplayer 500 was advertised and sold by Echostar under the "Dish

TV" trademark - and was available for only a limited period of time.  That the product might

have contained software jointly developed by Echostar and Microsoft was unknown to plaintiffs

until they learned of Microsoft's allegation to that effect in this litigation.[10]  Microsoft has itself

admitted that it neither manufactured nor sold these DVRs, thereby making it difficult, at best,

for plaintiffs to have known of any involvement by Microsoft in the development or distribution

of such product.  In view of the sale of this product under a trademark owned by Echostar, it was

---

[10]  Furthermore, knowledge of Microsoft's development of software used in an Echostar satellite television set-top box with a built-in DVR would not necessarily have been significant to plaintiffs.  Microsoft is the world's largest software development company.  Software developed by Microsoft can likely be found in many different third-party products.  Use of Microsoft software by Echostar in one of its satellite television set-top boxes would not likely have sufficiently alerted plaintiffs that Microsoft's representations concerning its lack of intent to develop, produce and/or sell a DVR were false.  Simply stated, Microsoft was asked if it had a current intent to use the technology disclosed in the Daniels Patent Applications– and it denied having any current intent.  Yet, the Ultimate TV DVR was introduced a week or so after execution of the parties' Agreement.

not unreasonable for plaintiffs to have been unaware of any involvement by Microsoft, and it was not unreasonable for plaintiffs to have reasonably believed Microsoft's representations that it had not developed a DVR and did not then plan to do so.

50.     The Echostar Dishplayer 500 product was advertised under Echostar's "Dish TV" trademark.[11]  Furthermore, the 2000 Consumer Electronics Show ("CES") is a massive trade show conducted in several distinct venues spread across the Las Vegas strip and having more than one thousand different exhibitors.  Microsoft argues that plaintiffs "must have known" of Microsoft's joint development of the Echostar Dishplayer 500 and, as a result, could not have been defrauded by Microsoft employees because John Daniels and I attended the 2000 CES and briefly visited Microsoft's booth   where, according to Microsoft, they *must have seen* the Echostar Dishplayer 500 box on display there.  However, I testified that they saw no such product at Microsoft's booth; and I clarified that we spent very little time at Microsoft's massive CES booth.  John Daniels and I attended the 2000 CES show for pre-scheduled meetings with specific individuals and companies, and to gain industry contacts.  We quickly left Microsoft's booth after being unable to speak to any of Microsoft's executives, who were all presumably in pre-scheduled meetings with attendees, and learning that the individuals working at the booth were largely actors hired solely to work for Microsoft at the CES show.

51.     I declare under penalty of perjury that the foregoing is true and correct.

---

[11]  Nor does availability of the WebTV service through the Dishplayer 500 imply that plaintiffs knew, or had any reason to know, of Microsoft's involvement in the development or sale of the Echostar DVR or its associated subscription service.  Plaintiffs knew of Microsoft's WebTV division as an internet service provider that made the internet available for display on a television set.  Having been advised by Microsoft at the Mountain View, California campus of WebTV that Microsoft had no plans to enter the DVR market plaintiffs had no reason to believe otherwise.

Dated: June 23, 2010

_____

Paul Hoffman