UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

INTELLIVISION, ET AL.,

                    Plaintiffs,                07 Civ. 4079 (JGK)

          - against -                          OPINION AND ORDER

MICROSOFT CORPORATION,

                    Defendant.
────────────────────────────────

JOHN G. KOELTL, District Judge:

     The plaintiffs, Intellivision and its three principals,
Bruce Adams, Paul Hoffman, and John Daniels, have asserted
claims against the defendant, Microsoft Corp. ("Microsoft"),
relating to a 2001 contract in which Microsoft obtained the
rights to several patent applications. The plaintiffs allege
that Microsoft made fraudulent or negligent misrepresentations
that induced them to enter into the contract, and that Microsoft
breached a fiduciary duty created by the contract. Microsoft
moves for summary judgment, arguing principally (a) that the
individual plaintiffs lack standing to sue; (b) that the
misrepresentation-based claims are barred by the statute of
limitations; and (c) that it did not owe a fiduciary duty to the
plaintiffs.  After the Court heard argument on the summary
judgment motion, the plaintiffs moved to supplement the summary
judgment record.

**I.**

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Robins

v. NYC Bd. of Educ., No. 07 Civ. 3599, 2010 WL 2507047, at *1
(S.D.N.Y. June 21, 2010).

In determining whether summary judgment is appropriate, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party. See Matsushita Elec. Indus.
Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing
United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see
also Gallo, 22 F.3d at 1223. Summary judgment is improper if
there is any evidence in the record from any source from which a
reasonable inference could be drawn in favor of the non-moving
party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d
Cir. 1994). The non-moving party must produce evidence in the
record and "may not rely simply on conclusory statements or on
contentions that the affidavits supporting the motion are not
credible." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d
Cir.1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d
Cir.1998) (collecting cases); Robins, 2010 WL 2507047, at *1.


                              II.


The facts of this case are fully set forth in Intellivision
v. Microsoft Corp. (the "2008 Order"), No. 07 Civ. 4079, 2008 WL
3884382 (S.D.N.Y. Aug. 20, 2008). The following is a brief

summary of the facts relevant to this motion, which the parties do not dispute except where noted.

Intellivision is an unincorporated joint venture formed by Bruce Adams, Paul Hoffman, and John Daniels (the "individual plaintiffs") "for the purpose of creating, developing, patenting, commercializing and/or licensing interactive television and related technologies." (Second Am. Compl. ("SAC") ¶¶ 1, 6.) At various times, Intellivision maintained offices in New York and in Connecticut. (Id. ¶ 1) The parties dispute Intellivision's place of domicile at times relevant to this case, with the plaintiffs claiming that it should be considered domiciled in New York and the defendant claiming that it should be considered domiciled in Connecticut. (Pls.' Mem. Opp'n Def.'s Mem. Summ. J. ("Pls.' Mem.") 27-29; Def.'s Mem. Summ. Jud. ("Def.'s Mem.") 2.)

Intellivision's "core inventions" related to what is known as "digital video recording" ("DVR") or "personal video recording" ("PVR"), technology that, among other things, allows viewers to pause, record, and rewind live television. (SAC ¶ 7.) These inventions were disclosed in no fewer than 18 patent applications (the "Patent Applications"). (Id. ¶¶ 11-13.) In their motion papers, the parties dispute who owned the Patent Applications and the underlying intellectual property at the time that they were transferred to Microsoft; the plaintiffs

4

argue that the individual plaintiffs owned them, while the defendants argue that Intellivision owned them. (Pls.' Mem. 23-25; Def.'s Rep. Mem. Summ. Jud. ("Def.'s Rep. Mem.") 2-4.)

In 1999, the parties began discussing Intellivision's intellectual property. (SAC ¶ 16.) These discussions culminated in a written agreement (the "Agreement") signed in January 2001. (Id. ¶ 33.) The Agreement states that it is between Microsoft and Daniels, Adams, and Hoffman, "the three (3) foregoing individuals doing business as Intellivision in a joint venture having its principal place of business [in] Seymour, Connecticut." (Frame Decl. Ex. 11 (the "Agreement") at 1.) The contract referred to "the parties John J. Daniels, Bruce L. Adams, Paul R. Hoffman, and their joint venture d.b.a. Intellivision . . . , both individually and collectively [as] ITV." (Id.) Under the contract, ITV assigned to Microsoft, among other things, "all of its right, title and interest in and to" the Patent Applications, the inventions disclosed therein, and any resulting patents. (Id. at 2.) In return, Microsoft paid ITV one million dollars, and was to pay it $850,000 upon the issuance of a patent "based upon any of the Patent Applications" and "having an enforceable patent claim consisting of the language . . . set forth in Attachment C" of the Agreement. (Id. at 3.) ITV covenanted "to provide its best efforts assisting and cooperating with [Microsoft], to the extent permitted by law, in

any action involving the Patent Applications," while Microsoft covenanted to "provide to ITV in a timely manner copies of all papers sent to or by the Patent Office in the Patent Application" until the payment of the $850,000. (Id. at 2-3.) The Agreement was signed by each of the three individual plaintiffs both in their individual capacities and for Intellivision. (Id. at 8.) It also included three attachments, one of which assigned the Patent Applications and one of which, Attachment C, laid out the language associated with the $850,000 payment. (Id. at Attachments A-C.)

The plaintiffs allege that they entered into the contract only after Microsoft represented that it "had not already developed, was not developing, and had no present intention of developing a product embodying Intellivision's core technologies." (SAC ¶ 38.) According to the Second Amended Complaint, "[t]his was an important consideration to Intellivision and was the main factor that persuaded Intellivision to enter an Agreement with Microsoft that did not require royalty payments based on the sale of products incorporating Intellivision's technology." (Id.) These representations were allegedly false because Microsoft was then developing and soon launched a product called Ultimate TV, which "incorporate[d] the core technologies embodied in Intellivision's patent applications." (Id. ¶ 39.)

6

The plaintiffs learned about Ultimate TV "within a month or two" of executing the Agreement. (Frame Aff. Ex. 2 ("Hoffman Dep.") at 182.) In 2002, they "confronted Microsoft attorneys about Microsoft's misrepresentations." (Id. ¶ 42.) Intellivision "contemplated rescission and/or reformation" of the Agreement at this time, but did not do so upon Microsoft's representations that Ultimate TV "had been discontinued and was a tremendous financial loss to Microsoft" and that Intellivision "would be better off financially if it awaited allowance by the Patent Office of the patent claim" set forth in Attachment C to the Agreement, which would trigger the $850,000 payment. (Id. ¶¶ 43, 45.)

The plaintiffs allege that Microsoft withheld additional facts at this time, failing to disclose "that it had already developed and/or was in the process of developing a software version of its Ultimate TV product that would be incorporated into its Windows Operating System." (Id. ¶ 46.) They also allege that Microsoft "misrepresented facts concerning prosecution of the patent application" referenced in Attachment C, misleading the plaintiffs about the status of that application and eventually making "a unilateral decision to abandon its efforts to pursue allowance of the claim" and not to pay Intellivision the $850,000 that it would owe if the claim were allowed. (Id. ¶¶ 47-48, 53-56.)

7

**III.**

Intellivision sued Microsoft in New York state court on January 12, 2007, and the suit was then removed to this Court on the basis of diversity of citizenship jurisdiction. In response to a motion to dismiss, Intellivision filed the First Amended Complaint ("FAC"). The defendant then filed a second motion to dismiss. In the 2008 Order, the Court granted that motion in part, finding that Intellivision's principal place of business was in Connecticut as of the time of the Agreement and that its claims were governed by Connecticut substantive law, to the extent that that law conflicted with New York law, and dismissing some of Intellivision's claims under Federal Rule of Civil Procedure 12(b)(6). The Court also denied the motion to dismiss other claims. See Intellivision, 2008 WL 3884382. Intellivision then filed the Second Amended Complaint, which added the individual plaintiffs. (SAC ¶ 1.)[1]

After the motion to dismiss, three claims remain. First, the plaintiffs claim that Microsoft fraudulently induced them to enter into the Agreement by misrepresenting "that Microsoft had not developed, was not developing, and had no present intention of developing a product which incorporated Intellivision's core

---

[1] The Second Amended Complaint does not identify any claims as being brought by the individual plaintiffs; instead, all claims for relief refer only to Intellivision. (SAC ¶¶ 60-84.) All prayers for relief seek relief solely on behalf of Intellivision. (SAC at 25-26.)

inventions." (SAC ¶ 61.) Second, the plaintiffs claim that, if Microsoft's representatives were not aware that those representations were false, their conduct amounted to negligent misrepresentation. (SAC ¶¶ 67-68.) Third, the plaintiffs claim that the Agreement created a fiduciary relationship between Microsoft and Intellivision, giving Microsoft "a duty to diligently prosecute the patent applications," which Microsoft allegedly breached. (SAC ¶¶ 78-79.)

The defendant has now moved for summary judgment on the remaining claims. As to the individual plaintiffs, it argues that the members of a joint venture cannot raise any claims on behalf of the joint venture, and that all claims pleaded in the Second Amended Complaint are Intellivision's, rather than the individual plaintiffs'. (Def.'s Mem. 9-11.) The plaintiffs respond by arguing that "the individual plaintiffs (and not Intellivision) owned [the] Patent Applications" and that "the individual plaintiffs (and not Intellivision) assign[ed] to Microsoft all of their right, title and interest in each of the . . . Patent Applications." (Pls.' Mem. 24-25.)

With respect to both misrepresentation claims, the defendant argues that the statute of limitations under Connecticut law has run, and that the claims are, in any event, meritless. (Def.'s Mem. 11-20.) The plaintiffs argue that Intellivision's claims are actually governed by New York law,

because Intellivision was "at all relevant times a New York-domiciled joint venture," and that even under the shorter Connecticut statute of limitations there are disputed issues of material fact as to when their claims accrued and whether a "continuous course of conduct" tolled the running of the statute. (Pls.' Mem. 27-32). Additionally, the plaintiffs at times appear to argue that their claims as individual plaintiffs are governed variously by Connecticut, New York, and New Jersey law.

As to the claimed breach of fiduciary duty, the defendant argues that the Agreement created no such duty and that any duty was not, in any event, breached, while the plaintiffs argue that issues of material fact exist on both points. (Def.'s Mem. 20-25; Pls.' Mem. 33-35.)

## IV.

The Second Amended Complaint added Adams, Daniels, and Hoffman as individual plaintiffs. The defendant argues that the individual plaintiffs lack standing to assert any claims because "it was Intellivision that negotiated the sale of the patent applications to Microsoft, it was Intellivision that entered into the assignment agreement with Microsoft, and it was in their capacity as 'Intellivision's principals' that Messrs.

Adams, Hoffman and Daniels executed the assignment agreement."
(Def.'s Mem. 10 (citations omitted).)

The plaintiffs allege that "Intellivision never owned the .
. . Patent Applications." (Pls.' Mem. 23.) Rather, "the
individual plaintiffs (and not Intellivision) assign[ed] to
Microsoft all of their right, title and interest in each of the
. . . Patent Applications." (Id. at 24.) Thus, "their individual
claims do not seek to recover on any obligation owed to the
joint venture Intellivision." (Id. at 25.) The plaintiffs have
attempted to support this assertion by moving to supplement the
summary judgment record to add the Agreement's "Exhibit A," an
assignment from Daniels to Adams and Hoffman of one-third shares
in several of the Patent Applications, as well as sundry other
documents. Because the individual plaintiffs owned the Patent
Applications at the time of the Agreement, the plaintiffs argue,
the individual plaintiffs are suing for their own injuries,
because the individual plaintiffs were induced to transfer their
patent rights and Microsoft's $850,000 obligation was owed to
the individual plaintiffs.

A.

The plaintiffs' current claims directly contradict their
representations at every previous stage of this case. In the

11

original Complaint and the First Amended Complaint, as well as in the plaintiffs' submissions to the Court, the Patent Applications were uniformly described as Intellivision's property and as assigned by Intellivision, and Microsoft's duties were described as owed to Intellivision. (See, e.g., Compl. ¶¶ 20, 22, 26, 28-29, 32-33, 35, 37, 40-41; FAC ¶¶ 19-21, 27, 40, 48, 52, 57-58, 60-62, 67, 72-75.)[2] The plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Complaint, for example, stated that "Intellivision developed the inventions it assigned to Microsoft" (Pls.' Mem. Opp'n Def.'s Mot. Dismiss FAC 16); that Microsoft acquired "Intellivision's assets" (id. at 3); that Intellivision had the "right to receive [the $850,000]" (id. at 34); and that Intellivision "execut[ed] . . . the patent application assignments comprising Attachment B of the Agreement" (id. at 3). Similarly, the plaintiffs based their arguments at earlier stages of the case on the representation that Intellivision was the party in interest. For example, in arguing that the torts occurred in New York, rather than in Connecticut, the plaintiffs focused exclusively on where Intellivision was located and thus

---

[2] The Second Amended Complaint makes identical representations. (See, e.g., SAC ¶¶ 19-21, 27, 40, 48, 52, 56-58, 61-62, 64-66, 71, 78-81.) In amending the First Amended Complaint, the plaintiffs altered none of the allegations stating that Intellivision owned and assigned the Patent Applications and was damaged by Microsoft's alleged conduct, and did not add any allegations indicating the individual plaintiffs' purported ownership. The individual plaintiffs were added as plaintiffs without any additional substantive allegations other than their residences. Intellivision is described as a "joint venture formed by plaintiffs Daniels, Adams and Hoffman." (SAC ¶ 6.)

felt any harm from Microsoft's alleged conduct.  (Pls.' Reply
Mem. of Law in Further Supp. of Pls.' Mot. to Supplement Summ.
J. Record ("Pls.' Supplementation Reply Mem.") at 16 (March 28,
2008 Ltr. of Bruce D. Katz, at 2).) Although the plaintiffs once
included a glancing mention of New Jersey in a list of states
that had "contacts" with the litigation, they never in any way
suggested that the places of residence of the individual
plaintiffs or the locations of their ownership interests were
relevant to the choice of law inquiry. (Id. at 12 (Feb. 1, 2008
Ltr. of Bruce D. Katz, at 2).)

     The federal doctrine of judicial estoppel bars a party from
"tak[ing] a position that is inconsistent with one taken in a
prior proceeding" if the first position was "adopted by the
tribunal to which it was advanced." Sticthing Ter Behartiging
Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van
Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 45 (2d Cir. 2005).
See also Rodal v. Anesthesia Group of Onondaga, P.C. 369 F.3d
113, 119 (2d Cir. 2004) ("[A] court must carefully consider the
contexts in which apparently contradictory statements are made
to determine if there is, in fact, direct and irreconcilable
contradiction."); Vitrano v. State Farm Ins. Co., No. 08 Civ.
103, 2009 WL 3365866, at *4 (S.D.N.Y. Oct. 19, 2009) (federal

judicial estoppel doctrine applies in diversity cases, rather than state judicial estoppel doctrine).[3]

The Supreme Court has identified three factors that inform a judicial estoppel inquiry: first, whether a party's current position is "clearly inconsistent with its earlier position"; second, whether a court "accept[ed] that party's earlier position"; and third, whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001) (internal quotation marks omitted); accord In re Adelphia Recovery Trust, --- F.3d ----, 2011 WL 420428, at *14 (2d Cir. Feb. 8, 2011); DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010). In the Second Circuit, judicial estoppel is limited to "situations where the risk of inconsistent results with its

---

[3] Although the defendant did not formally raise judicial estoppel in response to the plaintiffs' new argument, it emphatically argued that Intellivision's "new assertion is at odds with the evidentiary record and Intellivision's prior representations to the Court." (Def.'s Rep. Mem. 2.) Courts may raise the issue of judicial estoppel sua sponte "because judicial estoppel concerns the integrity of the judicial system independent of the interests of the parties," see In re Airadigm Commc'ns Inc., 616 F.3d 642, 661 n.14 (7th Cir. 2010), although at least one Court of Appeals has held that they may only do so in "especially egregious cases," Beall v. United States, 467 F.3d 864, 870 (5th Cir. 2006) (internal quotation marks and brackets omitted)). In any event, the Court directed the parties to address the issue of judicial estoppel in post-argument submissions, and the plaintiffs had ample opportunity to oppose the application of judicial estoppel. See Casanova v. Pre Solutions, Inc., No. 06-12417, 228 Fed. App'x 837, 841 n.6 (11th Cir. Mar. 28, 2007) ("Because Plaintiff had full opportunity to respond to the [judicial estoppel] argument below, the district court did not abuse its discretion, even if the court considered the issue sua sponte.").

impact on judicial integrity is certain." DeRosa, 595 F.3d at 103 (internal quotation marks omitted).

The plaintiffs argue that the Court of Appeals for the Second Circuit maintains an additional requirement, applying judicial estoppel only when a prior inconsistent position was taken in a "prior separate proceeding," Adler v. Pataki, 185 F.3d 35, 41 n.3 (2d Cir. 1999), where "proceeding" is interpreted as an entire action rather than a stage in an action. See id. (refusing to apply judicial estoppel where a party's representations on appeal were inconsistent with its representations before the district court); Tuff-N-Rumble Mgmt., Inc. v. Sugarhill Music Publ'g, 99 F. Supp. 2d 450, 457 n.3 (S.D.N.Y. 2000). Subsequent Supreme Court precedent has eliminated this requirement, however, and recent Second Circuit cases have not followed it. See Pegram v. Herdrick, 530 U.S. 211, 228 n.8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." (emphasis added)); see also Stichting, 407 F.3d at 45 (considering whether a party should be judicially estopped for taking "a position in their first motion to dismiss that was actually inconsistent with that taken on the current motion").

All three prongs of the judicial estoppel test are satisfied in this case. First, the plaintiffs' new position is

"clearly inconsistent" with the position Intellivision took at
an earlier proceeding in this action. The plaintiffs' prior
submissions unambiguously state that Intellivision owned and
assigned the Patent Applications, and that Microsoft's duties
were owed to Intellivision. The plaintiffs' new argument
explicitly contradicts this earlier position.

Second, the plaintiffs' initial representations were
adopted by the Court in its disposition of the defendant's
motion to dismiss the First Amended Complaint. See, e.g.,
Intellivision, 2008 WL 3884382, at *2 ("Intellivision entered
into an agreement in which Intellivision agreed to assign its
patent applications to Microsoft . . . ."); id. at *3
(referencing "the patent applications assigned by Intellivision
to Microsoft pursuant to the Agreement"). Indeed, the
proposition that Intellivision was the party in interest
informed the Court's determination in the 2008 Order that the
case was governed by Connecticut law because the Court relied on
Intellivision's principal place of business in Connecticut, as
listed in the Agreement; this, in turn, contributed to the
Court's holding that Intellivision's claim for negligent
misrepresentation could not be dismissed. See id. at *6-7
("Microsoft argues that Intellivision has failed to state a
claim for negligent misrepresentation, but does so under New
York law. Under Connecticut law . . . there is no basis to

dismiss the claim for negligent misrepresentation."). The Court also rejected Microsoft's reliance on a disclaimer in the Agreement as a bar to the claims for fraudulent and negligent misrepresentation because the disclaimer was not a bar to such claims under Connecticut law, although it would be under New York law. See id. at *5-6. The Court thus "accepted the accuracy of the [plaintiffs'] statements" when it partially denied the defendant's motion to dismiss. Adelphia Recovery Trust, 2011 WL 420428, at *14.

Third, the plaintiffs' eleventh-hour recharacterization of the facts of the case appears to be a transparent attempt to circumvent the Court's previous conclusion that the Connecticut statute of limitations governed various claims, a holding that (as discussed below) is dispositive of two of the plaintiffs' claims. The plaintiffs' new position was also first broached more than a year after the close of fact discovery and two months after the defendant had moved for summary judgment, leaving the defendant unable to develop the facts needed to respond to the plaintiffs' argument. Thus the plaintiffs would both "derive an unfair advantage" and "impose an unfair detriment on the opposing party if not estopped". New Hampshire, 532 U.S. at 751.

These same facts satisfy the Second Circuit's requirement that allowing a change in position would risk inconsistent

results and undermine judicial integrity. See DeRosa, 595 F.3d
at 103. A court cannot ignore a party's opportunistic use of
inconsistent representations when one allegation serves an
argument at one stage of a case and the other serves an argument
at a later stage. The purpose of judicial estoppel is to
"protect the integrity of the judicial process by prohibiting
parties from deliberately changing positions according to the
exigencies of the moment." New Hampshire, 532 U.S. at 749-50
(internal quotation marks and citation omitted); accord
Adelphia, 2011 WL 420428, at *14. Accepting the plaintiffs'
situational about-face would undermine the integrity of the
judicial process and the ability of courts to accept and rely
upon the unequivocal representations of parties.

     The plaintiffs' counsel, in his voluminous post-argument
filings,[4] argues that the omission of the individual plaintiffs
from the Complaint and First Amended Complaint was an innocent
error on counsel's part, and that he never intended to make any
"representation of fact concerning ownership of the patent

---

[4] The defendant argues that many of the plaintiffs' post-argument filings are
"unauthorized sur-replies and thus should be disregarded." (Microsoft's Opp'n
to Pls.' Mot. to Include Additional Evidence in Summ. J. Record ("Def.'s
Supplementation Opp'n Mem.") at 2 n.2.) The defendant is correct that the
Court need not consider many of these untimely, multiplicative, and
unauthorized filings. See, e.g., A.B.C. Home Furnishings, Inc. v. Town of E.
Hampton, 964 F. Supp. 697, 703 (E.D.N.Y. 1997). However, because none of the
arguments or factual assertions made therein affect the outcome of the case,
the Court will consider the representations made in the plaintiffs' post-
argument filings. For similar reasons, the Court will consider the material
that the plaintiffs seek to add to the record, although the plaintiffs'
motion to amend will be denied as moot.

applications" by using "Intellivision" as a "shorthand notation" for both the individual plaintiffs and their joint venture. (Jan. 10, 2011 Ltr. of Bruce D. Katz at 1-2; see also Dec. 15, 2010 Ltr. of Bruce D. Katz at 5 & n.1.) This argument is wholly unconvincing. Although judicial estoppel does not bar correction of a "good faith mistake or an unintentional error," Simon v. Safelite Glass Corp., 128 F.3d 68, 73 (2d Cir. 1997) (citations omitted), there is absolutely no evidence to support the plaintiffs' argument that they ever used "Intellivision" to refer to anything more than the joint venture in any filing or argument preceding the Second Amended Complaint.[5] As described above, the plaintiffs' original arguments clearly relied on Intellivision's status as an entity to determine the location of the alleged torts. This can only be interpreted as an intentional litigation strategy, rather than an "unintentional error." Even if this were not so, it stretches the definition of a "good faith mistake" beyond recognition to use it to shelter a frequently repeated misstatement going to so central an issue, and one so obviously known to the party seeking to take an inconsistent position, as the identity of the entity or entities bringing a lawsuit and for whom relief was sought.

---

[5] Indeed, even in the Second Amended Complaint, the individual plaintiffs were added as parties, but all of the allegations with respect to the ownership of the Patent Applications continued to name Intellivision, the joint venture, as the owner of the patents for whom relief was sought.

The plaintiffs attempt to shift the blame for any confusion about the identity of the party in interest back on Microsoft, noting that Microsoft did not include Exhibit A in the version of the Agreement included in the summary judgment record. This position borders on disingenuous, given that the plaintiffs do not dispute that the version of the Agreement relied upon by Microsoft is identical to the version of the Agreement attached by the plaintiffs to the First Amended Complaint, produced to Microsoft in discovery, and used by the plaintiffs as an exhibit in deposing Microsoft personnel. (Def.'s Supplementation Opp'n Mem. at 5; see also Pls.' Supplementation Reply Mem.; First Am. Compl. Ex. 1.) Rather, as already noted, Microsoft litigated the case on the basis of the Agreement provided by the plaintiffs and in response to the only plausible reading of the plaintiffs' representations at all prior stages of the case: that Intellivision, rather than the individual plaintiffs, owned and assigned the Patent Applications.[6]

Accordingly, the plaintiffs are estopped from arguing that the individual plaintiffs, rather than Intellivision, owned and assigned the Patent Applications. Instead, they must proceed on the basis of the position that they previously maintained: that

---

[6] Similarly, the plaintiffs' repeated reference Microsoft's failure to oppose the motion to file a second amended complaint is immaterial, at best, given the fact that the SAC did not add any substantive allegations relating to the individual plaintiffs.

Intellivision was the owner of the Patent Applications and the party to which Microsoft was obligated.[7]

B.

As the defendant argues, Intellivision's ownership of the Patent Applications disposes of the individual plaintiffs' claims. The parties agree that a joint venture may not assert the claims of its members and its members may not assert claims on its behalf. (Pls.' Mem. 24-25; Def.'s Mem. 10.) See M.I.F. Sec. Co. v. R.C. Stamm & Co., 463 N.Y.S.2d 771, 775 (App. Div. 1983), aff'd, 459 N.E.2d 193 (N.Y. 1983) ("A partnership may not assert the claim of an individual partner, any more than an individual partner may assert the claim of the partnership." (citation omitted)); see also Doe v. Yale Univ., 748 A.2d 834,

---

[7] The plaintiffs note in their post-argument briefing that this conclusion could call into question the validity of the patent application assignments, because those assignments could be read to identify the individual plaintiffs, rather than Intellivision, as the assignors. Cf. FilmTec v. Allied-Signal Inc., 939 F.2d 1568, 1572 (Fed. Cir. 1991) (holding that an assignment from an entity that lacks ownership of a patent is a nullity). The plaintiffs do not seek a declaratory judgment as to the ownership of the patent applications, however, and any such claim brought in a subsequent suit would appear to be barred by res judicata because it could have been brought in this action. See Bank of N.Y. v. First Millenium, Inc., 507 F.3d 905, 918 (2d Cir. 2010). That said, should Microsoft seek to enforce its putative ownership rights over any patents to which it allegedly holds title through the assignments, a defendant would likely be able to raise the possible invalidity of the assignments as part of a motion to dismiss for lack of standing. See Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 583 F.3d 832, 848-49 (Fed. Cir. 2009), cert. granted, 78 U.S.L.W. 3581 (U.S. Nov. 1, 2010) (No. 09-1159). Microsoft, however, as the party relying on judicial estoppel, appears perfectly satisfied to live with any such consequence.

854 (Conn. 2000) (under Connecticut law, "joint ventures are generally governed by the same principles that govern common-law partnerships"); <u>Gramercy Equities Corp. v. Dumont</u>, 531 N.E.2d 629, 632 (N.Y. 1988) (same under New York law).

The causes of action in the Second Amended Complaint are Intellivision's, rather than the individual plaintiffs'. The fraudulent inducement and negligent misrepresentation claims are based on the premise that Microsoft's alleged misrepresentations induced Intellivision to transfer its property rights on "less advantageous" terms than it would otherwise have contracted for. (SAC ¶ 62.) The fiduciary duty claim is similarly based on Microsoft's alleged "duty to diligently prosecute the patent applications assigned by Intellivision" and to "pay Intellivision $850,000." (<u>Id.</u> ¶¶ 78-79.) Accordingly, all of the claims in the Second Amended Complaint are dismissed for lack of standing insofar as they are pleaded on behalf of the individual plaintiffs.[8]

---

[8] If judicial estoppel did not apply, it is by no means clear that the record would require a finding that the individual plaintiffs owned the Patent Applications as individuals, rather than as joint venturers. The assignments signed by the three individual plaintiffs all state that the three individual plaintiffs "jointly own" the Patent Applications, suggesting, in contradiction to Hoffman's declaration, that the individual plaintiffs owned the property as joint venturers. (<u>See</u> Agreement at Ex. B.) The only individual assignment was from John Daniels, the inventor, who was a resident of Connecticut, and whose residence would not support the summary judgment arguments being made by the plaintiffs which rely on a residence other than Connecticut. Moreover, as discussed below, summary judgment would be appropriate even if the individual plaintiffs had standing to bring the claims in the Second Amended Complaint.

**V.**

The defendant next argues that the claims for fraudulent
inducement and negligent misrepresentation are barred by the
statute of limitations. In the 2008 Order, the Court determined
that Intellivision had its principal place of business in
Connecticut, that "for the purposes of the choice of law
analysis, the alleged fraud and negligent misrepresentations
occurred in Connecticut," and that "New York's choice of law
rules require the application of Connecticut law to the
plaintiff's claims for fraudulent inducement and negligent
misrepresentation." See Intellivision, 2008 WL 3884382, at *6.
Under Connecticut law, the statute of limitations for fraud is
three years and the statute for negligent misrepresentation is
two years from accrual or discovery, and, in any event, three
years from the date of the act or omission complained of. See
Conn. Gen. Stat. §§ 52-577, 52-584; see also N.Y.C.P.L.R. § 202
(where a cause of action filed by a non-resident plaintiff
accrues outside New York, courts apply the statute of
limitations of either New York or the state where the cause of
action accrued, whichever is shorter).[9]

---

[9] Although Connecticut law governs the plaintiffs' substantive claims to the
extent it conflicts with New York law, New York law governs procedural issues
such as the statute of limitations. See Gerena v. Korb, 617 F.3d 197, 206 (2d
Cir. 2010).

The plaintiffs argue that Intellivision's fraudulent inducement and negligent misrepresentation claims are timely for three reasons. First, they argue that Intellivision's claims are not governed by Connecticut law, because "Intellivision was at all relevant times a New York–domiciled joint venture." (Pls.' Mem. 28.) Second, they argue that disputed issues of material fact exist as to when the two claims accrued. (Pls.' Mem. 29-31.) Third, they argue that disputed issues of material fact exist as to whether Microsoft engaged in a "continuing course of conduct" tolling the statute of limitations. (Pls.' Mem. 31-32.)

A.

1.

The choice of law analysis applicable to this case was set out at length in the 2008 Order, see Intellivision, 2008 WL 3884382, at *4-6, and need only be restated briefly. The Court applied settled law to hold that "[a] federal court sitting in diversity applies the choice of law rules of the state in which it sits" — here, New York — and that New York used "interest analysis" to determine the applicable law where a conflict of laws exists. Id. at *4. Relying on the fact that "Intellivision's principal place of business is listed as Connecticut" in the Agreement, the Court concluded that "the

24

alleged fraud and negligent misrepresentations occurred in Connecticut" and that, "[a]s a result, to the extent there is an actual conflict between the law of New York and the law of Connecticut, New York's choice of law rules require the application of Connecticut law to the plaintiff's claims for fraudulent inducement and negligent misrepresentation." Id. at *6.

The plaintiffs argue that this conclusion was erroneous and that "Intellivision was at all relevant times a New York-domiciled joint venture." (Pls.' Mem. 28.) The designation of Connecticut as Intellivision's principal place of business in the Agreement, they allege, was made for the following reason:

> Intellivision's principals decided that John Daniels' Connecticut address would become the location of Intellivision's principal place of business simultaneously with the January 2001 execution of the parties' Agreement. This decision was based on the contemplated assignment to Microsoft of all of Intellivision's intellectual property and its resulting need to cease any further development of interactive television technology on the date of execution of the parties' Agreements. Since John Daniels, a Connecticut resident, had already entered into a two-year consulting agreement with Microsoft that required him to continue to develop interactive television technologies on behalf of Microsoft, the parties decided that John Daniels' Connecticut address would become the location of Intellivision's principal place of business simultaneously with the January 2001 execution of the parties' Agreement. However, when John Daniels moved from his Seymour, Connecticut residence two months after execution of the Agreement, Intellivision vacated its office in Seymour, which was in close proximity to John's residence. As a result, Intellivision's principal (and only) place of business

> reverted back to New York City within two months after
> execution of the parties' Agreement.

(Pls.' Mem. 28.)

As of the close of discovery, no evidence existed to support this convoluted assertion. Instead, all evidence on the summary judgment record as it initially stood showed the contrary. The Agreement expressly stated that Intellivision's principal place of business was in Connecticut. (Agreement at 1.) Similarly, Adams stated in his deposition that Intellivision's offices were originally in Connecticut, were still in Connecticut, and that "it's always been in Connecticut." (Frame Aff. Ex. 5 at 33.)

After the defendant moved for summary judgment, the plaintiffs filed a new declaration by one of the individual plaintiffs averring the facts quoted above. (See Decl. of Paul Hoffman at 22-23.) Additionally, the plaintiffs' post-argument motion to supplement the record included various documents that purport to show that Intellivision was based in New York as of 1999. (Dec. of Bruce Katz Ex. E, F, G.)

Even if the plaintiffs' new assertion were taken as fact, it would not change the choice of law analysis. The plaintiffs' new argument concedes that Intellivision's principal place of business was in Connecticut at the time that the Agreement was signed. This alone makes Connecticut the state of the

defendant's alleged tortious conduct. The place of a tort "is the state where the last event necessary to make an actor liable for an alleged tort takes place." Restatement (First) of Conflict of Laws § 377; see also Intellivision, 2008 WL 3884382, at *5. As discussed below, both the alleged fraud and the alleged negligent misrepresentation were complete and actionable at the time that the Agreement was signed and the plaintiffs gave consideration by binding themselves to assign the patent applications to Microsoft.[10] Because Intellivision's principal place of business was, "simultaneously" with that exchange (Pls.' Mem. 28), in Connecticut, the tort occurred in Connecticut for the purposes of a choice of law analysis. The plaintiffs' additional allegations are immaterial to the choice of law analysis. See, e.g., Besser v. E.R. Squibb & Sons, Inc., 539 N.Y.S.2d 734, 739 (App. Div. 1989) ("[A] plaintiff can avoid the operation of CPLR 202 only if she was a New York resident at the time her cause of action accrued.").

There is therefore no reason to depart from the Court's conclusion in the 2008 Order that Connecticut law should apply to these two claims. See Intellivision, 2008 WL 3884382, at *5-

---

[10] The plaintiffs maintained at argument that Intellivision did not give consideration until sometime after the Agreement was signed, because the assignments were conditioned on Microsoft's paying Intellivision. (See Agreement at 2.) This argument is meritless. See Osborne v. Locke Steel Chain Co., 218 A.2d 526, 531 (Conn. 1966) ("An exchange of promises is sufficient consideration to support a contract."); Hamer v. Sidway, 27 N.E. 256, 257 (N.Y. 1891) ("It is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him." (internal quotation marks omitted)).

6. Accordingly, under N.Y. C.P.L.R. § 202, the claims are time-barred unless they would be timely under both Connecticut's statute of limitations and New York's statute of limitations.

2.

Moreover, even if the individual plaintiffs were the true parties in interest on the claims of fraudulent misrepresentation and negligent misrepresentation, their claims would still have accrued in Connecticut. As a general rule of New York tort law, "[w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." Global Fin. Corp. v. Triarc Corp., 715 N.E.2d 482, 485 (N.Y. 1999). However, in "unusual circumstances," an economic injury may "occu[r] at a place other than the plaintiff's residence." Baena v. Woori Bank, No. 05 Civ. 7018, 2006 WL 2935752, at *6 (S.D.N.Y. Oct. 11, 2006) (internal quotation marks omitted). Such circumstances may exist "[w]here a plaintiff 'maintains a separate financial base' and where the impact of the financial loss is felt at that location." Id. (quoting Global Fin. Corp., 93 N.Y.2d at 510); accord Lang v. Paine, Webber, Jackson & Curtis, Inc., 582 F. Supp. 1421, 1425-26 (S.D.N.Y.1984).

Here, unusual circumstances exist making Connecticut the appropriate state of accrual even if the individual plaintiffs held ownership interests apart from the joint venture. The individual plaintiffs entered the Agreement both individually and as a joint venture, and referred throughout the Agreement to both themselves and their joint venture collectively as "ITV," making no distinction whatsoever between the plaintiffs and the joint venture. The Agreement provided for payment to ITV. (Agreement at 3.)[11] It stated that ITV's principal place of business was in Connecticut and required that notice be sent to ITV's business address in Connecticut. (Id. at 1, 5.) In short, the thrust of the entire agreement was to treat both the individual plaintiffs and their joint venture as a single entity having its principal place of business in Connecticut. The plaintiffs purposely located the base of their business dealings in Connecticut, insofar as the Agreement is concerned. Cf. Lang,

---

[11] The plaintiffs claim that "Microsoft issued three separate checks directly to Messrs. Daniels (in Connecticut), Adams (in New Jersey) and Hoffman (in New York) to pay them individually for acquisition of their patent applications." (Pls.' Mem. of Law in Support of Pls.' Mot. to Include Additional Evidence in Summ. J. Record ("Pls.' Supplementation Mem.") at 3-4.) There is no evidence to support this claim in the record. The deposition transcript to which this factual claim is cited says no such thing; rather, it states that Microsoft made an "initial payment . . . of $1 million" and that "[t]he payment was broken up" between the three plaintiffs. (Hoffman Dep. at 54.) No explicit mention is made of how Microsoft made this payment. If anything, this testimony contradicts the plaintiffs' post-argument representation; it states that Microsoft made "an initial payment" and occurs in the context of a discussion of how the individual plaintiffs shared the revenue from "the activities of . . . the Intellivision group." (Id. at 53-54 (emphasis added).) Moreover, it would be irrelevant how the joint venturers requested that the payment to the joint venture be paid, whether singly or in individual checks to the participants in the joint venture to whom the payment was owed.

582 F. Supp. at 1426 ("Although Lang resides in Ottawa, insofar as this case is concerned, his financial base is in Massachusetts.").

Given that the plaintiffs chose to center the Agreement in Connecticut, it would be appropriate to fix the place of the alleged injury occurring from the signing of that contract in Connecticut. It would be needlessly complicated to treat the plaintiffs' claims as subject to three different state-law regimes. Indeed, the plaintiffs have never briefed the Court on New Jersey law, which, under their interpretation, would apply to Adams's claims, illustrating just how far-ranging the inquiry would need to be if each joint venturer were treated separately for purposes of the claims' accrual. Moreover, to do so would be inequitable: although the joint venturers' claims in a case such as this are substantively indistinguishable, some would be barred from suit and some may not be barred by a statute of limitations, based solely on the places of residence of individual joint venturers. Thus, in this case, Paul Daniels, the inventor who created the inventions subject to the Patent Applications and the joint venturer so central to Intellivision that its principal place of business was located down the street from his home in Connecticut, would be barred from any recovery, while one or more of his joint venturers might not be. The plaintiffs have not identified any case in which a cause of

fraudulent inducement or negligent misrepresentation in the
inducement of a contract signed by a group of partners or joint
venturers was deemed to accrue in multiple states and thereby
carved up in such a fashion, and have provided inadequate reason
to do so here.

Accordingly, were the individual plaintiffs proper
plaintiffs in this case, their causes of action would still be
found to have accrued in Connecticut for purposes of the choice
of law analysis.

B.

The plaintiffs next argue that their fraudulent inducement
and negligent misrepresentation claims did not accrue when
Intellivision executed the contract or learned of Microsoft's
alleged misrepresentations. At that time, the plaintiffs claim,
they "could not have asserted a claim for relief" because
Ultimate TV, Microsoft's first product allegedly using
Intellivision's core technology, "was a commercial failure and a
financial loss" and therefore "plaintiffs' had [sic] no monetary
damage" and "could not then assert a claim for monetary relief."
(Pls.' Mem. 30.)

31

This argument is meritless. Under Connecticut law,[12] the fraudulent inducement and negligent misrepresentation claims accrued when Intellivision executed the Agreement, that is, in January 2001. At this time, Intellivision allegedly had been induced by false representations to execute a contract it would not otherwise have entered into. See Bello v. Barden Corp., 180 F. Supp. 2d 300, 310 (D. Conn. 2002) ("[Section 52-577] is an occurrence statute, so the limitations period begins to run at the moment the act or omission complained of occurs. The start of the running of the limitations period is not delayed until the cause of action has accrued or the injury has occurred. It is not delayed until the date when the plaintiff first discovers the injury." (citations omitted)); Nardi v. AA Elec. Sec. Eng'g, Inc., 628 A.2d 991, 994 (Conn. App. 1993) ("[Under § 52-584], in no event shall a plaintiff bring an action 'more than three years from the date of the act or omission complained of . . . .' The statutory clock on this three year time limit begins running when the negligent conduct of the defendant occurs.") Intellivision could have sued for rescission of the contract on either claim — and, by its own uncontroverted admissions, contemplated doing so (Hoffman Dep. at 183, Frame Aff. Ex. 5

---

[12] The plaintiffs maintained at argument that federal law governs the date of claim accrual in a diversity case. This argument is without merit. See Woods v. Interstate Realty Co., 337 U.S. 535, 538 (1949) (requiring a federal court in a diversity action to look to forum law to determine the date of accrual and limitations period applicable to a cause of action).

("Adams Dep.") at 191-92) — even if its damages were uncertain. Therefore, the causes of action accrued in January 2001 and the statutes of limitations had expired before the filing of suit in January 2007 if they were not tolled.

C.

The plaintiffs argue that, even if the fraudulent inducement and negligent misrepresentation claims accrued when the contract was executed, they were tolled because Microsoft's actions consisted of "a continuing course of conduct." (Pls.' Mem. 31-31.) According to the plaintiffs, Microsoft made additional "post-contractual misrepresentations" that "relate to its original misrepresentation," which had the effect of tolling the statute under Connecticut's continuing course of conduct doctrine. That doctrine, however, "has no application after the plaintiff has discovered the harm." Rosato v. Mascardo, 844 A.2d 893, 899 (Conn. App. 2004). Here, the plaintiffs do not dispute their discovery of the alleged misrepresentations "within months of the January 2001 execution of the parties' Agreement." (Pls.' Mem. 30.) The plaintiffs confuse concealment of the extent of damage with concealment of the fact of damage; the latter may be grounds for tolling, but the former is not. Here, the plaintiffs could have chosen to sue at that time to rescind the contract

based on allegedly material misstatements, and indeed considered
doing so. Therefore, there is no basis for applying the
continuing course of conduct to plaintiffs' claims, and the
claims for fraudulent inducement and negligent misrepresentation
must be dismissed as time-barred.[13]

## VI.

Finally, the defendant argues that it owed no fiduciary
duty to Intellivision and that, even if it did, the evidence
does not create a disputed issue of material fact as to whether
it breached that duty.

Because there is no conflict between New York and
Connecticut law respecting breach of fiduciary duty, as the
parties agreed at oral argument, the Court applies New York law
to this claim. See Intellivision, 2008 WL 3884382, at *4. Under
New York law, a claim for breach of fiduciary duty requires a
fiduciary relationship between the parties and a breach of that
duty. See id. at *8; see also Cramer v. Devon Group, Inc., 774
F. Supp. 176, 184 (S.D.N.Y. 1991). "A fiduciary relation 'exists
between two persons when one of them is under a duty to act for
or to give advice for the benefit of another upon matters within

---

[13] Because the fraudulent inducement and negligent misrepresentation claims
are time-barred, there is no need to consider the defendant's additional
arguments that they should be dismissed on the merits.

the scope of the relation.'" EBC I, Inc. v. Goldman Sachs & Co.,
832 N.E.2d 26, 31 (N.Y. 2005) (quoting Restatement (Second) of
Torts § 874 cmt. a); see also Abercrombie v. Andrew Coll., 438
F. Supp. 2d 243, 274 (S.D.N.Y. 2006) ("[A] fiduciary duty exists
where one assumes control and responsibility over another, or
where one has a duty, created by his undertaking, to act
primarily for the benefit of another in matters connected with
his undertaking."). Such a relationship may be created by
contract. See, e.g., Mandelblatt v. Devon Stores, Inc., 521
N.Y.S.2d 672, 676 (App. Div. 1987). However, "fiduciary
relationships typically do not arise between parties engaging in
arms length business transactions, especially those where the
parties are each represented by counsel or other professional
advisors." Abercrombie, 438 F. Supp. 2d at 274 (citation
omitted). "Generally, commercial transactions do not create
fiduciary obligations, absent express language in the contract,
or a prolonged prior course of dealings between the parties
establishing the fiduciary relationship." DFP Mfg. Corp. v.
Northrop Grunman Corp., No. 97 Civ. 4494, 1999 WL 33458384, at
*9 (E.D.N.Y. Mar. 23, 1999).

The Agreement between Intellivision and Microsoft obligated
Microsoft to make an $850,000 payment to Intellivision if a
patent having an enforceable patent claim consisting of the
language set forth in Attachment C was issued. The plaintiffs

argue that this sufficed to give Microsoft a fiduciary duty, because "Microsoft assumed responsibility for prosecuting the assigned Intellivision patent applications" and "Plaintiffs' right to the $850,000 payment was dependent upon Microsoft's handling of the assigned applications." (Pls.' Mem. 34.)

This evidence is insufficient as a matter of law to establish a fiduciary duty running from Microsoft to Intellivision. The plaintiffs have alleged no more than a "conventional business relationship." Oursler v. Women's Interart Ctr., Inc., 566 N.Y.S.2d 295, 297 (App. Div. 1991). The Agreement lacks any indication that Microsoft was obligated to pursue the patent applications primarily for Intellivision's benefit, and the plaintiffs do not allege a course of dealing or any representations by Microsoft that would suggest such an obligation. Intellivision, whose principals included an attorney and a patent agent, was a sophisticated party engaged in an arms-length business transaction. See Sebastian Holdings, Inc. v. Deutsche Bank AG, --- N.Y.S.2d ----, 2010 WL 4452176, at *1 (App. Div. Nov. 9 2010) ("Plaintiff's alleged reliance on defendant's superior knowledge and expertise . . . ignores the reality that the parties engaged in arm's-length transactions pursuant to contracts between sophisticated business entities that do not give rise to fiduciary duties."). Under the Agreement, Microsoft owed a contingent payment to Intellivision

in the event that it prosecuted a successful patent claim, an outcome that, according to Intellivision, would be highly profitable to Microsoft. Microsoft's conduct in connection with the Patent Applications was thus undertaken in its own interest, not "primarily for the benefit of" Intellivision. Abercrombie, 438 F. Supp. 2d at 274; cf. 330 Acquisition Co. v. Regency Sav. Bank, F.S.B., 761 N.Y.S.2d 185, 186 (App. Div. 2003) ("[W]here the recipient of [a power of attorney] is acting in his own interest as well as that of the grantor, no fiduciary duty arises."). If a contractual provision such as this were sufficient, on its own, to create a fiduciary duty, then every contingent payment would carry a fiduciary duty, a proposition that finds no support in the law. See City of Hope Nat'l Med. Ctr. v. Genentech, Inc., 181 P.3d 142, 153-54 (Cal. 2008) ("[O]ne party's right to contingent compensation, standing alone, does not give rise to a fiduciary duty.").

Accordingly, because the record would not allow a jury to find that a fiduciary duty existed between the parties, the claim for breach of fiduciary duty must be dismissed.[14]

---

[14] There is therefore no need to consider Microsoft's claim that it did not breach any duty that existed.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically discussed above, they are either moot or without merit.

The defendant's motion for summary judgment is GRANTED. The plaintiffs' motion for leave to supplement the summary judgment record is DENIED as moot. The Clerk is directed to close Docket Nos. 94 and 122, and to enter Judgment dismissing the Second Amended Complaint and closing this case.

**SO ORDERED.**

Dated:    New York, New York
          March 22, 2011

                                    John G. Koeltl
                          United States District Judge